## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. ALAN SACERDOTE, DR. HERBERT SAMUELS, MARK CRISPIN MILLER, MARIE E. MONACO, DR. SHULAMITH LALA STRAUSSNER, AND JAMES B. BROWN, individually and as representatives of a class of participants and beneficiaries on behalf of the NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration and the New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration, | CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |
| *Plaintiffs*, | |
| v. | |
| NYU LANGONE HOSPITALS (f/k/a NYU HOSPITALS CENTER), NYU LANGONE HEALTH SYSTEM (a/k/a NYU SCHOOL OF MEDICINE), RETIREMENT PLAN COMMITTEE, RICHARD BING, MICHAEL BURKE, CATHERINE CASEY, MARTIN DORPH, SABRINA ELLIS, THOMAS FEUERSTEIN, ANDREW GORDON, PATRICIA HALLEY, TIM HESLER, KATHLEEN JACOBS, MARINA KARTANOS, ANN KRAUS, MARGARET MEAGHER, CYNTHIA NASCIMENTO, NANCY SANCHEZ, TINA SURH, LINDA WOODRUFF, MAURICE MAERTENS, JOSEPH MONTELEONE, RAY OQUENDO, AND CHRIS TANG, | |
| *Defendants*. | |

## COMPLAINT

1.      Plaintiffs Dr. Alan Sacerdote, Dr. Herbert Samuels, Mark Crispin Miller, Marie E. Monaco, Dr. Shulamith Lala Straussner, and James B. Brown, individually and as representatives of a class of participants and beneficiaries of the New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration and the NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (herein collectively referred to as the "Plans"), bring this action under 29 U.S.C. §1132(a)(2) on behalf of the Plans against Defendants the Retirement Plan Committee, Richard Bing, Michael Burke, Catherine Casey, Martin Dorph, Sabrina Ellis, Thomas Feuerstein, Andrew Gordon, Patricia Halley, Tim Hesler, Kathleen Jacobs, Marina Kartanos, Ann Kraus, Margaret Meagher, Cynthia Nascimento, Nancy Sanchez, Tina Surh, Linda Woodruff, Maurice Maertens, Joseph Monteleone, Ray Oquendo, Chris Tang, the NYU School of Medicine, and the NYU Hospitals Center for breach of fiduciary duties under ERISA.[1]

2.      ERISA's fiduciary duties "are those of trustees of an express trust—the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982); 29 U.S.C. §1104(a). In exercising those duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *See Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants,"

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

2

*DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original), and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015).

3.     Defined contribution plans with billions of dollars in assets, like the Plans—which are among the largest 0.06% of defined contribution plans in the United States—have tremendous bargaining power in the marketplace for retirement plan services, and can demand high-quality administrative and investment management services at low cost. As fiduciaries to the Plans, Defendants are obligated to limit the Plans' expenses to a reasonable amount, to ensure that *each* fund in the Plans is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plans; and to analyze the costs and benefits of alternatives for the Plans' administrative and investment structure. Defendants must make those decisions for the exclusive benefit of participants, and not for the benefit of conflicted third parties, such as the Plans' service providers.

4.     Instead of using the Plans' bargaining power to reduce expenses and exercising independent judgment to determine what investments to include in the Plans, Defendants squandered that leverage by allowing the Plans' conflicted third party service providers—TIAA-CREF and Vanguard—to dictate the Plans' investment lineup, to link its recordkeeping services to the placement of investment products in the Plans, and to collect unlimited asset-based compensation from their own proprietary products.

5.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty and to restore to the Plans any profits made through Defendants' use of the Plans' assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## JURISDICTION AND VENUE

6.     **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

7.     **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plans are administered, where at least one of the alleged breaches took place, and where the Defendants reside or may be found.

8.     **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plans suffered millions of dollars in losses traceable to Defendants' fiduciary breaches and remain exposed to

4

harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

a. The named Plaintiffs and all participants in the Plans suffered financial harm as a result of the imprudent or excessive fee options in the Plans because Defendants' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plans if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b. The named Plaintiffs and all participants in the Plans were financially harmed by Defendants' improper bundling of some of the Plans' investment products, improperly allowing the companies to require inclusion of their investment products in the Plans, instead of each investment option being independently selected.

c. The named Plaintiffs' individual accounts in the Plans were further harmed by Defendants' breaches of fiduciary duties because one or more of the named Plaintiffs during the proposed class period (1)

5

invested in the CREF Stock and TIAA Real Estate accounts that were improperly linked to TIAA's other products and services and which Defendants failed to remove from the Plans when it was clear from past poor performance and their excessive fees that they were imprudent investments, at a time when those options suffered losses compared to the performance of numerous prudent alternatives in which those assets would have been invested had Defendants not breached their fiduciary duty (Plaintiffs Monaco, Samuels, and Straussner), (2) invested in excessive-cost investment options, including funds that paid revenue sharing to the Plans' recordkeepers and higher-cost share classes of mutual funds in the Plans which were priced for small investors at a time when far lower-cost but otherwise identical share classes of the same mutual funds were available for inclusion in the Plans because of the enormous size of the Plans, resulting in a loss of retirement savings (all Plaintiffs), and (3) through their investments in those mutual funds and other investments and the fees charged on their investments in those funds, paid a portion of the Plans' excessive administrative and recordkeeping fees, which would not have been incurred had defendants discharged their fiduciary duties to the Plan, and resulting in a loss of retirement savings (all Plaintiffs). Specifically, during the class period, Plaintiff Sacerdote invested in the higher-cost share classes of Vanguard

6

Morgan Growth, Vanguard Explorer, Vanguard Total Bond Market Index, Vanguard Total International Stock Index, and Vanguard Windsor II; Plaintiff Samuels invested in the higher-cost share class of the Vanguard Windsor II, as well as the CREF Global Equities and CREF Growth accounts; Plaintiff Miller invested in the higher-cost share class of the Vanguard Institutional Index; Plaintiff Straussner invested in the higher-cost share classes of Vanguard GNMA, Vanguard High-Yield Corporate, Vanguard Inflation-Protected Securities, and Vanguard Long-Term Treasury, as well as the CREF Bond Market and CREF Global Equities accounts; Plaintiff Brown invested in the higher-cost share classes of Vanguard Long-Term Treasury, Vanguard Prime Money Market, Vanguard Health Care, Vanguard Small Cap Value Index, and Vanguard Energy, at a time when far lower-cost share classes of each of those funds were available to the Plans because of their size. Plaintiff Brown invested in the Vanguard Target Retirement 2015, and Plaintiff Monaco invested in the CREF Global Equities and CREF Growth accounts, each of which paid a portion of the Plans' excessive administrative and recordkeeping fees through revenue sharing payments. Through their investments in these funds, each of the Plaintiffs paid excessive investment management fees and was assessed a portion of the Plans' excessive administrative and recordkeeping fees.

7

## PARTIES

### New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration

9.     New York University ("NYU") is a non-profit corporation organized under New York law with its principal place of business in New York, New York. NYU is the fiduciary responsible for the control, management and administration of the Plans, in accordance with 29 U.S.C. §1102(a). NYU is the Plans' Administrator under 29 U.S.C. §1002(16)(A)(i) with responsibility and complete discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable NYU to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

10.     Specifically, both the Faculty Plan and the Medical Plan provide that the Plan "Administrator" is the University, as defined as New York University, or such other person or committee appointed by the University to administer the Plan. Moreover, both Plans provide that the Plan Administrator is the "Named fiduciary" for purposes of § 402(a)(1) of ERISA.

11.     NYU is a fiduciary to the Plans because it exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of its assets

8

as explained below, and has discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii).

12.     NYU is the employer of those individuals who served on the Retirement Committee as described more fully in the "Defendants" section below. NYU delegated its fiduciary responsibilities with respect to the Plans as set forth in the "Defendants" section.

13.     The New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration ("Faculty Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

14.     The Faculty Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1). The Plan was organized effective January 1, 1952. The Faculty Plan was named the "NYU TIAA-CREF Retirement Plan" until January 1, 1985, the "NYU Retirement Annuity Plan" until September 1, 1990, and its current name thereafter. The Faculty Plan was most recently amended and restated effective January 1, 2014.

15.     The Faculty Plan covers substantially all members of the University's faculty, professional research staff, and administration, other than employees of the School of Medicine, and provides for retirement income for its participants. That retirement income depends upon deferrals of the employee's compensation, contributions made on behalf of each employee by his or her employer, and performance of investment options net of fees and expenses.

9

16.     As of December 31, 2016, the Faculty Plan had $2.6 billion in net assets and 17,299 participants with account balances. It is among the largest 0.04% of defined contribution plans in the United States in terms of assets. Plans of such great size are commonly referred to as "jumbo plans." As such, the Plan has enormous bargaining power by reason of its massive size to command very low investment management and recordkeeping fees for its participants.

**NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration**

17.     The NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration ("Medical Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

18.     The Medical Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1). The Medical Plan was established effective January 1, 2006. The Medical Plan was most recently amended and restated effective January 1, 2016.

19.     The Medical Plan provides for retirement income for employees of the New York University School of Medicine. That retirement income depends upon deferrals of the employee's compensation, contributions made on behalf of each employee by his or her employer, and performance of investment options net of fees and expenses.

20.     As of December 31, 2016, the Medical Plan had $2.0 billion in net assets and 8,481 participants with account balances. This jumbo plan is among the

10

largest 0.06% of defined contribution plans in the United States. As such, the Plan has enormous bargaining power by reason of its massive size to command very low investment management and recordkeeping fees for its participants.

21.     Under the terms of both the Faculty Plan and the Medical Plan, participants are eligible to contribute a discretionary amount of their annual compensation to the Plans, and NYU makes a matching contribution.

22.     The Plans' fiduciaries choose investment options for the Plans and participants invest their assets into these investment options. The Plans offer substantially similar menus of TIAA-CREF and Vanguard investment options consisting of 101 total options in the Faculty Plan, and 81 in the Medical Plan. Defendants exercise exclusive discretionary authority and control over the investment options that are included in the Plans.

**Plaintiffs**

23.     Dr. Alan Sacerdote is a Clinical Professor at the NYU School of Medicine and resides in Brooklyn, New York. He is a participant in the Medical Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

24.     Dr. Herbert Samuels is a Professor of Pharmacology and Professor Medicine at the NYU School of Medicine and resides in New Rochelle, New York. He is a participant in the Medical Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

25.     Mark Crispin Miller is a Professor of Media, Culture, and Communication at NYU and resides in New York, New York. He is a participant in

11

the Faculty Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

26.     Marie Monaco is an Associate Professor in the Department of Neuroscience and Physiology at NYU School of Medicine and resides in New York, New York. She is a participant in the Medical Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

27.     Dr. Shulamith Lala Straussner is a Professor of Social Work at NYU and resides in New York, New York. She is a participant in the Faculty Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

28.     James B. Brown is an Associate Professor at NYU's Tisch School of Arts and resides in New York, New York. He is a participant in the Faculty Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

## Defendants

29.     Upon information and belief, NYU Langone Health System is also known as New York University School of Medicine ("NYU School of Medicine"). NYU Langone Health System is a not-for-profit, organized under New York law with its principal place of business in New York, New York.

30.     According to the Medical Plan's Forms 5500 filed with the Department of Labor, NYU School of Medicine is the administrator of the Medical Plan. NYU School of Medicine is also the Plan administrator under 29 U.S.C. §1002(16)(A)(i)

with responsibility and complete discretionary authority to control the operation, management and administration of the Medical Plan, with all powers necessary to enable NYU School of Medicine to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

31.     The New York University Hospitals Center ("NYU Hospitals Center") is a not-for-profit hospital corporation organized under New York law with its principal place of business in New York, New York. NYU Hospitals Center was renamed NYU Langone Hospitals effective June 30, 2017.

32.     The Plans authorize NYU as the Plans' Administrator to allocate and delegate, by written instrument, any of its fiduciary duties and responsibilities.

33.     Pursuant to this authority, NYU and NYU Hospitals Center constituted the Retirement Plan Committee (the "Committee") to serve as the Plan Administrator for the Plans. The 2012, 2014, and 2017 Retirement Plan Committee Charters set forth that New York University and NYU Hospitals Center established the Committee "to serve as Plan Administrator for the plans of the Plan Sponsors (including plans of New York University School of Medicine) . . . pursuant to authority delegated by the applicable Plan Sponsor."

34.     Under the Committee's charter, effective June 1, 2008, the Committee was charged with responsibility for evaluating, selecting, and monitoring investment options in the Plans.

35.     The charter provides that the Committee will consist of the individuals serving in nine specified offices of NYU or NYU Hospitals Center.

36.     The following persons, who are named as individual Defendants have served or currently serve as members of the Committee and were employed by NYU or by NYU Hospital Centers: Richard Bing, Michael Burke, Catherine Casey, Martin Dorph, Sabrina Ellis, Thomas Feuerstein, Andrew Gordon, Patricia Halley, Tim Hesler, Kathleen Jacobs, Marina Kartanos, Ann Kraus, Margaret Meagher, Cynthia Nascimento, Nancy Sanchez, Tina Surh, Linda Woodruff, Maurice Maertens, Joseph Monteleone, Ray Oquendo, and Chris Tang.

37.     The Committee and its individual members, Richard Bing, Michael Burke, Catherine Casey, Martin Dorph, Sabrina Ellis, Thomas Feuerstein, Andrew Gordon, Patricia Halley, Tim Hesler, Kathleen Jacobs, Marina Kartanos, Ann Kraus, Margaret Meagher, Cynthia Nascimento, Nancy Sanchez, Tina Surh, Linda Woodruff, Maurice Maertens, Joseph Monteleone, Ray Oquendo, and Chris Tang are fiduciaries to the Plans because they exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of their assets, and have discretionary authority or discretionary responsibility in the administration of the Plans, as described in more detail below. 29 U.S.C. §1002(21)(A)(i) and (ii).

## ERISA'S FIDUCIARY STANDARDS

38.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part,

that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the
> interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
> > (i) providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan;
> [and]
>
> (B)     with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a
> like capacity and familiar with such matters would use in the
> conduct of an enterprise of like character and with like aims.

39.     Under ERISA, fiduciaries that exercise any authority or control over

plan assets, including the selection of plan investments and service providers, must

act prudently and for the *exclusive* benefit of participants in the plan, and not for

the benefit of third parties including service providers to the plan such as

recordkeepers and those who provide investment products. Fiduciaries must ensure

that the amount of fees paid to those service providers is no more than reasonable.

DOL Adv. Op. 97-15A (1997); DOL Adv. Op. 97-16A (1997).

40.     "[T]he duty to conduct an independent investigation into the merits of

a particular investment" is "the most basic of ERISA's investment fiduciary duties."

*In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*,

744 F.2d 270, 279 (2d Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A (1998); DOL Adv. Opinion 88-16A (1988). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015).

41.    The general fiduciary duties imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered *per se* violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)   sale or exchange, or leasing, of any property between the plan and a party in interest;
>         * * *
> (C)   furnishing of goods, services, or facilities between the plan and party in interest;
> (D)   transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

16

Section 1106(b) provides, in pertinent part, that:

> [A] fiduciary with respect to the plan shall not –
>
> > (1)     deal with the assets of the plan in his own interest or for his own account,
> >
> > (2)     in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or
> >
> > (3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

42.     Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

43.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

17

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

44.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## BACKGROUND FACTS

## I.    Defined contribution plans, services, and fees.

45.    When ERISA was enacted in 1974, defined benefit pension plans were America's retirement system. Such plans are now rarely available to employees in

the private sector. "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008).

46.     These plans allow employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in the plan has an individual account. Participants direct the plan contributions into one or more investment options in a lineup chosen and assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015).

47.     The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 135 S. Ct. at 1826.

48.     The plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers for the plan, such as a recordkeeper, and for negotiating and approving the amount of fees paid to those administrative service providers. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees which are deducted from the returns that participants receive on their investments.

19

49.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[2] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans like the Plans, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

50.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

51.     Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—*i.e.*, proprietary funds that will generate substantial fee revenue for the provider—or

---

[2] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

## II.   Defined contribution recordkeeping.

52.   Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participants' investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

53.   There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.*, recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business.

54.    Some recordkeepers in the market provide only recordkeeping and administrative services, while others provide both recordkeeping and investment products. The latter group has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing the plan. As explained below, when faced with such conflicted fund recommendations, fiduciaries must independently assess whether the provider's investment product is the best choice for the plan, or whether the purpose of providing benefits to participants would be better accomplished by considering other investment managers who may offer superior funds at a better price.

### III.    Defined contribution investment options.

55.    As noted, defined contribution fiduciaries have exclusive control over the particular investment alternatives available in the plan to which participants direct and allocate their plan accounts, and the returns on which are credited to participants' accounts.

56.    Regulations require that participants be able to choose from at least three investment alternatives, each of which is diversified and has materially different risk and return characteristics. 29 C.F.R. §2550.404c-1(b)(3). Each investment alternative is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income, bonds, or equities. Fixed income funds are generally conservative principal protection options, such as stable value funds. Bond funds invest in diversified portfolios of government or corporate debt securities. Equity funds invest in diversified portfolios of stocks of large, mid-size, or small domestic or

international companies in a particular style such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks and bonds in varying percentages.

57.     Equity and bond funds can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

58.     Investors in a mutual fund own shares of the mutual fund rather than the underlying fund assets. Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[3] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

59.     Many mutual funds offer different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the identical manager, are managed identically, and invest in the same portfolio of

---

[3] One basis point is equal to 1/100th of one percent (or 0.01%).

securities, which provides the same liquidity to all investors in the fund regardless of share class. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise *identical in all respects*. Because the underlying assets are managed at the fund level and investors own shares of the mutual fund, the size and corresponding number of investors in a share class does not influence other aspects of the share class such as their management or returns.

60.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing. The presence of revenue sharing thus provides an incentive for administrative service providers to recommend that the fiduciary select higher cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing.

61.     Although fees are not the only factor that a fiduciary should consider when selecting investments, the importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary

duties. Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (citing Restatement (Third) of Trusts § 90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

62.     Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

63.     In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively-managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2). Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[4] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs…in terms of net returns to investors, active investment must be a negative sum game.").

64.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

65.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance

---

[4] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

66.     Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

## IV.     Revenue sharing: a practice that can lead to excessive fees if not properly monitored and capped.

67.     There are two primary methods for defined contribution plans to pay for recordkeeping and administrative services: "direct" payments from plan assets, and "indirect" revenue sharing payments from plan investments such as mutual funds. Plans may use one method or the other exclusively, or may use a combination of both direct and indirect payments.

68.     In a typical direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain administrative services in exchange for a flat annual fee

27

based on the number of participants for which the recordkeeper will be providing services, for example $30 per participant. Jumbo defined contribution plans possess tremendous economies of scale for purposes of recordkeeping and administrative fees. A plan with 20,000 participants can obtain a much lower fee on a per-participant basis than a plan with 2,000 participants.

69.     A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

70.     As an example, a fiduciary of a 20,000 participant, $2 billion plan may issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 20,000 participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $30 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $600,000 direct annual fee (20,000 participants at $30/participant). If the plan's assets increase to $3 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

71.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from their account. To be sure, the fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $30 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in our example, each participant would pay a direct administrative fee of 0.03% of their account balance annually for recordkeeping ($600,000/$2,000,000,000 = 0.0003). If plan assets increase to $3 billion without an increase in the number of participants, the aggregate fee paid by the plan would not change. The *percentage* of assets per participant would decrease to 0.02%—again, because the services provided have not changed. Under either allocation method, the *plan* is paying the same price: $600,000, the amount negotiated at the plan level for the services to be provided to the plan.

72.     Some plans use a second method of paying for recordkeeping, through "indirect" revenue sharing payments from the plan's mutual funds. Revenue

sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored and restrained.

73.     In a revenue sharing arrangement, the mutual fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset-based, the fees can grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, have not increased at a similar rate. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

74.     If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is critical to (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, and (3) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

75.     As to the second critical element—determining the price that would be available on a flat per-participant basis—making that assessment for a jumbo plan requires soliciting bids from competing providers. Plans with relatively small amounts of assets to invest have limited products and services available to them and are more likely to use an "off-the-rack" platform from a single provider with standardized features. In contrast, in multi-billion dollar plans with over 10,000

participants, benchmarking based on fee surveys alone is inadequate.

Recordkeeping fees for jumbo plans have also declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (noting opinion of independent consultant in similar case "'without an actual fee quote comparison'—*i.e*, a bid from another service provider—[consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'"). Industry experts recognize that this principle applies fully in the university 403(b) context. Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education organizations." Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2.*[5] Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal.*[2] Engaging in in this RFP process "allows plan sponsors . . . to meet their fiduciary obligations, provides leverage to renegotiate services and fees; enhances service and investment opportunities and improves overall plan operation." *Id*. Prudent fiduciaries of defined contribution plans—including university 403(b)

---

[5] http://www.fiduciaryplangovernance.com/blog/buying-power-for-higher-education-institutions-when-you-have-it-and-when-you-dont-part-2

plans—thus obtain competitive bids for recordkeeping at regular intervals of approximately three years.

## V.   Bundled services and open architecture.

76.     As the prevalence and asset size of defined contribution plans grew, in the shift away from traditional defined benefit pension plans, numerous financial services entered this burgeoning retirement plan market. These providers often marketed "bundled" plans, offering to assist in the setting up a plan and which included a package of the provider's proprietary investment funds as well as administrative and recordkeeping services. The plans were often marketed as "free" plans, meaning there were supposedly no additional fees beyond the revenues the provider received from having their investment funds in the plan. These purportedly free plans had a significant caveat—in order to obtain the free pricing, the fiduciary had to agree to put the provider's preferred investment lineup in the plan—a group of hand-picked funds that would guarantee the provider would receive its desired fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan was established would require the provider's approval or result in the plan being assessed additional direct fees. Thus, under these closed arrangements, funds were often included in defined contribution plans not based on an independent analysis of their merits or what was in the best interests of participants, but because of the benefits they provided to the plan's service providers.

77.     In the years since the final regulations were published, fiduciaries of jumbo defined contribution plans have largely rejected closed architecture and

bundling, demanded an open architecture model for the plan's investment platform. In an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products, which the provider has an interest in including in the plan because the funds provide it with revenue sharing and investment fees. Instead, the fiduciary is free to reject the recordkeeper's conflicted fund recommendations, and can independently assess whether another investment manager offers a superior product at a more attractive price, and can include such funds in the plan's investment lineup. Open architecture also facilitates negotiation of reasonable recordkeeping fees, since the price of the recordkeeping service is more transparent and not obscured by opaque revenue sharing arrangements—through which the investment product provider does not publicize the amount of revenue sharing it kicks back to itself in its separate role as a recordkeeper—and can be negotiated separately without investment revenue skewing the recordkeeping price. There are recordkeepers in the market that exclusively operate on an open architecture basis in that they do recordkeeping only and do not sell investment products. These providers can offer pricing on a pure per-participant basis, without any revenue sharing component taken from funds in the plan. While open, transparent architecture allows for greater control over revenue sharing arrangements, and indeed, allows a fiduciary to eliminate them altogether, to the extent revenue sharing payments are still used they can effectively be "kickbacks" to induce recordkeepers to advocate for the fund to be included in the plan's investment lineup.

**VI.    History of 403(b) plans and 401(k) plans—more similarities than differences.**

78.    Defined contribution plans can qualify for favored tax treatment under different sections of the Internal Revenue Code. Plans offered by corporate employers typically qualify under 26 U.S.C. §401(k), and are commonly referred to as 401(k) plans. Tax-exempt organizations, public schools (including state colleges and universities), and churches are eligible to offer plans qualified under §403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A).

79.    403(b) plans sponsored by churches and governmental employers such as public schools are exempt from Title I of ERISA, including fiduciary obligations. 29 U.S.C. §1003(b)(1), (2). Plans sponsored by tax-exempt organizations such as private universities are subject to Title I of ERISA and its fiduciary requirements, unless the plan satisfies a 1979 "safe-harbor" regulation based on the employer having limited involvement in operating the plan. 29 C.F.R. §2510.3-2(f).

80.    Although 401(k) plans and 403(b) plans have different historical origins, legislative and regulatory developments over a number of decades largely eroded those differences, as reflected in final 403(b) regulations published by the IRS on July 26, 2007, which required certain employers to become more involved with administering their plans than they had previously. Sponsors of 403(b) plans were given almost one-and-a-half years to prepare for the effective date of the regulations, January 1, 2009. Once these regulations were published, many non-profit plan sponsors whose 403(b) programs previously qualified for the safe-harbor

determined they would have to comply with ERISA's fiduciary requirements by the regulations' effective date of January 1, 2009.

81.     In the Plans' Forms 5500 filed with the Department of Labor, Defendants have acknowledged that the Plans are subject to ERISA. To the best of Plaintiffs' knowledge, the Plans have never qualified for the safe harbor, and thus have been subject to ERISA's fiduciary requirements well before the IRS published its 403(b) regulations in 2007.

82.     When §403(b) was first enacted in 1958, plan assets could only be invested in insurance company annuity contracts. 26 U.S.C. §403(b)(1). In 1974, §403(b) was amended to allow 403(b) plans to invest in custodial accounts holding mutual fund shares. 26 U.S.C. §403(b)(7). While many 401(k) plans also invest in mutual funds, such plans may also offer alternatives to mutual funds such as collective trusts and separate accounts, which provide substantially similar investment management services but have lower expenses than mutual funds.

83.     Regardless of these differences, 401(k) and 403(b) plans both have the same fundamental purpose: allowing employees to save for a secure retirement. The duties of fiduciaries in both are the same: to operate as a financial expert familiar with investment practices, operate the plan for the exclusive benefit of employees and retirees, and to make sure that fees are reasonable and investments are prudent.  Participants in both types of plans depend on their plan fiduciaries to ensure that those savings are not depleted by excessive fees or imprudent investments. Accordingly, the historical differences and investment limitations of

403(b) plans do not allow 403(b) fiduciaries to exercise a lesser degree of care or attention to fees and investments than their 401(k) counterparts.

## VII.   Historical practice of multiple recordkeepers and a proliferation of investment options in 403(b) plans.

84.    As the Department of Labor has recognized, historically, many 403(b) sponsors had treated their plans as a collection of individual contracts under which employees could take various actions without the consent or involvement of the employer or plan administrator. Field Assistance Bulletin 2009-02.

85.    Many 403(b) plans historically before 2009 included multiple bundled service providers, with each performing the recordkeeping function for its own investment products in the plan. In fact, "403(b) plan investment options were often 'sold' by record keepers and their representatives rather than offered by plan sponsors as evaluated investments." Fiduciary Plan Governance, LLC, *Legacy Investments in Higher Education: What is a Plan Sponsor's Responsibility to Participants*?[6] Indeed, sponsors of these plans often took a "'hands off' approach to plan oversight." *Id*. This practice resulted in plans having costly, inefficient structures involving multiple recordkeepers with each recordkeeper having its own investment option in the plan, leaving participants with the task of navigating a haphazard collection of duplicative and overlapping investment options from the various recordkeepers, and ultimately led to them paying excessive and unnecessary fees. *Id*. In some cases the recordkeeper insisted on its own funds being

---

[6] http://www.fiduciaryplangovernance.com/blog/legacy-investments-in-higher-education-what-is-a-plan-sponsors-responsibility-to-participants.

included in the plan without any resistance or analysis of those funds by the fiduciaries.

## VIII.  TIAA-CREF's bundled 403(b) plan services.

86.     TIAA-CREF is an insurance company financial services provider that historically has dominated the market for services to educational institution 403(b) plans. TIAA-CREF consists of two companion organizations: Teachers Insurance and Annuity Association of America (TIAA), and College Retirement Equities Fund ("CREF"). The services that TIAA-CREF provides to 403(b) plans include annuities, mutual funds, insurance coverage, trust services, and administrative services.

87.     Although TIAA-CREF's marketing materials suggest that it is a "nonprofit" organization, that is misleading. Since 1998, both TIAA and CREF have been subject to federal income taxation following a decision by Congress to revoke the organization's status as a tax-deductible 501(c)(3) charitable organization. This revocation of tax-deductible status was initiated because TIAA-CREF "competed directly with for-profit insurance companies and mutual fund groups."[7]

88.     While CREF is organized as a New York not-for-profit corporation, TIAA is organized as a *for-profit* stock life insurance company. TIAA's "operating surplus" is spent, loaned, and otherwise distributed to more than a dozen TIAA subsidiaries and affiliates that operate on a for-profit basis, including Nuveen Investments, which TIAA acquired in April 2014 for an enterprise value of $6.25

---

[7] Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. Times (July 30, 2007), available at http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.

37

billion. TIAA receives dividends from these for-profit subsidiaries.[8] Consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is on par with or greater than executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. In 2015, TIAA's CEO received $18 million in compensation,[9] more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and just below the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). When expressed as a percentage of assets under management, TIAA's CEO had the highest compensation rate of any of those companies. In fact, TIAA's five highest-ranking "named executive officers" earned a combined total of well over $40 million in compensation in 2015.

89.     TIAA's disclosures further state that its employees' compensation and benefits programs are designed to "align their interests with those of the Company's participants by linking pay to long-term growth and *profitability*."[10] (emphasis added).

90.     Responding to criticism that TIAA-CREF's CEO and other executives "garnered salaries and bonuses significantly greater than similar pension fund operations," TIAA-CREF responded that such exorbitant pay was justified because "the company had to compete for top-level employees with major financial services

---

[8] https://www.tiaa.org/public/pdf/C16623_where-tiaa-profits-go.pdf.
[9] TIAA Compensation Disclosures, *Executive Compensation Discussion and Analysis* 20 (May 2016), https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.
[10] TIAA Compensation Disclosures, *Executive Compensation Discussion and Analysis* 3 (May 2016), https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.

corporations."[11] Critics found this justification dubious because the "flagship CREF Stock Account, an equity portfolio of $59 billion, was primarily indexed to the Russell 3000," meaning that "CREF automatically invested nearly two of every three dollars in companies held by the benchmark fund," leaving "little for the highly paid officers to manage." *Id.*

91.    TIAA used its position as recordkeeper to obtain access to participants, learning their ages, length of employment, contact information, the size of their accounts, and choices of investments, and used that information for its benefit in marketing lucrative investment products and wealth management products to participants as they neared retirement and before retirement. This has been documented by former TIAA employees in multiple recent reports in the New York Times.[12]

92.    A recent New York Times article dated November 9, 2017, states that New York's attorney general has issued subpoenas to TIAA for documents related to its "dubious" sales practices. *Id.* The article goes on: "TIAA has previously said it puts its clients first and has maintained that because its 855 financial advisers and consultants do not receive commissions on the products they sell they are unbiased. But former employees and TIAA regulatory filings challenge this view, pointing out

---

[11] Funding Universe, *Teachers Insurance and Annuities Association – College Retirement Equities Fund History*, http://www.fundinguniverse.com/company-histories/teachers-insurance-and-annuity-association-college-retirement-equities-fund-history/.

[12] Gretchen Morgenson , *The Finger-Pointing at the Finance Firm TIAA*, N.Y. Times, Oct. 21, 2017, https://www.nytimes.com/2017/10/21/business/the-finger-pointing-at-the-finance-firm-tiaa.html. See also Gretchen Morgenson, *TIAA Receives New York Subpoena on Sales Practices*, N.Y. Times, Nov. 9, 2017, https://www.nytimes.com/2017/11/09/business/tiaa-subpoena.html.

that the company awards bonuses to sales personnel when they steer customers into more expensive in-house products and services." *Id*. The article also describes how TIAA's role as a recordkeeper provides TIAA with access to sell individuals additional investment products through IRAs. "Most of TIAA's clients invest with the firm because their employers have hired it to administer their workers' retirement plans . . . The company earns a record-keeping fee from the institutions whose accounts it oversees, but can generate far more revenue when investors buy its annuities and funds. This presents the potential for conflict." *Id*.

93.     The value of TIAA's use of its position as a recordkeeper to the Plans to market and sell lucrative products to soon-to-be-retired participants and retired participants was substantial and far greater than would be true of recordkeepers who do not sell investment products, thus conveying a stamp of approval by Defendants of TIAA.

94.     Despite this, Defendants allowed TIAA to market and sell its services and investment products in this way, benefitting TIAA enormously, yet obtaining no benefit to the Plan from this, either by reduced recordkeeping fees or requiring TIAA to make direct payments to the Plans for the use of this information. This is even more lucrative to TIAA because Defendants are using TIAA as a recordkeeping and using their products.

95.     In benchmarking (and justifying) its executives' compensation packages, TIAA disclosed the following sixteen *for-profit* financial services and insurance companies as the peer group it used for competitive analysis:

40

The comparator group used in the market competitive analysis consists of the following sixteen companies (the "Peer Group"), which were selected based on being of similar size and complexity in the asset management and insurance industries:

| Affiliated Managers Group | Invesco | Principal Financial |
|---|---|---|
| Ameriprise Financial | Legg Mason | Prudential Financial |
| Bank of NY Mellon | Lincoln National | T. Rowe Price |
| Charles Schwab | MassMutual Financial | Voya Financial |
| Franklin Resources | MetLife | |
| The Hartford Financial | Northern Trust | |

96.    TIAA-CREF offered its 403(b) plan services exclusively on a bundled basis. If a plan wished to offer the TIAA Traditional Annuity, TIAA-CREF required that the CREF Stock Account and Money Market Account also be offered to participants, and required the plan to use TIAA as recordkeeper for its proprietary products. Thus, by using TIAA-CREF, fiduciaries locked their plans into an arrangement in which certain investments could not be removed from the plan—*even if the funds were no longer prudent investments*. This arrangement also precluded the fiduciary from implementing an open architecture platform and using another recordkeeper who could provide the same administrative services at lower cost. If a plan desired to offer investments from an additional provider, the plan had to use multiple recordkeepers, resulting in an inefficient and excessively expensive plan structure, as described in more detail below.

97.    There is no shortage of high-quality, low-cost alternatives to TIAA-CREF's products in the defined contribution plan market. Many 403(b) plan fiduciaries have recognized that stable value funds are prudent alternatives to TIAA's Traditional Annuity as a conservative principal preservation option providing superior returns to a money market fund, and can be recordkept by

virtually any defined contribution recordkeeper. Other insurance companies also offer fixed annuity products. And there are myriad large cap blend mutual fund investments in the market that provide far superior returns to the CREF Stock account at much lower cost. In light of TIAA-CREF's restrictions and superior alternatives in the market that do not impose such restrictions, fiduciaries of 403(b) defined contribution plans must engage in a cost-benefit analysis to determine whether it is prudent and in the interest of participants to lock their plans into an arrangement that precludes the removal of imprudent plan investments and results in excessive plan fees, or whether participants would be better served by using superior low-cost alternatives to TIAA-CREF's products and saving millions of dollars in administrative and investment management costs by hiring a different recordkeeper. As explained below, many 403(b) fiduciaries have engaged in this analysis and overhauled their plans for the benefit of participants.

## IX.    Move to consolidation and open architecture in 403(b) plans.

98.    As noted, under the 2007 final regulations that became effective January 1, 2009,[13] employers with 403(b) plans were compelled to exercise greater control over their 403(b) plans than they had previously. Among other things, the final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for benefits under the plan. DOL separately published revised Form 5500 annual reporting rules effective for 2009 that required large ERISA-covered 403(b) plans to file

---

[13] The DOL gave 403(b) plans almost a year and a half to make changes necessary to comply before the regulation became effective January 1, 2009.

audited financial statements providing detailed information about the assets in the plan. The regulations are expressly intended to make 403(b) plans more like 401(k) plans.

99.     Once the final regulations were published, many 403(b) plan fiduciaries recognized that fulfilling their fiduciary obligations required them to engage, if they had not already been doing so, in a comprehensive review of their plans' fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for the benefit of participants. There could be no doubt, if there had been any before, that fiduciaries could not just accept investment options provided by the same providers who did recordkeeping for the plan and to comply with ERISA's requirements that all fees are reasonable.

100.    As a result, the fiduciaries of hundreds of 403(b) plans implemented dramatic overhauls to their plans and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their continuing fiduciary obligations under ERISA.

101.    For example, the fiduciaries of the Loyola Marymount University (LMU) Defined Contribution Plan, a 403(b) plan, recognized that under the new regulations, "Recordkeeping must be consolidated and/or managed by a single party."[14] Beginning in 2008, to assist LMU in assessing the plan's investment options and recordkeeping services, LMU hired an independent third party consultant, Hewitt Associates (n/k/a Aon Hewitt), to issue a request for proposal to

---

[14] See LMU 403(b) Retirement Plan Project Overview, at 1, available at
http://www.lmu.edu/AssetFactory.aspx?vid=33038

seven different 403(b) recordkeeping providers, including AIG Retirement,

Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal

Financial Group, and TAA-CREF.[15] LMU consolidated from two recordkeepers to

one effective on the date the final regulation became effective, January 1, 2009.

Loyola Marymount's fiduciaries recognized that a dual recordkeeper structure

would require its employees to pay higher fees for overlapping services, and because

consultants, legal counsel, and all of the recordkeeping firms interviewed

recommended that LMU use only one record keeper, starting in January 2009.[16]

Moreover, LMU selected Diversified as the new recordkeeper because Diversified "is

not an investment manager and therefore, does not require that certain investment

options be offered by LMU." LMU was therefore able to offer "best in class" funds in

each fund category.[17]

102.    Similarly, following the new IRS 403(b) regulations, the fiduciaries of

the Pepperdine University Retirement Plan recognized the implications of

maintaining four different recordkeepers. In order to comply with the regulations

and its fiduciary responsibilities, Pepperdine determined that it must make certain

changes to the plan, including "Consolidating recordkeeping (by having one fund

provider manage administration for multiple providers or by moving to a sole

administrator scenario)."[18] Pepperdine retained an independent third party

consultant to assist the fiduciaries in issuing a request for proposal to different

---

[15] See http://www.lmu.edu/AssetFactory.aspx?vid=32045.
[16] LMU 403(b) Retirement Plan Project Overview, at 2.
[17] *Id.* at 6.
[18] See Pepperdine University Participant Q & A, available at
http://community.pepperdine.edu/hr/content/benefits/fulltime/faq.pdf.

403(b) recordkeeping providers. Following the competitive bidding process, effective February 1, 2009, Pepperdine selected Diversified, a recordkeeper which does not offer proprietary investments, as the "sole administrator" and consolidated from four recordkeepers (Fidelity, TIAA-CREF, Vanguard and Prudential) to a single recordkeeper. Pepperdine found that the benefits of consolidation included lower costs and more robust services, as well as a streamlined compliance process and simplified data coordination.[19] Pepperdine acknowledged that maintaining a multiple-vendor platform was not a "cost-effective, viable option."[20] Recognizing the inefficiencies and overlapping work in a multiple recordkeeper arrangement, Pepperdine determined that costs were "higher in a multivendor arrangement, because each vendor receives only a portion of the ongoing total plan contributions," while a single provider allowed to "realize true economies of scale."[21]

103.   Pepperdine also recognized that the bundled model demanded by certain providers was not in participants' interest. Using those providers "meant being obligated to offer some or all of that provider's proprietary funds on the plan's investment menu—*whether or not those investments offered participants the best range of choice, value, and relative performance.*"[22] (emphasis added). Acting in participants' interest required that the fiduciaries instead have the ability to select those "funds that the university—working with an independent financial adviser—

---

[19] *Id.*

[20] Paul B. Lasiter, *Single Provider, Multiple Choices*, NACUBO, available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[21] *Id.*

[22] *Id.*

could identify as being the 'best options in their respective asset classes.'"[23] After weighing and analyzing a variety of factors, Pepperdine determined that "consolidating with a single vendor has been the straightforward solution to achieving" the objective of acting "for the exclusive benefit of plan participants." The benefits of consolidation included "[a] better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants."[24]

104.   In the fall of 2008, in response to the new, not yet effective regulations and required changes within the defined contribution industry, Purdue University began a comprehensive review of its defined contribution retirement program. Purdue recognized that "*[t]he primary intent of the regulations was to reduce the difference between Section 403(b) plans, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured retirement program for employees in the non-profit sector." (emphasis added).[25] Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a Aon Hewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to recordkeepers. The "benefits" of Purdue's program enhancements included the transition from five providers (TIAA-CREF, Fidelity, American

---

[23] *Id.*

[24] *Id.*

[25] James S. Almond, *403(b) Plan Redesign–Making a Good Retirement Plan Better*, Purdue University, available at http://www.cacubo.org/wp-content/uploads/2016/02/10_403b_Plan_Redesign_Making_a_Good_Retirement_Plan_Better.docx. (emphasis added).

Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses. The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options."[26] Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated *$3–4 million per year* which is then compounded over time." (emphasis added).

105.    Likewise, California Institute of Technology (CalTech) TIAA-CREF DC Retirement Plan consolidated from multiple recordkeepers (TIAA-CREF and Fidelity) to a single recordkeeper (TIAA-CREF) effective January 1, 2010, with the assistance of an independent third party consultant, Mercer Investment Consulting.[27] In selecting a core set of investment options for the plan, CalTech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Form 5500s filed with the Department of Labor, between 2013 and 2015, CalTech

---

[26] *Id.*

[27] *Caltech Names TIAA-CREF Recordkeeper,* Institutional Investor (Dec. 10, 2009), available at http://www.institutionalinvestor.com/Article/2355324/Search/Caltech-Names-TIAA-CREF-Record-Keeper.html#/.WBn8Oy0rKpp.

negotiated over *$15 million* in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

106.   Extensive industry literature shows that these sponsors are not outliers, and that similarly situated fiduciaries who have also comprehensively reviewed their plans have been able to reduce fees, consolidate recordkeepers and investment options, leading to enhanced outcomes and retirement security for their plans' participants.

107.   In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a Aon Hewitt) issued a "403(b) Plan Redesign Working Paper" which set forth 403(b) fiduciary best practices taken in response to the IRS 403(b) regulations.[28] Hewitt noted that "[w]ith the issuance of new Internal Revenue Service regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market."[29]

108.   Hewitt noted several areas of plan improvements. *First*, recordkeeper consolidation provided "many benefits to participants," including cost savings. Although the multiple-recordkeeper model had been common in the higher-education marketplace, "[e]xperience and research suggests that this type of administrative structure can be costly and confusing to faculty and staff."[30] "The

---

[28] Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper: University of Notre Dame* (Feb. 2014), available at https://workplacecontent.fidelity.com/bin-public/070_NB_PreLogin_Pages/documents/ND_403(b)%20Plan%20Redesign%20White%20Paper.pdf.
[29] *Id.* at 3.
[30] *Id.* at 4.

multiple-recordkeeper model tends to divide participant assets into individual accounts held at separate recordkeepers resulting in costs that are meaningfully higher than under a single recordkeeper model."[31] Such "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants."[32]

109.    *Second*, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants."[33] An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup.

110.    According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. See LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[34]

---

[31] *Id.* at 5.
[32] *Id.*
[33] *Id.* at 6.
[34] Available at
http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/
News_Center/Reports/130329-01exec.pdf.

111.     Annual surveys by Plan Sponsor Council of America found that in each year from 2010 through 2014, the overwhelming majority of 403(b) plans—over 80%—have only a single recordkeeper, and provide an average of 28 investment fund options.[35] An earlier PSCA survey of 403(b) plans found that as of 2009, 57% of 403(b) plan fiduciaries had made changes to their plans as a result of the new 403(b) regulations that became effective January 1, 2009.[36]

112.     The majority of plans use a single recordkeeper because a "**multi-recordkeeper platform is inefficient**" and squanders the ability to leverage a plan's bargaining power. The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[37] "By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants," while allowing participants to "benefit from a more manageable number of institutional-quality investment options to choose from."[38] Additional benefits of a single recordkeeper platform include simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

---

[35] Each PSCA survey covers the year prior to the year indicated in the title. PSCA's 2015 Benchmarking Survey of 403(b) Plans, at 32, 65; PSCA's 2014 Benchmarking Survey of 403(b) Plans, at 32, 61; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2011 Benchmarking Survey of 403(b) Plans, at 28, 55, 59.

[36] PSCA's 2010 Benchmarking Survey of 403(b) Plans at 45.

[37] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

[38] *Id.*

50

113.    AonHewitt, an independent investment consultant, similarly recognized that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by" "[c]onsolidating recordkeepers," "[l]everaging aggregate plan size and scale to negotiate competitive pricing, and reducing the number of investment options and "utilizing an 'open architecture' investment menu[.]" AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[39]

114.    Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers makes it "difficult for employers to monitor available choices and provide ongoing oversight" while harming participants through "high investment and administrative costs" and a lack of guidance needed to achieve retirement readiness. Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[40]

115.    Other industry literature further supports the fact that the use of a single recordkeeper provides reasonable fees. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan

---

[39] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[40] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[41] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[42]

116.   Use of a single recordkeeper is also less confusing to participants and eliminates excessive, overlapping recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[43]

---

[41] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[42] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[43] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

**DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND
COMMITTED PROHIBITED TRANSACTIONS**

117.    The use of multiple recordkeepers and proprietary funds required by the recordkeepers to be included in the Plans shows that, in contrast to the comprehensive plan reviews conducted by the 403(b) plan fiduciaries described above, Defendants failed to adequately engage in a similar analysis. Had Defendants conducted such a review of the Plans, Defendants would not have allowed the Plans to continue to pay excessive administrative fees; would not have maintained an inefficient multi-recordkeeper structure; would not have continued to include over 100 investment options in the Plans, including duplicative funds in numerous investment styles and higher-cost retail share classes for which an identical lower-cost version of the same fund was available; and would not have retained investment options in the Plans despite a sustained track record of underperformance. This follows because a prudent process would have produced a different outcome.

**I.      The Plans' investments**

118.    Defendants exercise discretionary authority and control over the investment options that are included in the Plans.

119.    For both Plans, Defendants provided mutual funds and insurance company variable annuity products as investment options.  The investment options are offered by TIAA-CREF and the Vanguard Group, Inc. ("Vanguard"). Defendants select investment options into which participants' investments are directed, and

determine whether to remove investment options from the Faculty Plan and the Medical Plan.

120.    As of December 31, 2016, Defendants designated a total of 101 investment alternatives as options in the Faculty Plan, including 27 TIAA-CREF investments and 74 Vanguard investments. These investments included mutual funds (many of which had identical lower-cost share classes available, as explained below), an insurance separate account, variable annuity options, and a fixed annuity option.

121.    As of December 31, 2016, Defendants designated a total of 82 investment alternatives as options in the Medical Plan, including 11 TIAA-CREF investments and 71 Vanguard investments. These investments also included mutual funds (many of which had identical lower-cost share classes available, as explained below), an insurance separate account, variable annuity options, and a fixed annuity option.

## II.    Defendants improperly allowed TIAA-CREF to require inclusion of its investment products in the Plans and that it provide recordkeeping services for its proprietary options.

122.    ERISA requires fiduciaries to independently evaluate the prudence of each investment option offered in a defined contribution plan, *DiFelice*, 497 F.3d at 423, and to remove imprudent investments within a reasonable time, *Tibble*, 135 S. Ct. at 1828–29.

123.    As noted, TIAA-CREF offered its products and services strictly on a bundled basis. If a plan offers the TIAA Traditional Annuity, TIAA-CREF required

that the plan also offer the CREF Stock and Money Market account, and to also use TIAA as recordkeeper for its proprietary products.

124.   TIAA's financial interests were also served insofar as TIAA was able to use its position as recordkeeper to obtain access to the Plans' participants, acquiring information about their ages, length of employment, contact information, the size of their accounts, and choices of investments, and then used this information for its benefit in marketing lucrative investment products and wealth management products to participants as they neared retirement and before retirement. This has been documented by former TIAA employees in multiple recent reports in the New York Times described in more detail above.

125.   By allowing the Plans to enter such a bundled arrangement with TIAA-CREF, Defendants agreed to lock the Plans' participants into funds which Defendants did not analyze. It can never be prudent to lock funds in a plan for the future and to keep them in because of recordkeeping. Defendants thus failed to discharge their duty to independently evaluate whether each investment option was prudent for the Plans, and to determine whether the use of TIAA as a plan recordkeeper was prudent, reasonably priced, and in the exclusive interest of participants. Instead of acting solely in the interest of participants, Defendants allowed TIAA's financial interest to dictate the Plans' investment selections and recordkeeping arrangement. Because Defendants allowed the CREF Stock to be locked into the Plans, Defendants could not satisfy their duty to remove investments that are *no longer prudent* within a reasonable time. As a result of

Defendants' breach in allowing CREF Stock to be retained in the Plans because TIAA-CREF demanded it and not based on an independent and ongoing assessment of the merits of the option, the Plans suffered massive losses compared to prudent alternatives, as discussed in more detail below.

126.    Both Plans offer the TIAA Traditional Annuity. This option is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in TIAA's general account and are dependent on TIAA's claims-paying ability.

127.    The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plans. For example, some participants who invest in the TIAA Traditional Annuity must pay a 2.5% surrender charge if they withdraw their investment in a single lump sum within 120 days of termination of employment. The only way for these participants to withdraw or change their investment in the TIAA Traditional Annuity is to spread the withdrawal over a *ten-year period,* unless this substantial penalty is paid. Thus, any of these participants who wish to withdraw their savings without penalty can only do so over ten years.

128.    Both Plans include TIAA's proprietary funds, including the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities that invest in underlying securities for a given investment style.

The value of the Plans' investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

129. The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

    a. "administrative expense" charge (24 bps);[44]

    b. "distribution expense" charge (9.5 bps);

    c. "mortality and expense risk" charge (0.5 bps); and

    d. "investment advisory expense" charge (ranging from 4 to 12.5 bps).

130. Two of these four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA-CREF to Plan participants, and the other two provide no benefit to the Plans' participants.

    a. **Administrative expenses (or recordkeeping fees):** The administrative fee assessed on each variable annuity option is charged as a percentage of assets, rather than a flat fee per participant. As described above, recordkeeping costs depend on the number of participant accounts that the recordkeeper will service in the plan rather than based on a percentage of assets because a higher account balance costs no more to track than a lower account balance. As a result, as the growth in the Plans' assets outpaced the growth in participants, the fees paid to TIAA-CREF likewise increased even though the services provided did not increase at the same rate, resulting in further unreasonable compensation.

---

[44] Expenses are stated as of May 1, 2014.

b. **Distribution expenses (or 12b-1 fees):** Distribution expenses are charged for services performed for marketing and advertising of the account to potential investors. However, in a retirement plan, the funds are selected by the sponsor. Thus, marketing and distribution services provide no benefit to plan participants and are wholly unnecessary. Being charged for such wholly useless expenses causes a loss of retirement assets with no benefit.

c. **Mortality and expense risk charges:** Some annuity or insurance providers charge mortality and expense risk charges to compensate the insurance company for the risk it assumes when providing periodic income or payments to the investor over her lifetime, which will vary depending on the value of the underlying investments. This charge only benefits a participant if she elects upon retirement to annuitize her holdings in the account to provide for periodic income. Prior to annuitizing her account, the participant derives no conceivable benefit for paying such a charge, and TIAA-CREF provides no actual services or incurs any risk to justify the fee until a decision is made at retirement to convert the value of the lump sum to an annuity. Most participants in retirement plans recordkept by TIAA-CREF do not elect to annuitize their holdings in their variable annuity accounts upon retirement. Yet, *all* participants pay these fees for many years regardless of whether they annuitize their variable annuity account.

d. **Investment advisory expense charge (or investment management**

**fees):** It is a fundamentally established principle of investment management that larger asset size enables the asset holder to obtain lower fees as a percentage of assets. Fund managers institute breakpoints, whereby the investment management fee is reduced, as asset size goes up, at pre-specified asset thresholds to pass along economies of scale to the investor. For example, if $5 million is a breakpoint, one fee, based on a percentage of assets, will be charged on the first $5 million, and a lesser percentage will be charged on the next portion of the assets. A large investor will therefore be charged a lower fee, on a percentage of assets, than a smaller investor to recognize the economies of scale generated from the higher asset levels. Jumbo plans, such as NYU's, can command extremely low fees. Despite this recognized principle, TIAA-CREF has not instituted *any* breakpoints whatsoever on its investment management fees to pass along economies of scale experienced by jumbo plan investors. The Plans' fiduciaries did not obtain the lower investment management fees that come with the Plans' enormous asset size. As a result, the Plans, with billions of dollars invested in CREF variable annuities, pay the same asset-based fee as the smallest client with a tiny fraction of their total assets, resulting in a windfall to TIAA-CREF and excessive fees paid by NYU employees and retirees.

131.    The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is a pooled investment

59

vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but is segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges, which were excessive for the same reasons. As of May 1, 2013, these charges consisted of the following:

      a.  "administrative expense" charge (26.5 bps);

      b.  "distribution expense" charge (8 bps);

      c.  "mortality and expense risk" charge (0.5 bps);

      d.  "liquidity guarantee" (18 bps); and

      e.  "investment management expense" charge (36.5 bps).

132. The remaining TIAA-CREF funds are mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

133. The Vanguard investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management, but also charge for distribution, marketing, and other expenses, depending on the type of investment and share class.

134. This means that NYU plan participants are paying for marketing costs of funds which their employer has placed in their retirement plan when such

marketing costs provide no benefit to them. Other mutual funds that were available to the Plans do not include such marketing costs.

135.   Mutual funds have shareholders who are not participants in either NYU Plan, or any retirement plan, and who purchase shares as a result of the funds' marketing efforts. However, all shareholders in the mutual funds, including the participants in the NYU Plans, pay the expenses set forth in ¶¶123–124.

136.   As of December 31, 2016, of the Faculty Plan's $2.4 billion in net assets, TIAA-CREF funds accounted for over $1.8 billion and Vanguard funds accounted for over $770 million. As of December 31, 2016, of the Medical Plan's $1.8 billion in net assets, TIAA-CREF funds accounted for over $1.2 billion and Vanguard funds accounted for over $819 million.

## III.   Defendants caused the Plans to pay excessive administrative and recordkeeping fees.

137.   As set forth above, the market for recordkeeping services is highly competitive and there are numerous recordkeepers in the market who can provide a high level of service to large defined contribution plan who will readily respond to a request for proposal.

138.   Because market rates for recordkeeping services have declined in recent years and because the only way to reliably determine the true market rate for a complex jumbo plan is to obtain an actual fee quote comparison, prudent fiduciaries of jumbo defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

139.    As noted, extensive industry literature and the experience of similarly situated fiduciaries has shown that multiple recordkeeper platforms are inefficient and result in excessive fees. Instead of leveraging the size of the participant base to take advantage of economies of scale, using multiple recordkeepers fractures and dilutes the plan's leverage. Instead of obtaining pricing based on a 25,000 participant plan from one recordkeeper, spreading participants among multiple recordkeepers undercuts the plan's ability to obtain favorable pricing.

140.    Despite the recognized benefits of a single recordkeeper, to this date Defendants have continued to contract with two separate recordkeepers (TIAA-CREF and Vanguard) for the Faculty Plan and did not consolidate the Medical Plan to one recordkeeper (TIAA-CREF) until late 2012. The Medical Plan went to one recordkeeper in late 2012 and yet the Faculty Plan has failed to do so do this day, despite having the same fiduciary committee—the Retirement Committee—and the same individual members comprising this committee overseeing both Plans.

141.    There is no reason why it took the Medical Plan until late 2012 to consolidate to a single recordkeeper or why the Faculty Plan could not have been consolidated to a single recordkeeper at any time.

142.    The Retirement Committee's own publicly-available admissions unequivocally concede that the Plans' structure was imprudent and caused plan losses. Specifically, in 2009, the Retirement Committee recognized that in order to leverage the plans' $3 billion in assets, improve the plans' administrative efficiency

and reduce costs, and offer a "best in class fund lineup," it "need[ed] to streamline & reduce the fund lineup and select one vendor as sole recordkeeper[.]"[45]

143.    Moreover, the Retirement Committee readily acknowledged that an unbundled platform was preferable to the plans' "bundled" arrangement. *Id*. at 18. It also admitted that plan consolidation would enable the Plans to obtain "better share classes yielding higher returns," which would "result in *significantly lower fee structures for the participant*." Id. (emphasis added).

144.    Even so, over seven years later, Defendants still have not taken the action it recognized was "need[ed]" as of 2009. In an October 13, 2016 meeting regarding the Plans—after the filing of a related lawsuit that challenged the Plans' use of multiple recordkeepers and duplicative options[46]—the Retirement Committee admitted that it had still not met the goal of "reducing duplication and fees[.]"[47]

145.    Instead of obtaining a flat per-participant rate or rebates of excessive revenue sharing back to the Plans, Defendants allowed these recordkeepers to collect uncapped asset-based revenue sharing as payment for administrative services.

---

[45] Ree*ngineering II, More Opportunities for Self Service,* Slides 11, 12–18 (July 30, 2009), available at:
   https://www.nyu.edu/content/dam/nyu/execVicePres/documents/13-Appendix-D-Self-Service-Opportunities.ppt
[46] The related lawsuit is *Sacertdote et al. v. New York University*, 1:16-cv-06284.
[47] *Minutes of the C-Faculty Senators Council Meeting of October 20, 2016,* Document B at 23, available at: https://www.nyu.edu/content/dam/nyu/facultyGovernance/documents/C-FSCMinutes102016.pdf.

146. Based upon information from industry experts, the Plans' TIAA-CREF investments kicked back the following approximate amounts of revenue sharing to the TIAA-CREF recordkeeping entity:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

147. Further adding to the fees received, Vanguard's recordkeeping arm also received "internal" revenue sharing from using higher-cost share classes of Vanguard's mutual funds, in amounts substantially greater than it would have from the available lower-cost otherwise identical share classes.

148. In addition to these revenue sharing payments, TIAA-CREF and Vanguard also received other indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

149. To discharge its fiduciary duty to act prudently and in the exclusive interest of participants, Defendants were required to consider TIAA-CREF's and Vanguard's financial interests in including funds in the Plans that would provide them with steady streams of revenue from revenue sharing payments and investment management fees. Defendants were also required to determine and monitor all sources of TIAA-CREF's and Vanguard's compensation, and to ensure

that the compensation was limited to a reasonable amount for the services provided. Had Defendants discharged those duties, they would not have retained as Plan investments exclusively options proprietary to the Plans' recordkeepers while failing to consider alternatives from other managers, and would not have allowed the Plans to pay the following excessive sums for recordkeeping.

150.   TIAA uses its position as recordkeeper to glean valuable information about the Plans' participants including, among other things, participants' age, length of employment, amount invested, and investment selections. TIAA then uses this information to market and sell lucrative financial products to the Plans' participants as they near retirement (and prior to retirement). Defendants failed to consider TIAA's exploitation of its position as recordkeeper to sell lucrative retirement products to the Plans' participants, outside of their investments already in the Plans. If Defendants had acted as prudent and loyal fiduciaries they would have taken this into account and demanded that TIAA rebate substantial portions of its recordkeeping compensation to the Plans in order to account for the use of this valuable information.

151.   Experts in the recordkeeping industry with vast experience in requests for proposals and information for similar plans have determined the market rate that the Plans likely would have been able to obtain had the fiduciaries put the Plans' recordkeeping services out for competitive bidding. Based on the Plans' features, the information available to Plaintiffs regarding the nature and type of administrative services actually provided by the Plans' recordkeepers, the Plans'

combined participant level (roughly 25,000), and the market rates obtained for similar plans, a reasonable annual recordkeeping fee for the Plans would be no more than $840,000 in the aggregate for both Plans combined (a rate of no more than approximately $35 for each participant in the Plans per year) even using a recordkeeper who does not sell investment products and less because TIAA was allowed to profit from its position as a recordkeeper in selling lucrative retirement products outside of the Plans to the Plans' participants. Even if Defendants had negotiated a reasonable recordkeeping fee for the Faculty and Medical Plans separately, the Plans would have paid dramatically less for recordkeeping services.

152.    Based on schedules regarding service provider compensation in the Faculty Plan's Forms 5500 filed with the Department of Labor, and upon information regarding the rate of internal revenue share allocated to each of the Plans' recordkeepers from their in-house proprietary investment options, the Faculty Plan paid between $2.2 and $2.8 million (or approximately $147 to $200 per participant) per year from 2011 to 2016, over *770%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

153.    Based on schedules regarding service provider compensation in the Medical Plan's Forms 5500 filed with the Department of Labor, and upon information regarding the rate of internal revenue share allocated to each of the Plans' recordkeepers from their proprietary investment options, the Medical Plan paid between $1.1 and $1.8 million (or approximately $139 to $221 per participant)

per year from 2011 to 2016, over *571%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

154.   To discharge its fiduciary duties, Defendants were required to obtain sufficient information regarding all sources of compensation received by the Plans' recordkeepers, including the amount of any revenue sharing payments, to make an informed assessment as to whether the amount of compensation was no more than reasonable for the services provided. Had Defendants accounted for and monitored those payments, it would have been apparent that TIAA-CREF and Vanguard were receiving excessive fees and that participants were losing retirement savings as a result. Defendants should also have obtained rebates or payments for the benefit to TIAA of selling to participants near retirement or retired, lucrative IRA products or wealth management services.

155.   Soliciting competitive bids from other recordkeepers should have allowed Defendants to reduce the Plans' excessive recordkeeping fees to reasonable levels. Had Defendants conducted a diligent competitive bidding process for the Plans' recordkeeping services, and not allowed bundling of recordkeeping with the recordkeepers' investment products, the process would have resulted in very substantial reductions in the Plans' recordkeeping fees, totaling millions of dollars. This competitive bidding process would have enabled Defendants to select a recordkeeper charging reasonable fees, negotiate a reduction in recordkeeping fees, and obtain rebates of any excess expenses paid by participants for recordkeeping services.

156.   Aside from the failures to monitor the amount of revenue sharing payments and to adequately solicit competitive bids, Defendants also failed to negotiate rebates of all the excessive fee payments to TIAA-CREF and Vanguard. Because the multi-billion dollar plans paid the same asset-based fees as much smaller plans that used TIAA-CREF's products and services, Defendants could have demanded "plan pricing" rebates from TIAA-CREF based on the Plans' economies of scale. Defendants could have also demanded similar rebates from Vanguard. Had Defendants negotiated for these rebates, the Plans' recordkeeping fees would have been reduced, avoiding additional losses of retirement savings.

157.   By failing to prudently monitor and control the Plans' recordkeeping and administrative fees, particularly the open-ended asset-based revenue sharing received by TIAA-CREF and Vanguard, and maintaining an inefficient and costly structure of multiple recordkeepers, Defendants caused the Plans' participants to pay excessive and unreasonable fees for recordkeeping and administrative services. Defendants' failure to ensure that participants only paid reasonable fees for administrative and recordkeeping services caused the Faculty and Medical Plans and their participants to lose over $22 million of their retirement savings.[48]

**IV.   Defendants caused the Plans to pay wholly unnecessary and excessive fees by using higher-cost share classes of Plan mutual funds instead of identical versions of the same funds in lower-cost share classes.**

---

[48] The Plans' losses from 2011–2016 have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in the Plans' investments, growing with the market.

158.   Jumbo retirement plans have massive leverage to obtain low fees for investment management services. If a plan invests in mutual funds, prudent fiduciaries of jumbo defined contribution plans review all available share classes, and do so for every fund in their plans, whether the plan contains three funds, 30 funds, or 300 funds. Because the only difference between the various share classes is fees, prudent fiduciaries view higher-cost share classes as imprudent, because using a higher-cost share class results in the plan paying wholly unnecessary fees. Because there is no prudent reason to pay a higher cost when the same fund is available at a lower cost, prudent fiduciaries of multi-billion dollar defined contribution plans obtain the lowest-cost share class available to the plan.

159.   As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[49]

160.   Given that defined contribution plan fiduciaries are held to the standard of a knowledgeable financial expert, if a service provider or consultant recommends a particular share class, a fiduciary cannot blindly accept that recommendation at face value, but instead must review the fund's prospectus to

---

[49] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

determine if a lower-cost version of the same fund is available, to avoid saddling the plan with unnecessary fees.

161.    Jumbo investors like the Faculty and Medical Plans can obtain share classes with far lower costs than retail mutual fund shares. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments in defined contribution plans.

162.    Even if a jumbo plan does not meet the minimum investment thresholds for an institutional share class, fund companies will routinely waive those minimums for billion dollar plans if merely requested, particularly if the plan's total investment in the investment provider's platform is significant. Therefore, Defendants knew or should have known that investment providers would have made lower-cost share classes available to the Plans if Defendants had asked.

163.    Despite the availability of far lower-cost options, Defendants have allowed the Plans to use investment options with far higher costs than were available to the Plans based on their size. Moreover, for the *exact same mutual fund option*, Defendants allowed the Plans to offer far higher-cost share classes of mutual funds instead of identical lower-cost share classes that were available to the Plans. The lower-cost share classes of these funds are identical in every respect—including liquidity—except for having lower fees.

164.    Numerous sources confirm that the different share classes of a given mutual fund are identical except for fees, including the prospectuses of the Plans' funds filed with the SEC.

**Share classes**

Each Fund may offer Institutional, Advisor, Premier and Retirement Class shares in this Prospectus. The Lifecycle Retirement Income Fund also offers Retail Class shares. *Each Fund's investments are held by the Fund as a whole, not by a particular share class, so an investor's money will be invested the same way no matter which class of shares is held.* However, there are *differences among the fees and expenses* associated with each class and not everyone is eligible to buy every class.

TIAA-CREF Lifecycle Funds, Prospectus at 163 (Sept. 27, 2016)(emphasis added).[50]

165.   Moreover, in granting certiorari on the Solicitor General's recommendation, the Supreme Court in *Tibble* modified the question presented in the petition to specifically focus on the issue of mutual fund share classes.[51] If including retail-class mutual funds instead of identical lower-cost institutional shares was prudent as a matter of law, the issue of whether such a claim was timely would have been entirely irrelevant and the Supreme Court would have had no reason to grant certiorari. In a 9-0 opinion, the Court held that ERISA fiduciaries have a "continuing duty to monitor investments and remove imprudent ones," and remanded for the Ninth Circuit. In a unanimous 11-judge opinion, the Ninth Circuit, sitting en banc, observed that under trust law, "cost-conscious management is fundamental to prudence in the investment function," and that "trustees are

---

[50] Available at: https://www.sec.gov/Archives/edgar/data/1084380/000093041316008290/c85911_485bpos.htm#168.

[51] "Whether a claim that ERISA plan fiduciaries breached their duty of prudence by offering higher-cost retail-class mutual funds to plan participants, even though identical lower-cost institutional-class mutual funds were available, is barred by 29 U.S.C. §1113(1) when fiduciaries initially chose the higher-cost mutual funds as plan investments more than six years before the claim was filed." *See* 135 S. Ct. 43.

obliged to minimize costs." *Tibble V*, 843 F.3d at 1197–98 (quoting Restatement

(Third) of Trust §90, cmt. b, and Unif. Prudent Investor Act §7).

166.   After a second trial, the district court entered a second judgment for

plaintiffs, concluding that the Edison plan fiduciaries breached their duty of

prudence by retaining retail-class shares of 17 mutual funds instead of switching to

institutional-class shares of the same funds. *Tibble VI,* 2017 U.S. Dist. LEXIS

130806, at *36–39. The court found that a prudent fiduciary would have known "of

the existence of the institutional shares" and would have switched to the

institutional shares as soon as they became available. *Id*. at *39–42.

167.   Like *Tibble*, other courts have consistently found that, because the

only difference between share classes is fees, a fiduciary's decision to provide the

higher-cost share class raises an inference that the process was flawed.[52]

---

[52] *Braden,* 588 F.3d at 595–96 & n.5 (denying motion to dismiss where fiduciaries provided "retail class shares, which charge significantly higher fees than institutional shares for the same return on investment"); *Bell v. Pension Comm. of ATH. Holding Co.,* No. 15-2062, 2017 U.S. Dist. LEXIS 42107, at *8–9 (S.D. Ind. Mar. 23, 2017)(rejecting reliance on *Loomis* and *Hecker* because "[n]either court addressed whether a defendant violates their fiduciary duty in selecting high-cost investment options where *identical* investment options are available at a lower-cost."); *Terraza v. Safeway Inc.,* No. 16-3994, 2017 U.S. Dist. LEXIS 35732, at *39–40 (N.D. Cal. Mar. 13, 2017)(because indisputably "the *only* difference between the option that was offered and the option that allegedly should have been offered was price," … "[t]he Court can reasonably infer from this allegation that the Defendants acted imprudently by selecting the more expensive option"); *Kruger v. Novant Health, Inc.,* 131 F.Supp.3d 470, 477–79 (M.D.N.C. 2015)(denying motion to dismiss claim involving 403(b) plan where fiduciaries "utiliz[ed] imprudently expensive … retail class funds when institutional class shares were available"); *Krueger v. Ameriprise Fin., Inc.,* No. 11-2781, 2012 U.S. Dist. LEXIS 166191, at *29–30 (D. Minn. Nov. 20, 2012)(denying motion to dismiss based on use of higher-cost share class instead of lower-cost share class which would have provided "identical investment management"); *Tussey v. ABB, Inc.,* No. 06-4305, 2012 U.S. Dist. LEXIS 45240, at *8–9, 109–11, 115–16 (W.D. Mo. Mar. 31, 2012)(defendants "violated their fiduciary duties" by, *inter alia,* "select[*ing*] more *expensive share classes … when less expensive share classes were available[.]*")(emphasis added), *affirmed in relevant part,* 746 F.3d 327 (8th Cir. 2014).

168.    Under ERISA, each and every investment option must be prudent. Despite this, for the entire proposed class period nearly *half* of the investment options in the Faculty Plan were retail funds, or options that had lower-cost identical funds available. This demonstrates a sustained failure of process on the part of the Retirement Committee to ensure that each option in the Plans was prudent.

169.    In the Faculty and Medical Plans, lower-cost mutual funds *identical* to the Plans' Vanguard mutual funds include and have included the following:

| Plan Mutual Fund[53] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard 500 Index (Inv) (VFINX) | 17 bps | Vanguard Institutional Index (Instl Plus) (VIIIX) | 2 bps | 750.00% |
| Vanguard Asset Allocation (Inv) (VAAPX) | 27 bps | Vanguard Asset Allocation (Adm) (VAARX) | 19 bps | 42.11% |
| Vanguard Balanced Index (Inv) (VBINX) | 26 bps | Vanguard Balanced Index (Instl) (VBAIX) | 8 bps | 225.00% |
| Vanguard Capital Opportunity (Inv) (VHCOX) | 48 bps | Vanguard Capital Opportunity (Adm) (VHCAX) | 41 bps | 17.07% |
| Vanguard Developed Markets Index (Inv) (VDMIX) | 20 bps | Vanguard Developed Markets Index (Instl Plus) (VDMPX) | 6 bps | 233.33% |
| Vanguard Developed Markets Index (Adm) (VTMGX) ** | 9 bps | Vanguard Developed Markets Index (Instl) (VTMNX) | 7 bps | 28.57% |

---

[53] Funds marked with an * were only included in the Faculty Plan.  Funds marked with a ** were only included in the Medical Plan. If there is no asterisk, they were included in both.

| Plan Mutual Fund[53] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 35 bps | Vanguard Emerging Markets Stock Index (Instl) (VEMIX) | 15 bps | 133.33% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 33 bps | Vanguard Emerging Markets Stock Index (Instl Plus) (VEMRX) | 10 bps | 230.00% |
| Vanguard Emerging Markets Stock Index (Adm) (VEMIX) ** | 12 bps | Vanguard Emerging Markets Stock Index (Instl Plus) (VEMRX) | 10 bps | 20.00% |
| Vanguard Energy (Inv) (VGENX) * | 38 bps | Vanguard Energy (Adm) (VGELX) | 31 bps | 22.58% |
| Vanguard Equity-Income (Inv) (VEIPX) | 31 bps | Vanguard Equity-Income (Adm) (VEIRX) | 22 bps | 40.91% |
| Vanguard European Stock Index (Inv) (VEURX) | 26 bps | Vanguard European Stock Index (Instl) (VESIX) | 10 bps | 160.00% |
| Vanguard European Stock Index (Adm) (VEUSX) ** | 12 bps | Vanguard European Stock Index (Instl) (VESIX) | 9 bps | 33.33% |
| Vanguard Explorer (Inv) (VEXPX) | 49 bps | Vanguard Explorer (Adm) (VEXRX) | 32 bps | 53.13% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 26 bps | Vanguard Extended Market Index (Instl) (VIEIX) | 8 bps | 225.00% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 24 bps | Vanguard Extended Market Index (Instl Plus) (VEMPX) | 6 bps | 300.00% |
| Vanguard Extended Market Index (Adm) (VEXAX) ** | 10 bps | Vanguard Extended Market Index (Instl Pl) (VEMPX) | 6 bps | 66.67% |
| Vanguard FTSE Social Index (Inv) (VFTSX) | 29 bps | Vanguard FTSE Social Index (Instl) (VFTNX) | 16 bps | 81.25% |

74

| Plan Mutual Fund[53] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard GNMA (Inv) (VFIIX) | 23 bps | Vanguard GNMA (Adm) (VFIJX) | 13 bps | 76.92% |
| Vanguard Growth & Income (Inv) (VQNPX) | 32 bps | Vanguard Growth & Income (Adm) (VGIAX) | 21 bps | 52.38% |
| Vanguard Growth Index (Inv) (VIGRX) | 26 bps | Vanguard Growth Index (Instl) (VIGIX) | 8 bps | 225.00% |
| Vanguard Growth Index (Adm) (VIGAX) ** | 9 bps | Vanguard Growth Index (Instl) (VIGIX) | 8 bps | 12.50% |
| Vanguard Health Care (Inv) (VGHCX) * | 36 bps | Vanguard Health Care (Adm) (VGHAX) | 29 bps | 24.14% |
| Vanguard High-Yield Corporate (Inv) (VWEHX) | 28 bps | Vanguard High-Yield Corporate (Adm) (VWEAX) | 15 bps | 86.67% |
| Vanguard Inflation-Protected Securities (Inv) (VIPSX) | 22 bps | Vanguard Inflation-Protected Securities (Instl) (VIPIX) | 7 bps | 214.29% |
| Vanguard Institutional Index (Instl) (VINIX) * | 4 bps | Vanguard Institutional Index (Instl Plus) (VIIIX) | 2 bps | 100.00% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index (Instl) (VBIMX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index (Instl Plus) (VBIUX) | 5 bps | 300.00% |
| Vanguard Intermediate-Term Bond Index (Adm) (VBILX) ** | 10 bps | Vanguard Intermediate-Term Bond Index (Instl Plus) (VBIUX) | 5 bps | 100.00% |
| Vanguard Intermediate-Term Investment-Grade (Inv) (VFICX) | 24 bps | Vanguard Intermediate-Term Investment-Grade (Adm) (VFIDX) | 11 bps | 118.18% |
| Vanguard Intermediate-Term Treasury (Inv) (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury (Adm) (VFIUX) | 12 bps | 108.33% |

| Plan Mutual Fund[53] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard International Growth (Inv) (VWIGX) | 49 bps | Vanguard International Growth (Adm) (VWILX) | 33 bps | 48.48% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 22 bps | Vanguard Long-Term Bond Index (Instl) (VBLLX) | 7 bps | 214.29% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 20 bps | Vanguard Long-Term Bond Index (Instl Plus) (VBLIX) | 5 bps | 300.00% |
| Vanguard Long-Term Investment-Grade (Inv) (VWESX) | 26 bps | Vanguard Long-Term Investment-Grade (Adm) (VWETX) | 13 bps | 100.00% |
| Vanguard Long-Term Treasury (Inv) (VUSTX) | 25 bps | Vanguard Long-Term Treasury (Adm) (VUSUX) | 12 bps | 108.33% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 26 bps | Vanguard Mid Cap Index (Instl) (VMCIX) | 8 bps | 225.00% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 24 bps | Vanguard Mid Cap Index (Instl Plus) (VMCPX) | 6 bps | 300.00% |
| Vanguard Mid Cap Index (Instl) (VMCIX) ** | 8 bps | Vanguard Mid Cap Index (Instl Plus) (VMCPX) | 6 bps | 33.33% |
| Vanguard Morgan Growth (Inv) (VMRGX) | 43 bps | Vanguard Morgan Growth (Adm) (VMRAX) | 29 bps | 48.28% |
| Vanguard Pacific Stock Index (Inv) (VPACX) | 26 bps | Vanguard Pacific Stock Index (Instl) (VPKIX) | 10 bps | 160.00% |
| Vanguard Pacific Stock Index (Adm) (VPADX) ** | 12 bps | Vanguard Pacific Stock Index (Instl) (VPKIX) | 9 bps | 33.33% |
| Vanguard Prime Money Market (Inv) (VMMXX) | 23 bps | Vanguard Prime Money Market (Adm) (VMRXX) | 9 bps | 155.56% |
| Vanguard PRIMECAP (Inv) (VPMCX) | 45 bps | Vanguard PRIMECAP (Adm) (VPMAX) | 36 bps | 25.00% |
| Vanguard REIT Index (Inv) (VGSIX) | 26 bps | Vanguard REIT Index (Instl) (VGSNX) | 9 bps | 188.89% |

| Plan Mutual Fund[53] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 22 bps | Vanguard Short-Term Bond Index (Adm) (VBIRX) | 11 bps | 100.00% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 20 bps | Vanguard Short-Term Bond Index (Instl Plus) (VBIPX) | 5 bps | 300.00% |
| Vanguard Short-Term Bond Index (Adm) (VBIRX) ** | 10 bps | Vanguard Short-Term Bond Index (Instl Plus) (VBIPX) | 5 bps | 100.00% |
| Vanguard Short-Term Federal (Inv) (VSGBX) | 22 bps | Vanguard Short-Term Federal (Adm) (VSGDX) | 12 bps | 83.33% |
| Vanguard Short-Term Investment-Grade (Inv) (VFSTX) | 24 bps | Vanguard Short-Term Investment-Grade (Instl) (VFSIX) | 9 bps | 166.67% |
| Vanguard Short-Term Treasury (Inv) (VFISX) | 22 bps | Vanguard Short-Term Treasury (Adm) (VFIRX) | 12 bps | 83.33% |
| Vanguard Small Cap Growth Index (Inv) (VISGX) | 26 bps | Vanguard Small Cap Growth Index (Instl) (VSGIX) | 8 bps | 225.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 26 bps | Vanguard Small Cap Index (Instl) (VSCIX) | 8 bps | 225.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 24 bps | Vanguard Small Cap Index (Instl Plus) (VSCPX) | 6 bps | 300.00% |
| Vanguard Small Cap Index (Instl) (VSCIX) ** | 8 bps | Vanguard Small Cap Index (Instl Plus) (VSCPX) | 6 bps | 33.33% |
| Vanguard Small Cap Value Index (Inv) (VISVX) | 26 bps | Vanguard Small Cap Value Index (Instl) (VSIIX) | 8 bps | 225.00% |

| Plan Mutual Fund[53] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Instl) (VBTIX) | 7 bps | 214.29% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Instl Plus) (VBMPX) | 5 bps | 340.00% |
| Vanguard Total Bond Market Index (Instl) (VBTIX) ** | 6 bps | Vanguard Total Bond Market Index (Instl Plus) (VBMPX) | 5 bps | 20.00% |
| Vanguard Total International Stock Index (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index (Instl) (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index (Inv) (VTSMX) | 17 bps | Vanguard Total Stock Market Index (Instl Plus) (VITPX) | 2 bps | 750.00% |
| Vanguard Total Stock Market Index (Instl) (VITSX) ** | 4 bps | Vanguard Total Stock Market Index (Instl Plus) (VITPX) | 2 bps | 100.00% |
| Vanguard U.S. Growth (Inv) (VWUSX) | 45 bps | Vanguard U.S. Growth (Adm) (VWUAX) | 29 bps | 55.17% |
| Vanguard Value Index (Inv) (VIVAX) | 26 bps | Vanguard Value Index (Instl) (VIVIX) | 8 bps | 225.00% |
| Vanguard Value Index (Inv) (VVIAX) ** | 9 bps | Vanguard Value Index (Instl) (VIVIX) | 8 bps | 12.5% |
| Vanguard Wellesley Income (Inv) (VWINX) | 28 bps | Vanguard Wellesley Income (Adm) (VWIAX) | 21 bps | 33.33% |
| Vanguard Wellington (Inv) (VWELX) | 30 bps | Vanguard Wellington (Adm) (VWENX) | 22 bps | 36.36% |

| Plan Mutual Fund[53] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Windsor II (Inv) (VWNFX) | 35 bps | Vanguard Windsor II (Adm) (VWNAX) | 27 bps | 29.63% |
| Vanguard Windsor (Inv) (VWNDX) | 33 bps | Vanguard Windsor (Adm) (VWNEX) | 22 bps | 50.00% |

170.   Lower-cost alternatives *identical* to the Faculty Plan's TIAA-CREF

mutual funds include and have included the following:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF International Equity Index (Retire) (TRIEX) | 35 bps | TIAA-CREF International Equity Index (Instl) (TCIEX) | 10 bps | 250.00% |
| TIAA-CREF Large-Cap Value Index (Retire) (TRCVX) | 34 bps | TIAA-CREF Large-Cap Value Index (Instl) (TILVX) | 9 bps | 277.78% |
| TIAA-CREF Lifecycle 2010 (Retire) (TCLEX) | 65 bps | TIAA-CREF Lifecycle 2010 (Instl) (TCTIX) | 40 bps | 62.50% |
| TIAA-CREF Lifecycle 2015 (Retire)  (TCLIX) | 67 bps | TIAA-CREF Lifecycle 2015 (Instl) (TCNIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2020 (Retire) (TCLTX) | 67 bps | TIAA-CREF Lifecycle 2020 (Instl) (TCWIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2025 (Retire) (TCLFX) | 69 bps | TIAA-CREF Lifecycle 2025 (Instl) (TCYIX) | 44 bps | 56.82% |
| TIAA-CREF Lifecycle 2030 (Retire) (TCLNX) | 71 bps | TIAA-CREF Lifecycle 2030 (Instl) (TCRIX) | 46 bps | 54.35% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2035 (Retire) (TCLRX) | 72 bps | TIAA-CREF Lifecycle 2035 (Instl) (TCIIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2040 (Retire) (TCLOX) | 72 bps | TIAA-CREF Lifecycle 2040 (Instl) (TCOIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2045 (Retire) (TTFRX) | 72 bps | TIAA-CREF Lifecycle 2045 (Instl) (TTFIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2050 (Retire) (TLFRX) | 71 bps | TIAA-CREF Lifecycle 2050 (Instl) (TFTIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle Retirement Income (Retire) (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income (Instl) (TLRIX) | 40 bps | 62.50% |
| TIAA-CREF Mid-Cap Growth (Retire) (TRGMX) | 77 bps | TIAA-CREF Mid-Cap Growth (Instl) (TRPWX) | 52 bps | 48.08% |
| TIAA-CREF Mid-Cap Value (Retire) (TRVRX) | 74 bps | TIAA-CREF Mid-Cap Value (Instl) (TIMVX) | 49 bps | 51.02% |
| TIAA-CREF Small-Cap Blend Index (Retire) (TRBIX) | 34 bps | TIAA-CREF Small-Cap Blend Index (Instl) (TISBX) | 9 bps | 277.78% |

171.   These lower-cost share classes of the *identical* mutual funds for the Faculty Plan and Medical Plan have been available for years, some dating back to the early 2000's or before.

172.   The failure to select far lower-cost share classes for the Plans' mutual fund options that are identical in all respects (portfolio manager, underlying investments, and asset allocation), except for cost, demonstrates that Defendants

failed to consider the size and purchasing power of the Plans when selecting share classes and failed to engage in a prudent process for the selection, monitoring, and retention of those mutual funds.

173.   Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the lower-cost share classes, the Plans' participants would not have lost millions of dollars of their retirement savings.

## V.   Defendants selected and retained a large number of duplicative investment options, diluting the Plans' ability to ensure lower fees and confusing participants.

174.   Defendants provided a dizzying array of duplicative funds in the same investment style, thereby reducing the bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees, and causing "decision paralysis" for participants. For each Plan, Defendants placed over 70 investment options in the core lineup for the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market, real estate, and fixed guaranteed annuity.

175.   It is well-documented in industry literature, and well-known by prudent fiduciaries of large defined contribution plans, that a large number of options is detrimental for a number of reasons, including because it results in poor asset allocation decisions, worse outcomes for participant retirement savings,

investor confusion, and "decision paralysis."[54] Accordingly, prudent fiduciaries view a large number of duplicative investment options as imprudent and take steps to consolidate the investment menu to a level that maintains ample choice while optimizing retirement outcomes for participants.

176.   In comparison, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average of *15* investment options, excluding target date funds.[55] This reasonable number of options provides choice of investment style to participants while maintaining a larger pool of assets in each investment style, which benefits participants by avoiding participant confusion and ensuring lower fees.

177.   A larger pool of assets in each investment style significantly reduces fees paid by participants. Consolidating duplicative investments of the same investment style into a single investment option would strengthen the Plans' ability to command lower-cost investments.

178.   Including a range of choices in investment options is generally beneficial, as long as the fund selections are the result of a detailed due diligence process that considers factors such as risk, investment return, and expenses of available investment alternatives, the fiduciary gives "appropriate consideration" to "the role the investment or investment course of action plays . . . in the plan's investment portfolio," 29 C.F.R. §§ 2550.404a-1(b)(i)-(ii), and the resulting

---

[54] Sheena S. Iyengar, et al., Choice Proliferation, Simplicity Seeking, and Asset Allocation, 94 J.PUB. ECON. 530 (Mar. 2010)(finding that the presence of more funds in a plan results in poor individual asset allocation decisions).

[55] Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015), available at https://www.callan.com/research/files/990.pdf.

investment lineup provide participants with the ability to diversify their portfolio appropriately while benefiting from the size of the pooled assets of other employees and retirees. Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Assembling a haphazard lineup of over 100 duplicative, high-cost funds proprietary to the Plans' recordkeepers—and shifting to participants the burden to screen those options—does not reflect a prudent investment selection process.

179.    Within each asset class and investment style deemed appropriate for a participant-directed retirement plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. In contrast to Defendants, prudent fiduciaries do not select and retain numerous duplicative investment options for a single asset class and investment style. When a plan includes many investment options in a single investment style, fiduciaries reduce their leverage to obtain lower investment management expenses for that style.

180.    Moreover, using many actively managed funds within the same investment style results in the Plans effectively having an index fund return, while paying much higher fees for active management than the fees of a passive index fund, which has much lower fees because there is no need for active management and its higher fees.

181.    From 2010 to date, the Faculty Plan included and continues to include duplicative investments in every major asset class and investment style, including balanced/asset allocation (9–10 options), fixed income and high yield bond (17 options), international (11 options), large cap domestic equities (19–20 options), mid cap domestic equities (9 options), small cap domestic equities (5 options), real estate (2 options), money market (4 options), and target date investments (2 fund families). The Medical Plan included and continues to include duplicative investments in balanced/asset allocation (9–10 options), fixed income and high yield bond (17 options), international (10 options), large cap domestic equities (17–18 options), mid cap domestic equities (7 options), small cap domestic equities (4 options), real estate (2 options), money market (4 options), and stable value (2 options). This dizzying array of duplicative funds in a single investment style harmed participants by diluting the Plans' bargaining power and providing participants a collection of options that were far inferior to low-cost alternatives that were available to the Plans.

182.    For illustration purposes, Defendants included up to six large cap domestic blend investments for the Faculty Plan and Medical Plan as of December 31, 2016. These investments are summarized below and compared to a far lower-cost large cap domestic blend alternative that was available to the Plans, the Vanguard Institutional Index Fund (Instl Plus), which was only recently included in the Medical Plan.  The Vanguard Institutional Index Fund (Instl Plus) (VIIIX), by definition, mirrors the market, and has an expense ratio of 2 bps.

84

| Large Cap Blend Investments[56] | Assets | Fee | Institutional Index Fund (VIIIX) | Plan's Excess Cost |
|---|---|---|---|---|
| CREF Stock Account | $812,146,351 | 46 bps | 2 bps | 2200% |
| CREF Equity Index Account | $104,165,602 | 37 bps | 2 bps | 1750% |
| Vanguard Growth & Income (Adm) (VGIAX) ** | $13,850,027 | 23 bps | 2 bps | 1050% |
| Vanguard Growth & Income (Inv) (VQNPX) * | $4,987,624 | 37 bps | 2 bps | 1750% |
| Vanguard Institutional Index Fund (Instl) (VINIX) * | $62,168,369 | 4 bps | 2 bps | 100% |
| Vanguard PRIMECAP Core (Inv) (VPCCX) * | $2,828,531 | 50 bps | 2 bps | 2400% |
| Vanguard Total Stock Market Index Fund (Instl) (VITSX) ** | $44,993,383 | 4 bps | 2 bps | 100% |
| Vanguard Total Stock Market Index Fund (Inv) (VTSMX) * | $9,469,355 | 17 bps | 2 bps | 750% |
| **Total of Higher-Cost Alternatives** | **$1,054,609,242** | | | |

183.    With over *$916 million* held in the CREF Stock Account and the CREF

Equity Index Account, these large cap blend options were *23 and 18 times* more

expensive than the lower-cost Vanguard option with an expense ratio of 2 bps.

---

[56] Funds marked with an * were only included in the Faculty Plan.  Funds marked with a ** were only included in the Medical Plan. If there is no asterisk, they were included in both.



184.   There are many other large cap index funds that are also available in the market at far lower costs than the Plans' large cap blend funds. Had the amounts invested in the Plans' large cap blend options been consolidated into a single large cap blend investment such as the Vanguard Institutional Index Fund (Instl Plus), Plan participants would have avoided losses of well over $4 million dollars in fees in 2014 alone, and many more millions since 2011.

185.   In addition, Defendants selected and continue to retain multiple passively managed index options in the same investment style. As discussed above, unlike actively managed funds, index funds do not attempt to beat their benchmark through active stock selection, but instead simply attempt to track a given index, such as the S&P 500, and thus have much lower fees than actively managed funds. In the large cap blend investment style, Defendants included four separate index

funds in each Plan which generate investment results that correspond to the return of the U.S. equity market. As another example, Defendants retained four separate index funds for the fixed income and intermediate-term bond investment styles.

186.    Since index funds merely hold the same securities in the same proportions as the index,[57] having multiple index funds in the Plans provides no benefit to participants. Instead, it hurts participants by diluting the Plans' ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

187.    Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, the Plans would have generated higher investment returns, net of fees, and participants would not have lost significant retirement assets.

188.    Defendants' failure to pool the assets invested in duplicative investment options for the same investment style into a single investment option caused Plan participants to pay millions of dollars in unreasonable investment expenses, thereby depleting their retirement assets.

---

[57] Another example of an index is the Dow Jones Industrial Average.

## VI.    Defendants imprudently retained historically underperforming Plan investments.

189.    A fiduciary who breaches its fiduciary duties is required to make good any losses to the plan resulting from each such breach. 29 U.S.C. §1109(a). Defendants' failure to conduct appropriate due diligence in selecting and monitoring the Plans' investments resulted in options being retained in the Plans despite years of historical underperformance compared to superior lower-cost alternatives, causing massive losses to the Plans compared to what those assets would have earned if invested in prudent alternatives.

190.    Despite acknowledging in 2009 that one of the fiduciary advantages of consolidation included the ability to "develop[] an investment policy and monitor fund performance," Defendants did not create an investment policy statement until 2014—over five years later.[58]

### A.    Defendants imprudently retained the CREF Stock Account.

191.    TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plans. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. Under the restrictions, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account. Instead of controlling each plan option allowed in the Plans, as ERISA requires,

---

[58] Re*engineering II, More Opportunities for Self Service,* (July 30, 2009), available at: https://www.nyu.edu/content/dam/nyu/execVicePres/documents/13-Appendix-D-Self-Service-Opportunities.ppt

Defendants allowed TIAA-CREF to dictate that the CREF Stock Account would be placed and retained in the Plans. Defendants did so without a prudent process to determine whether there were other prudent alternatives in the exclusive best interest of Plans' participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by nearly 50% (15 bps).

192. The CREF Stock Account has excessive and unnecessary fees, has consistently underperformed for years, and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plans, yet has not been removed from the Plans nor frozen to new investments. The CREF Stock Account is one of the largest investment options in the Plans with over $812 million in total assets, and has been offered to participants throughout the period from 2011 to date.[59]

193. As understood in the investment community, passively managed investment options should either be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis, as set forth above. This extreme unlikelihood is even greater in

---

[59] TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category in its fund fact sheets, as well as in participant disclosures.

the large cap market because such companies are the subject of many analysts'
coverage, while smaller stocks are not as widely covered by analysts and thus are
subject to potential inefficiencies in pricing.

194.   The efficiencies of the large cap market hinder an active manager's
ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief
> that securities markets are remarkably efficient. Most investors would be
> considerably better off by purchasing a low expense index fund, than by
> trying to select an active fund manager who appears to possess a "hot hand."
> Since active management generally fails to provide excess returns and tends
> to generate greater tax burdens for investors, the advantage of passive
> management holds, a fortiori.

Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50

J. FIN. 549, 571 (1995).[60]

195.   Academic literature overwhelmingly concludes that active managers
consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for
> passive investing. Dozens of studies have examined the performance of
> mutual funds and other professional-managed assets, and virtually all of
> them have concluded that, on average, active managers underperform
> passive benchmarks…The median active fund underperformed the passive
> index in 12 out of 18 years [for the large-cap fund universe]…The bottom line
> is that, over most periods, the majority of mutual fund investors would have
> been better off investing in an S&P 500 Index fund.
>
> ****
>
> Most of the dismal comparisons for active managers are for large-cap
> domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*,

ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed.,1998).

---

[60] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

196.    Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it is in participants' best interest to offer an actively managed large cap option for the particular investment style and asset class, in light of the higher costs of active management.

197.    Defendants failed to undertake such an analysis, or any analysis, when it allowed the actively managed CREF Stock Account to be included and retained in the Plans. This is particularly true given TIAA-CREF's requirement that the CREF Stock Account be provided in the Plans in order to drive revenue to TIAA-CREF. By allowing the Plans to be bound by this requirement, Defendants failed to conduct an independent evaluation of the prudence of this option, which contradicts every principle of prudent investing because an investment that was no longer prudent could not be removed from the Plans.

198.    Additionally, as detailed above, the 46 bps that the CREF Stock Account charged was comprised of four layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plans' participants. Defendants failed to analyze whether these fees were appropriate and reasonable in light of the services provided and given that the Plans collectively invested over *$812 million* in the CREF Stock Account.

199.    Had Defendants engaged in a prudent investment review and monitoring process, it would have determined that the CREF Stock Account would

not be expected to outperform the large cap index after fees. That is in fact what occurred.

200.    The CREF stock account did not merely experience poor performance in a single year or two, but rather its historical performance has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark.

201.    Defendants and TIAA-CREF identified the Russell 3000 Index as the appropriate benchmark to evaluate the fund's investment results, as shown in the excerpt below that was provided to the Plans' participants.

| Investment Name / Benchmark | Morningstar Category | Ticker Symbol | Inception Date | Average Annual Total Returns/Benchmark | | |
| | | | | 1 Yr. | 5 Yr. | 10 Yr. or Since Inception |
| --- | --- | --- | --- | --- | --- | --- |
| **CREF Stock Account R3** | Large Blend | QCSTIX | 04/24/2015 | -3.33% | 7.39% | 5.16% |
| *Russell 3000 Index* | | | | -0.34% | 11.01% | 6.90% |

202.    The following chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style and its benchmark for the one-, five-, and ten-year periods ending December 31, 2016.[61] For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Instl Plus) (VITPX) and the Vanguard Institutional Index

---

[61] Performance data provided as of December 31, 2016 to correspond to the Plans' most recent Form 5500 filed with the Department of Labor as of the filing of this complaint.

(Instl Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.



203.   The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Instl Plus) (2 bps) and the Vanguard Institutional Index (Instl Plus) (2 bps).

204.   Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one, five-, and ten-year periods ending December 31, 2016. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard PRIMECAP (Adm) (VPMAX) and Vanguard Capital Opp. (Adm) (VHCAX).



205.  The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[62]

---

[62] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.







206.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (40 bps), the Vanguard PRIMECAP (Adm) (35 bps), and the Vanguard Capital Opp. (Adm) (40 bps).

207.    Besides this abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plans. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July

96

2012).[63] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the over 60 separate underlying investment strategies, which greatly reduced the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5. Had Defendants conducted a reasonable due diligence investigation, they would have discovered these defects and removed the CREF Stock Account from the Plans or frozen it to new investments.

208.    The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and has retained the fund even though it continues to underperform lower-cost investment alternatives that are readily available to the Plans.

209.    Prudent fiduciaries of defined contribution plans regularly monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries place underperforming investments on a "watch list." If performance does not improve within a reasonable period, fiduciaries replace those imprudent investments with better-performing and reasonably priced options. Under the

---

[63] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans based on years of historical underperformance.

210.   Had Defendants removed the CREF Stock Account and the amounts been invested in any of the actively or passively managed lower-cost alternatives identified in ¶¶189 and 191, participants in the Plans would not have lost well in excess of $148 million of their retirement savings from the fund being retained in the Plans.[64]

**B.   Defendants imprudently retained the TIAA Real Estate Account.**

211.   Defendants allowed the Plans to include the TIAA Real Estate Account as one of the real estate investment options in the Plans. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Instl) (VGSNX).

212.   With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real Estate Account is also over *10 times more expensive* than the Vanguard REIT Index (Instl), which has an expense ratio of 8 bps.

---

[64] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.



213.    The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[65] Despite this, Defendants have not removed or frozen the Real Estate Account and to date has retained it in the Plans.

---

[65] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Instl) was 5.49%.







214.   This underperformance continued for years before 2009 and has continued after 2009. The TIAA Real Estate Account significantly underperformed the Vanguard REIT Index (Instl) over the one-, five-, and ten-year periods ending September 30, 2017.





215.   As the Supreme Court unanimously ruled in *Tibble*, fiduciaries of defined contribution plans have a continuing duty to monitor plan investment

options and replace imprudent investments. *Tibble*, 135 S. Ct. at 1829. Defendants failed to conduct such a process and continues to retain the TIAA Real Estate Account as an investment option in the Plans, despite its continued dramatic underperformance and far higher costs compared to available investment alternatives.

216.   Had the amounts invested in the TIAA Real Estate Account instead been invested in the lower-cost and better-performing Vanguard REIT Index (Instl), Plan participants would not have lost almost $20 million of their retirement savings.[66]

## CLASS ACTION ALLEGATIONS

217.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. §1109(a).

218.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration and the New York University Retirement

---

[66] Losses in the Plans have been brought forward to the present value using the investment returns of the Vanguard REIT Index (Instl) to compensate participants who have not been reimbursed for their losses.

Plan for Members of the Faculty, Professional Research Staff and Administration from November 10, 2011, through the date of judgment, excluding the Defendants and any participant who is a fiduciary to the Plans.

219.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 20,000 members and is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.   Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plans were harmed by Defendants' misconduct, as described above.

d.   Plaintiffs are adequate representatives of the Class because they were participants in the Plans during the Class period, have no interest that

is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of its fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

220.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, it would be impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter,

and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

221.    Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.    Schlichter, Bogard & Denton has been appointed as class counsel in 17 other ERISA class actions regarding excessive fees in large defined contribution plans. As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206, at *4–5 (S.D.Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816

at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation,

Schlichter, Bogard & Denton has achieved unparalleled results on behalf of

its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622

at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable

defendants and their sophisticated attorneys required Class Counsel to

demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper*

*Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D. Ill. Jan. 31, 2014).

      b.     The U.S. District Court Judge G. Patrick Murphy recognized the

work of Schlichter, Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation
> illustrates an exceptional example of a private attorney general
> risking large sums of money and investing many thousands of
> hours for the benefit of employees and retirees. No case had
> previously been brought by either the Department of Labor or
> private attorneys against large employers for excessive fees in a
> 401(k) plan. Class Counsel performed substantial work[,]
> investigating the facts, examining documents, and consulting
> and paying experts to determine whether it was viable. This
> case has been pending since September 11, 2006. Litigating the
> case required Class Counsel to be of the highest caliber and
> committed to the interests of the participants and beneficiaries
> of the General Dynamics 401(k) Plans.

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at

8–9 (S.D.Ill. Nov. 22, 2010).

      c.     Schlichter, Bogard & Denton handled the only full trial of an

ERISA excessive fee case, resulting in a $36.9 million judgment for the

plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB,*

*Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the

district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans.

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

d.     In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "Schlichter, Bogard & Denton added great value to the Class through the persistence and skill of their attorneys." No. 06-cv-743, Doc. 587, at 5 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.).

e.     In approving a recent settlement including $32 million plus significant affirmative relief, Chief Judge Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class

Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

f.      In November 2016, Judge Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. November 3, 2016).

g.      Recently, on October 24, 2017, Judge Andre Birotte Jr. of the United States District Court for the Central District of California found that the $16.75 million settlement fund obtained by Schlichter, Bogard & Denton was an "exceptional result" for the class that came after approximately eleven years of hard fought litigation. *Waldbuesser v. Northrop Grumman Corp.*, No. 06-6213, Doc. 803 at 4–5. (C.D.Cal. October 24, 2017).

h.      Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*—the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ

109

of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

i.    The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[67] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[68] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[69] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y. TIMES (Oct. 16, 2014);[70] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[71] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [72] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on*

---

[67] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[68] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[69] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[70] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[71] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[72] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

*Trial*, NPR (Dec. 15, 2014);[73] Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[74] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[75]

## COUNT I

## Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

## Locking the Plans into CREF Stock Account and TIAA Recordkeeping

222.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

223.    Defendant was required to discharge its duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

224.    Defendant was required to independently assess "the prudence of *each* investment option" for the Plans on an ongoing basis, *DiFelice*, 497 F.3d at 423, and to act prudently and solely in the interest of the Plans' participants in deciding whether to maintain a recordkeeping arrangement, DOL Adv. Op. 97-16A.

---

[73] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[74] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[75] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

Defendant was also required to remove investments that were no longer prudent for the Plans, as the Supreme Court recently confirmed. *Tibble*, 135 S. Ct. at 1828–29.

225.   By allowing TIAA-CREF to mandate the inclusion of the CREF Stock Account and Money Market Account in the Plans, and to require that it provide recordkeeping for its proprietary options, Defendant committed the Plans to an imprudent arrangement in which certain investments could not be removed from the plan *even if they were no longer prudent investments*, and prevented the Plans from using alternative recordkeepers who could provide superior services at a lower cost.  In so doing, Defendant abdicated its duty to independently assess the prudence of each option in the Plans on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plans' recordkeeper. By allowing TIAA-CREF to dictate these terms, Defendant favored the financial interests of TIAA-CREF in receiving a steady stream of revenues from bundled services over the interest of participants.

226.   Because Defendant shackled the Plan with the CREF Stock Account and TIAA recordkeeping services without engaging in a reasoned decisionmaking process as to the prudence of those options, Defendant is liable to make good to the Plans all losses resulting from its breach. 29 U.S.C. §1109(a). As described in detail above, the Plans suffered massive losses from the inclusion of the CREF Stock Account in the Plans compared to what those assets would have earned if invested in prudent alternative investments that were available to the Plans, and also

suffered losses from paying TIAA recordkeeping fees that far exceeded market rates.

## COUNT II

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Locking the Plans into CREF Stock Account and TIAA Recordkeeping

227.    Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

228.    Section 1106(a)(1) prohibits transactions between a plan and a "party in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> * * *
>
> (C)    furnishing of goods, services, or facilities between the plan and party in interest;
>
> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan …

29 U.S.C. §1106(a)(1).

229.    Congress defined "party in interest" to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000); 29 U.S.C. §1002(14)(A)–(C). As service providers to the Plans, TIAA-CREF and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

230.   By allowing the Plans to be locked into an unreasonable arrangement that required the Plans to include the CREF Stock Account and to use TIAA as the recordkeeper for its proprietary products even though the fund was no longer a prudent option for the Plans due to its excessive fees and poor performance, and even though TIAA's recordkeeping fees were unreasonable expensive for the services provided, Defendant caused the Plans to engage in transactions that it knew or should have known constituted an exchange of property between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA-CREF in connection with the Plans' investments in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA.

231.   Under 29 U.S.C. §1109(a), Defendant is liable to restore all losses to the Plans resulting from these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

## COUNT III

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)
### Unreasonable Administrative Fees

232.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

233.   Defendants were required to discharge its duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to,

114

Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

234.   If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying … through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense," is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

235.   Defendants' process for monitoring and controlling the Plans' recordkeeping fees was flawed in that Defendants failed to: monitor the amount of the revenue sharing received by the Plans' recordkeepers, determine if those amounts were competitive or reasonable for the services provided to the Plans, or use the Plans' size to reduce fees or obtain rebates. Moreover, Defendants failed to solicit bids from competing providers on a flat per-participant fee basis. As the Plans' assets grew, the asset-based revenue sharing payments to the Plans' recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the

115

recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties.

236.    Defendants also failed to account for the fact that TIAA used its position as a recordkeeper to obtain access to participants, gaining valuable information including participants' contact information, their choices of investments, the size of their accounts, their employment status, and their age among other things. Defendants allowed TIAA to then use this information to sell lucrative products to plan participants as they neared retirement age without receiving any compensation for the use of this valuable information.  This information was even more lucrative for TIAA because Defendants are using TIAA as a recordkeeper and are offering TIAA's products in the Plans to participants.

237.    By allowing TIAA-CREF and Vanguard to put their proprietary investments in the Plans without scrutinizing those providers' financial interest in using funds that provided them a steady stream of revenue sharing payments, Defendants failed to act in the exclusive interest of participants.

238.    In contrast to the comprehensive plan reviews conducted by similarly situated 403(b) plan fiduciaries which resulted in consolidation to a single recordkeeper and significant fee reductions, Defendants failed to engage in a timely and reasoned decisionmaking process to determine whether the Plans would similarly benefit from consolidating the Plans' administrative and recordkeeping services under a single provider. Instead, Defendants retained two recordkeepers to provide recordkeeping services. This failure to consolidate the recordkeeping

services eliminated the Plans' ability to obtain the same services at a lower cost with a single recordkeeper. Defendants' failure to "balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so"—and, indeed, *did* so—was a breach of fiduciary duty. *George*, 641 F.3d at 788.

239.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

240.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

241.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Unreasonable Administrative Fees

242.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

117

243.   As service providers to the Plans, TIAA-CREF and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

244.   In engaging multiple entities—TIAA-CREF and Vanguard—to provide recordkeeping services to the Plans and allowing them to collect unreasonably high fees for the services provided, Defendant caused the Plan to pay excessive fees for unnecessary services, thereby causing the Plans to engage in transactions that Defendant knew or should have known constituted an exchange of property between the Plan and TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA-CREF or Vanguard in connection with the Plans' investments in funds that paid revenue sharing to TIAA or Vanguard.

245.   Under 29 U.S.C. §1109(a), Defendant is liable to restore all losses to the Plans resulting from these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

## COUNT V

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

**Unreasonable investment management fees, unnecessary marketing and distribution (12b-1) fees and mortality and expense risk fees, and performance losses.**

246.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

247.    Defendants are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plans' assets are invested prudently. Defendants had a continuing duty to evaluate and monitor the Plans' investments on an ongoing basis and to "remove imprudent ones" within a reasonable time. *Tibble,* 135 S. Ct. at 1829.

248.    These duties required Defendants to independently assess whether each option was a prudent choice for the Plans, and not simply to follow the recordkeepers' fund recommendations or to allow the recordkeepers to put their entire investment lineups in the Plans' menus. *DiFelice*, 497 F.3d at 423; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590, 595–96 (8th Cir. 2009).

249.    In making investment decisions, Defendants were required to consider all relevant factors under the circumstances, including without limitation alternative investments that were available to the Plans, the recordkeepers' financial interest in having their proprietary investment products included in the Plans, and whether the higher costs of actively managed funds was justified by a realistic expectation of higher returns. *Braden*, 588 F.3d at 595–96; *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014); 29 C.F.R. § 2550.404a-1(b); Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2).

119

250.   Defendants selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with high expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times.

251.   Many of these options included unnecessary layers of fees that provided no benefit to participants but significant benefits to TIAA-CREF and Vanguard, including marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

252.   Rather than consolidating the 103 options in the Faculty Plan and 84 options in the Medical Plan into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plans of their ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion. In addition, as a fiduciary required to operate as a prudent financial expert, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), Defendants knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plans' investment offerings included the use of mutual funds and variable annuities with expense ratios far in

120

excess of other lower-cost options available to the Plans. These lower-cost options included lower-cost share class mutual funds with the identical investment manager and investments, lower-cost insurance company variable annuities and insurance company pooled separate accounts. All of the Plans' options were the recordkeepers' own proprietary investments. Thus, the use of these funds was tainted by the recordkeepers' financial interest in including these funds in the Plans, which Defendants failed to consider. In so doing, Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge its duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans. This was a breach of fiduciary duties.

253.   Defendants failed to engage in a prudent process for monitoring the Plans' investments and removing imprudent ones within a reasonable period. This resulted in the Plans continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plans.

254.   CREF Stock Account: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments with similar underlying asset allocations.

255.   <u>TIAA Real Estate Account</u>: Defendants selected and retained the TIAA Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

256.   Had Defendants engaged in a prudent investment review process, it would have concluded that these options were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans, and thus should be removed from the Plans or, at a minimum, frozen to new investments.

257.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

258.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

259.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

# COUNT VI

## Prohibited transactions—29 U.S.C. §1106(a)(1)

### Unreasonable investment management fees, unnecessary marketing and distribution (12b-1) fees and mortality and expense risk fees.

260.   Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

261.   As the plan's providers of investment services, TIAA-CREF and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

262.   In including 103 TIAA-CREF and Vanguard investment options in the Faculty Plan and 84 TIAA-CREF and Vanguard investment options in the Medical Plan, many of which were duplicative and charged excessive and unnecessary fees compared to superior low-cost alternatives that were available to the Plans, including identical lower-cost share classes of the same mutual funds, Defendant caused the Plan to pay excessive fees for unnecessary and duplicative services, thereby causing the Plans to engage in transactions that Defendant knew or should have known constituted an exchange of property between the Plan and TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA-CREF or Vanguard in connection with the Plans' investments in TIAA-CREF and Vanguard investment options.

263.   Under 29 U.S.C. §1109(a), Defendant is liable to restore all losses to the Plans resulting from these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

## COUNT VII

## Prohibited transactions—29 U.S.C. §1106(a)(1)

## TIAA's Exploitation of Its Role as Recordkeeper

264.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

265.   As the plan's providers of investment services, TIAA-CREF is a party in interest. 29 U.S.C. §1002(14)(B).

266.   By allowing TIAA to exploit its position as recordkeeper to glean valuable information about the Plans' participants and to use that information to market and sell lucrative financial products to the Plans' participants outside of their investments already in the Plans, Defendants caused the Plans to engage in transactions that Defendant knew or should have known constituted an exchange of property between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time TIAA harvested information from the Plans' records or used the Plans' participant information to sell outside retirement products and wealth management services to the Plans' participants.

124

267.    Under 29 U.S.C. §1109(a), Defendant is liable to restore all losses to the Plans resulting from these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

## COUNT VIII

## Failure to Monitor Fiduciaries

268.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

269.    This Count alleges breach of fiduciary duty against NYU Hospitals Center and NYU School of Medicine.

270.    NYU Hospitals Center and NYU School of Medicine had the responsibility to control and manage the operation and administration of the Plans, including the selection of service providers for the Plans, with all powers necessary to enable it to properly carry out such responsibilities.

271.    To the extent NYU Hospitals Center or NYU School of Medicine disclaims responsibility for any of the actions or omissions alleged in the preceding counts based on having delegated its responsibilities to a third party, NYU Hospitals Center and NYU School of Medicine remains liable for failing to monitor its delegate. 29 U.S.C. §1105(a), (c)(2).

272.    A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

273.     NYU Hospitals Center and NYU School of Medicine delegated certain of its fiduciary responsibilities to the Retirement Plan Committee and its members, including responsibility for administrative matters, and for evaluating, selecting, and monitoring the Plans' investment options.

274.     NYU School of Medicine and NYU Hospitals Center breached its fiduciary monitoring duties by, among other things:

a.     Failing to monitor the Retirement Plan Committee and its members, including the individual Defendants, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of its delegates' imprudent actions and omissions with respect to the Plans;

b.     Failing to monitor the fiduciary process of the Retirement Plan Committee, including the individual Defendants, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperforming Plan investments in violation of ERISA;

c.     Failing to ensure that the Retirement Plan Committee and its members, including the individual Defendants, had a prudent process in place for evaluating the Plans' administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plans' recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from

126

receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plans;

d.      Failing to ensure that the Retirement Plan Committee and its individual members, including the individual Defendants considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plans' investments;

e.      Failing to ensure that the Retirement Plan Committee and its individual members, including individual Defendants considered whether there were lower-cost, institutional share classes in the Plans;

f.      Failing to remove members of the Retirement Plan Committee, including individually named Defendants whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

275.   Had NYU School of Medicine and NYU Hospitals Center discharged their fiduciary monitoring duties prudently as described above, the Plans would not have suffered these losses. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plans, the Plaintiffs, and the other Class members, lost tens of millions of dollars of retirement savings.

127

## JURY TRIAL DEMANDED

276.   Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendants have breached its fiduciary duties as described above;

- Find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

- Determine the method by which losses to the Plans under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);

- Order Defendants to disgorge all benefits TIAA received from excessive fees and from marketing TIAA's IRA products and wealth management services, to compensate Plaintiffs for such benefits that Defendants allowed TIAA to obtain;

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- Reform the Plans to include only prudent investments;

- Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- Require the fiduciaries to select investments and service providers based solely on the merits of those selections, and not because it is a requirement in order to offer some different investment product or to use the provider;

- Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

November 13, 2017                          Respectfully submitted,

/s/ Andrew D. Schlichter

SCHLICHTER, BOGARD & DENTON LLP
Andrew D. Schlichter, Bar No. 4403267
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Phone: (314) 621-6115, Fax: (314) 621-5934
aschlichter@uselaws.com