# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DR. ALAN SACERDOTE, DR. HERBERT SAMUELS, MARK CRISPIN MILLER, MARIE E. MONACO, DR. SHULAMITH LALA STRAUSSNER, AND JAMES B. BROWN, individually and as representatives of a class of participants and beneficiaries on behalf of the NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration and the New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration,<br><br>*Plaintiffs*,<br><br>v.<br><br>NEW YORK UNIVERSITY SCHOOL OF MEDICINE, CAMMACK LARHETTE ADVISORS, LLC, RETIREMENT PLAN COMMITTEE, RICHARD BING, MICHAEL BURKE, CATHERINE CASEY, MARTIN DORPH, SABRINA ELLIS, THOMAS FEUERSTEIN, ANDREW GORDON, PATRICIA HALLEY, TIM HESLER, KATHLEEN JACOBS, MARINA KARTANOS, ANN KRAUS, MARGARET MEAGHER, CYNTHIA NASCIMENTO, NANCY SANCHEZ, TINA SURH, LINDA WOODRUFF, MAURICE MAERTENS, JOSEPH MONTELEONE, RAY OQUENDO, AND CHRIS TANG,<br><br>*Defendants*. | CLASS ACTION AMENDED COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

## Amended COMPLAINT

1.      Plaintiffs Dr. Alan Sacerdote, Dr. Herbert Samuels, Mark Crispin Miller, Marie E. Monaco, Dr. Shulamith Lala Straussner, and James B. Brown, individually and as representatives of a class of participants and beneficiaries of the New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration and the NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (herein collectively referred to as the "Plans"), bring this action under 29 U.S.C. §1132(a)(2) on behalf of the Plans against Defendants the Retirement Plan Committee, Cammack Larhette Advisors, LLC, Richard Bing, Michael Burke, Catherine Casey, Martin Dorph, Sabrina Ellis, Thomas Feuerstein, Andrew Gordon, Patricia Halley, Tim Hesler, Kathleen Jacobs, Marina Kartanos, Ann Kraus, Margaret Meagher, Cynthia Nascimento, Nancy Sanchez, Tina Surh, Linda Woodruff, Maurice Maertens, Joseph Monteleone, Ray Oquendo, Chris Tang, and the NYU School of Medicine[1] for breach of fiduciary duties under ERISA.[2]

2.      ERISA's fiduciary duties "are those of trustees of an express trust—the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982); 29 U.S.C. §1104(a). In exercising those duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *See Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998). Fiduciaries must "initially determine, and continue to

---

[1] The Retirement Plan Committee and its individual members are collectively referred to as the "NYU Defendants".

[2] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

monitor, the prudence of *each* investment option available to plan participants,"
*DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original),
and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*,
135 S. Ct. 1823, 1828–29 (2015).

 3. Defined contribution plans with billions of dollars in assets, like the
Plans—which are among the largest 0.06% of defined contribution plans in the
United States—have tremendous bargaining power in the marketplace for
retirement plan services, and can demand high-quality administrative and
investment management services at low cost. As fiduciaries to the Plans,
Defendants are obligated to limit the Plans' expenses to a reasonable amount, to
ensure that *each* fund in the Plans is a prudent option for participants to invest
their retirement savings and priced at a reasonable level for the size of the Plans;
and to analyze the costs and benefits of alternatives for the Plans' administrative
and investment structure. Defendants must make those decisions for the exclusive
benefit of participants, and not for the benefit of conflicted third parties, such as the
Plans' service providers.

 4. Instead of using the Plans' bargaining power to reduce expenses and
exercising independent judgment to determine what investments to include in the
Plans, Defendants squandered that leverage by allowing the Plans' conflicted third
party service providers—TIAA-CREF and Vanguard—to dictate the Plans'
investment lineup, to link their recordkeeping services to the placement of
investment products in the Plans and not a single one from any other investment

managers, and to collect unlimited asset-based compensation from their own proprietary products.

5.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty and to restore to the Plans any profits made through Defendants' use of the Plans' assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## JURISDICTION AND VENUE

6.      **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

7.      **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plans are administered, where at least one of the alleged breaches took place, and where the Defendants reside or may be found.

8.      **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29

4

U.S.C. §1132(a)(2). As explained in detail below, the Plans suffered millions of dollars in losses traceable to Defendants' fiduciary breaches and remain exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

a.  The named Plaintiffs and all participants in the Plans suffered financial harm as a result of the imprudent or excessive fee options in the Plans because Defendants' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plans if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b.  The named Plaintiffs and all participants in the Plans were financially harmed by Defendants' improper bundling of some of the Plans' investment products, improperly allowing the companies to require inclusion of their investment products in the Plans, instead of each investment option being independently selected.

c.   The named Plaintiffs' individual accounts in the Plans were further harmed by Defendants' breaches of fiduciary duties because one or more of the named Plaintiffs during the proposed class period (1) invested in the CREF[3] Stock and TIAA[4] Real Estate accounts that were improperly linked to TIAA being recordkeeper to the Plans and which Defendants never seriously analyzed and failed to remove from the Plans when it was clear from past poor performance and their excessive fees that they were imprudent investments, at a time when those options suffered losses compared to the performance of numerous prudent alternatives in which those assets would have been invested had Defendants not breached their fiduciary duty (Plaintiffs Monaco, Samuels, and Straussner), (2) invested in excessive-cost investment options, including funds that paid revenue sharing to the Plans' recordkeepers and higher-cost share classes of mutual funds in the Plans which were priced for small investors at a time when far lower-cost but otherwise identical share classes of the same mutual funds were available for inclusion in the Plans because of the enormous size of the Plans, resulting in a loss of retirement savings (all Plaintiffs), and (3) through their investments in those mutual funds and other investments and the fees charged on their investments in those funds, paid a portion of the Plans' excessive administrative and recordkeeping

---

[3] College Retirement Equities Fund ("CREF").
[4] Teachers Insurance and Annuity Association ("TIAA").

fees, which would not have been incurred had defendants discharged their fiduciary duties to the Plan, and resulting in a loss of retirement savings (all Plaintiffs). Specifically, during the class period, Plaintiff Sacerdote invested in the higher-cost share classes of Vanguard Morgan Growth, Vanguard Explorer, Vanguard Total Bond Market Index, Vanguard Total International Stock Index, and Vanguard Windsor II; Plaintiff Samuels invested in the higher-cost share class of the Vanguard Windsor II, as well as the CREF Global Equities and CREF Growth accounts; Plaintiff Miller invested in the higher-cost share class of the Vanguard Institutional Index; Plaintiff Straussner invested in the higher-cost share classes of Vanguard GNMA, Vanguard High-Yield Corporate, Vanguard Inflation-Protected Securities, and Vanguard Long-Term Treasury, as well as the CREF Bond Market and CREF Global Equities accounts; Plaintiff Brown invested in the higher-cost share classes of Vanguard Long-Term Treasury, Vanguard Prime Money Market, Vanguard Health Care, Vanguard Small Cap Value Index, and Vanguard Energy, at a time when far lower-cost share classes of each of those funds were available to the Plans because of their size. Plaintiff Brown invested in the Vanguard Target Retirement 2015, and Plaintiff Monaco invested in the CREF Global Equities and CREF Growth accounts, each of which paid a portion of the Plans' excessive administrative and recordkeeping

fees through revenue sharing payments. Through their investments in these funds, each of the Plaintiffs paid excessive investment management fees and was assessed a portion of the Plans' excessive administrative and recordkeeping fees.

## PARTIES

### New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration

9.      New York University ("NYU") is a non-profit corporation organized under New York law with its principal place of business in New York, New York. NYU is the fiduciary responsible for the control, management and administration of the Plans, in accordance with 29 U.S.C. §1102(a). NYU is the Plans' Administrator under 29 U.S.C. §1002(16)(A)(i) with responsibility and complete discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable NYU to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

10.     Specifically, both the Faculty Plan and the Medical Plan provide that the Plan "Administrator" is the University, as defined as New York University, or such other person or committee appointed by the University to administer the Plan. Moreover, both Plans provide that the Plan Administrator is the "Named fiduciary" for purposes of § 402(a)(1) of ERISA.

11.     NYU is a fiduciary to the Plans because it exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of its assets as explained below, and has discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii).

12.     NYU is the employer of those individuals who served on the Retirement Plan Committee as described more fully in the "Defendants" section below. NYU delegated its fiduciary responsibilities with respect to the Plans as set forth in the "Defendants" section.

13.     The New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration ("Faculty Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

14.     The Faculty Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1). The Plan was organized effective January 1, 1952. The Faculty Plan was named the "NYU TIAA-CREF Retirement Plan" until January 1, 1985, the "NYU Retirement Annuity Plan" until September 1, 1990, and its current name thereafter. The Faculty Plan was most recently amended and restated effective January 1, 2014.

15.     The Faculty Plan covers substantially all members of the University's faculty, professional research staff, and administration, other than employees of the School of Medicine, and provides for retirement income for its participants. That

retirement income depends upon deferrals of the employee's compensation, contributions made on behalf of each employee by his or her employer, and performance of investment options net of fees and expenses.

16.     As of December 31, 2016, the Faculty Plan had $2.6 billion in net assets and 17,299 participants with account balances. It is among the largest 0.04% of defined contribution plans in the United States in terms of assets. Plans of such great size are commonly referred to as "jumbo plans." As such, the Plan has enormous bargaining power by reason of its massive size to command very low investment management and recordkeeping fees for its participants.

## NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration

17.     The NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration ("Medical Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

18.     The Medical Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1). The Medical Plan was established effective January 1, 2006. The Medical Plan was most recently amended and restated effective January 1, 2016.

19.     The Medical Plan provides for retirement income for employees of the New York University School of Medicine. That retirement income depends upon deferrals of the employee's compensation, contributions made on behalf of each

10

employee by his or her employer, and performance of investment options net of fees and expenses.

20.     As of December 31, 2016, the Medical Plan had $2.0 billion in net assets and 8,481 participants with account balances. This jumbo plan is among the largest 0.06% of defined contribution plans in the United States. As such, the Plan has enormous bargaining power by reason of its massive size to command very low investment management and recordkeeping fees for its participants.

21.     Under the terms of both the Faculty Plan and the Medical Plan, participants are eligible to contribute a discretionary amount of their annual compensation to the Plans, and NYU makes a matching contribution.

22.     The Plans' fiduciaries choose investment options for the Plans and participants invest their assets into these investment options. The Plans offer substantially similar menus of TIAA-CREF and Vanguard investment options consisting of 101 total options in the Faculty Plan, and 81 in the Medical Plan. Defendants exercise discretionary authority and control over the investment options that are included in the Plans.

### Plaintiffs

23.     Dr. Alan Sacerdote is a Clinical Professor at the NYU School of Medicine and resides in Brooklyn, New York. He is a participant in the Medical Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

24.     Dr. Herbert Samuels is a Professor of Pharmacology and Professor Medicine at the NYU School of Medicine and resides in New Rochelle, New York.

11

He is a participant in the Medical Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

25.     Mark Crispin Miller is a Professor of Media, Culture, and Communication at NYU and resides in New York, New York. He is a participant in the Faculty Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

26.     Marie Monaco is an Associate Professor in the Department of Neuroscience and Physiology at NYU School of Medicine and resides in New York, New York. She is a participant in the Medical Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

27.     Dr. Shulamith Lala Straussner is a Professor of Social Work at NYU and resides in New York, New York. She is a participant in the Faculty Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

28.     James B. Brown is an Associate Professor at NYU's Tisch School of Arts and resides in New York, New York. He is a participant in the Faculty Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

**Defendants**

29.     Upon information and belief, Defendant New York University School of Medicine ("NYU School of Medicine") is a division of New York University and is an

educational institution focusing on medicine. NYU School of Medicine has its principal place of business in New York, New York.

30.    According to the Medical Plan's Forms 5500 filed with the Department of Labor, NYU School of Medicine is the administrator of the Medical Plan. NYU School of Medicine is also the Plan administrator under 29 U.S.C. §1002(16)(A)(i) with responsibility and complete discretionary authority to control the operation, management and administration of the Medical Plan, with all powers necessary to enable NYU School of Medicine to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

31.    The Plans authorize NYU as the Plans' Administrator to allocate and delegate, by written instrument, any of its fiduciary duties and responsibilities.

32.    Pursuant to this authority, NYU constituted the Retirement Plan Committee (the "Committee") to serve as the Plan Administrator for the Plans, in addition to other plans not at issue in this case. The 2012, 2014, and 2017 Retirement Plan Committee Charters set forth that New York University established the Committee "to serve as Plan Administrator for the plans of the Plan Sponsors (including plans of New York University School of Medicine) . . . pursuant to authority delegated by the applicable Plan Sponsor."

13

33.     Under the Committee's charter, effective June 1, 2008, the Committee was charged with responsibility for evaluating, selecting, and monitoring investment options in the Plans.

34.     The charter provides that the Committee will consist of the individuals serving in nine specified offices within NYU.

35.     The following persons, who are named as individual Defendants have served or currently serve as members of the Committee and were employed by NYU, the NYU School of Medicine, or another division of NYU: Richard Bing, Michael Burke, Catherine Casey, Martin Dorph, Sabrina Ellis, Thomas Feuerstein, Andrew Gordon, Patricia Halley, Tim Hesler, Kathleen Jacobs, Marina Kartanos, Ann Kraus, Margaret Meagher, Cynthia Nascimento, Nancy Sanchez, Tina Surh, Linda Woodruff, Maurice Maertens, Joseph Monteleone, Ray Oquendo, and Chris Tang.

36.     The Committee and its individual members, Richard Bing, Michael Burke, Catherine Casey, Martin Dorph, Sabrina Ellis, Thomas Feuerstein, Andrew Gordon, Patricia Halley, Tim Hesler, Kathleen Jacobs, Marina Kartanos, Ann Kraus, Margaret Meagher, Cynthia Nascimento, Nancy Sanchez, Tina Surh, Linda Woodruff, Maurice Maertens, Joseph Monteleone, Ray Oquendo, and Chris Tang are fiduciaries to the Plans because they exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of their assets, and have

14

discretionary authority or discretionary responsibility in the administration of the Plans, as described in more detail below. 29 U.S.C. §1002(21)(A)(i) and (ii).

37.     Cammack LaRhette Advisors, LLC ("Cammack") is a for-profit Massachusetts limited liability company with its principal place of business in Wellesley, Massachusetts.

38.     Cammack has served as the investment advisor to the Plans since 2009. Cammack is a fiduciary to the Plans because it rendered investment advice to the Plans for a fee. 29 U.S.C. §1002(21)(A)(ii).

## ERISA'S FIDUCIARY STANDARDS

39.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;
> [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

40.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must

act prudently and for the *exclusive* benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A (1997); DOL Adv. Op. 97-16A (1997).

41.     "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A (1998); DOL Adv. Opinion 88-16A (1988). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015).

42.     The general fiduciary duties imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29

16

U.S.C. §1106, and are considered *per se* violations because they entail a high

potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a
> transaction, if he knows or should know that such transaction constitutes
> a direct or indirect –

> (A)   sale or exchange, or leasing, of any property between the plan
>        and a party in interest;
>        * * *
> (C)   furnishing of goods, services, or facilities between the plan and
>        party in interest;
> (D)   transfer to, or use by or for the benefit of a party in interest, of
>        any assets of the plan…

Section 1106(b) provides, in pertinent part, that:

> [A] fiduciary with respect to the plan shall not –

> (1)   deal with the assets of the plan in his own interest or for his own
>        account,

> (2)   in his individual or in any other capacity act in a transaction
>        involving the plan on behalf of a party (or represent a party)
>        whose interests are adverse to the interest of the plan or the
>        interest of its participants or beneficiaries, or

> (3)   receive any consideration for his own personal account from any
>        party dealing with such plan in connection with a transaction
>        involving the assets of the plan.

43.   Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any
> employer and shall be held for the exclusive purposes of
> providing benefits to participants in the plan and their
> beneficiaries and defraying reasonable expenses of
> administering the plan.

17

44.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

45.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of

18

the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## BACKGROUND FACTS

### I.     Defined contribution plans, services, and fees.

46.     The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 135 S. Ct. at 1826.

47.     The plan's fiduciaries have control over defined contribution plan expenses and the selection of plan investment options.

48.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[5] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans like the Plans, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees

---

[5] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

## II.  Defined contribution recordkeeping.

49.    Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participants' investments in the various options in the plan. Recordkeeping services are largely commodities, and the market for recordkeeping services is highly competitive.

50.    Some recordkeepers in the market provide only recordkeeping and administrative services, while others provide both recordkeeping and investment products. The latter group has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing the plan.

## III.  Defined contribution investment options.

51.    Many mutual funds offer different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the identical manager, are managed identically, and invest in the exact same portfolio of securities. The only difference is that the retail shares charge significantly higher fees. The share classes are otherwise *identical in all respects*.

52.    Many of the investment options in the Plans are retail share classes instead of their corresponding far lower-priced identical institutional share classes. *See* ¶¶181–82. In fact, in the Faculty Plan, nearly *half* of the investment options are in a higher-cost share class than was available to the Plan.

20

53.     As an example, Vanguard funds can be offered in as many as five share classes with differing minimum initial investments and differing expense ratios. According to Vanguard, "[t]his tiered structure facilitates a greater return of cost savings to larger-account shareholders, who bring about economies of scale." Importantly, as Vanguard makes clear, "regardless of the share class, the fund's objective, management, and underlying investments are identical."[6]

54.     The following Vanguard disclosure shows the differences between certain Vanguard share classes. As it indicates, certain share classes such as the "Investor Shares" are available to individual investors and "should be used by advisors only when a lower-cost share class is not available." Other share classes, like the "Institutional Shares" or "Institutional Plus Shares" have "very low expense ratios for institutions and other large investors[.]"

| Investor Shares | Vanguard Target Retirement Funds  and STAR® Fund | $1,000 | A share class available to individual investors. This share class should be used by advisors only when a lower-cost share class is not available. |
| | Most other funds | $3,000 | |
| Institutional Shares | Select index and active funds | $5 million | Shares with very low expense ratios for institutions and other large investors that meet the minimum investment at the underlying-account level. |
| Institutional Plus Shares | Select index and active funds | $100 million | |

55.     The Co-Chair of the Retirement Plan Committee, Defendant Linda Woodruff, has conceded that it is "probably not" appropriate for a multi-billion dollar plan like the Plans to offer retail share classes when institutional rates are available. Indeed, she has admitted under oath that ". . . she could not recall any

---

[6] Also, there is no difference in liquidity between a retail share class fund and the institutional share class of the same fund.

reason why . . ." the Faculty Plan included Vanguard shares in the investor share class.

56.     Similarly, Nancy Sanchez, a Committee member since its inception, admitted under oath that she does not recall anyone on the Committee asking whether lower cost share classes were available for the Plans' Vanguard mutual funds.

57.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing.

58.     "[T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties. Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (citing Restatement (Third) of Trusts § 90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b.

59.     Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds

with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

60.     In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively-managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[7] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs…in terms of net returns to investors, active investment must be a negative sum game.").

## IV.     Revenue sharing: a practice that results in excessive fees if not properly monitored and capped.

61.     There are two primary methods for defined contribution plans to pay for recordkeeping and administrative services: "direct" payments from plan assets,

---

[7] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

and "indirect" revenue sharing payments from plan investments such as mutual funds. Plans may use one method or the other exclusively, or may use a combination of both direct and indirect payments.

62.     Jumbo defined contribution plans with enormous assets such as NYU's Plans possess tremendous economies of scale for purposes of recordkeeping and administrative fees.

63.     A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

64.     The only way to determine the true market price for recordkeeping services at a given time is to obtain competitive bids. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (noting opinion of independent consultant in similar case "'without an actual fee quote comparison'—*i.e*, a bid from another service provider—[consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'"). Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education organizations." Fiduciary Plan Governance,

LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2*.[8] Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal*.[2] Prudent fiduciaries of defined contribution plans—including university 403(b) plans—thus obtain competitive bids for recordkeeping at regular intervals of approximately three years.

**V.   Closed architecture versus open architecture.**

65.   As the prevalence and asset size of defined contribution plans grew, in the shift away from traditional defined benefit pension plans, numerous financial services entered this burgeoning retirement plan market. These providers often marketed "bundled" plans which included a package of the provider's proprietary investment funds as well as administrative and recordkeeping services. The plans were often marketed as "free" plans. These purportedly "free" plans had a significant caveat—in order to obtain the free pricing, the fiduciary had to agree to put the provider's preferred investment lineup in the plan—a group of hand-picked funds that would guarantee the provider would receive its desired fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan was established would require the provider's approval or result in the plan being assessed additional direct fees.

---

[8] http://www.fiduciaryplangovernance.com/blog/buying-power-for-higher-education-institutions-when-you-have-it-and-when-you-dont-part-2

66.     Thus, under these closed arrangements, funds were often included in defined contribution plans not based on an independent analysis of their merits or what was in the best interests of participants, but because of the benefits they provided to the plan's service providers. In the NYU Plans, that is what the NYU Defendants established and continue to maintain—plans with closed, not open architecture which only allows funds that are proprietary funds of the two recordkeepers, TIAA and Vanguard.

67.     Prudent fiduciaries of jumbo defined contribution plans have rejected closed architecture and bundling of recordkeepers' proprietary products in a plan and have demanded an open architecture model for the plan's investment platform. In an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products, which the provider has an interest in including in the plan because the funds provide it with investment fees.

68.     Among the thousands of mutual funds in the market, *not a single fund* other than the proprietary funds of the recordkeepers was allowed in the Plans. There are recordkeepers in the market that exclusively operate on an open architecture basis in that they do recordkeeping only and do not sell investment products. These providers can offer pricing on a pure per-participant basis, without any revenue sharing component taken from the expense ratio of the funds in the plan.

69.     TIAA-CREF offered its 403(b) plan services exclusively on a bundled basis. If a plan wished to offer the TIAA Traditional Annuity, TIAA-CREF required

that the CREF Stock Account and Money Market Account also be offered to participants, and required the plan to use TIAA as recordkeeper for its proprietary products. Thus, by using TIAA-CREF, fiduciaries locked their plans into an arrangement in which certain investments could not be removed from the plan— *even if the funds were not prudent investments*, in violation of prudent accepted fiduciary practices.

70.    There are thousands of alternatives to TIAA-CREF's products in the defined contribution plan market from many other investment managers. Many 403(b) plan fiduciaries have recognized that stable value funds are prudent alternatives to TIAA's Traditional Annuity in the NYU Plans as a conservative principal preservation option providing superior returns to a money market fund, and can be recordkept by virtually any defined contribution recordkeeper. Other insurance companies also offer fixed annuity products. And there are myriad large cap blend mutual fund investments in the market that provide far superior returns to the CREF Stock Account in the NYU Plans at much lower cost.

## VI.    403(b) plans and 401(k) plans.

71.    Defined contribution plans can qualify for favored tax treatment under different sections of the Internal Revenue Code. Plans offered by corporate employers typically qualify under 26 U.S.C. §401(k), and are commonly referred to as 401(k) plans. Tax-exempt organizations, public schools (including state colleges and universities), and churches are eligible to offer plans qualified under §403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A).

72.     Although 401(k) plans and 403(b) plans have different historical origins, legislative and regulatory developments over a number of decades largely eroded those differences, as reflected in final 403(b) regulations published by the IRS on July 26, 2007.

73.     The NYU Plans have been subject to ERISA's fiduciary requirements long before the IRS published its 403(b) regulations in 2007.

74.     401(k) and 403(b) plans both have the same fundamental purpose: allowing employees to save for a secure retirement. The duties of a fiduciary in both are the same: to operate as a financial expert familiar with investment practices, operate the plan for the exclusive benefit of employees and retirees, and to make sure that fees are reasonable and investments are prudent.  Participants in both types of plans depend on their plan fiduciaries to ensure that those savings are not depleted by excessive fees or imprudent investments. Accordingly, the historical differences and investment limitations of 403(b) plans do not allow 403(b) fiduciaries to exercise a lesser degree of care or attention to fees and investments than their 401(k) counterparts.

## VII.    Historical practice of multiple recordkeepers and only offering their own products in 403(b) plans.

75.     Many 403(b) plans historically before 2009 included multiple bundled service providers, with each performing the recordkeeping function for its own investment products in the plan. In fact, "403(b) plan investment options were often 'sold' by record keepers and their representatives rather than offered by plan sponsors as evaluated investments." Fiduciary Plan Governance, LLC, *Legacy*

28

*Investments in Higher Education: What is a Plan Sponsor's Responsibility to Participants*?[9] That is what the NYU Defendants allowed to be done in the NYU Plans.

## VIII.   TIAA-CREF's bundled 403(b) plan services.

76.   TIAA-CREF is an insurance company financial services provider that historically has dominated the market for services to educational institution 403(b) plans. TIAA-CREF consists of two companion organizations: Teachers Insurance and Annuity Association of America (TIAA), and College Retirement Equities Fund ("CREF"). The services that TIAA-CREF provides to 403(b) plans include annuities, mutual funds, insurance coverage, trust services, and administrative services.

77.   Although TIAA-CREF's marketing materials suggest that it is a "nonprofit" organization, that is not true. Though originally a nonprofit, since 1998 both TIAA and CREF have been subject to federal income taxation following a decision by Congress to revoke the organization's status as a tax-deductible 501(c)(3) charitable organization. This revocation of tax-deductible status was initiated because TIAA-CREF "competed directly with for-profit insurance companies and mutual fund groups."[10]

78.   TIAA is organized as a *for-profit* stock life insurance company. TIAA's "operating surplus" is spent, loaned, and otherwise distributed to more than a dozen TIAA subsidiaries and affiliates that operate on a for-profit basis, including Nuveen

---

[9] http://www.fiduciaryplangovernance.com/blog/legacy-investments-in-higher-education-what-is-a-plan-sponsors-responsibility-to-participants.

[10] Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. Times (July 30, 2007), available at http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.

Investments, which TIAA acquired in April 2014 for an enterprise value of $6.25 billion. TIAA receives dividends from these for-profit subsidiaries.[11] Consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is on par with, or greater than executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. In 2015, TIAA's CEO received $18 million in compensation,[12] more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and just below the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). When expressed as a percentage of assets under management, TIAA's CEO had the highest compensation rate of any of those companies. In fact, TIAA's five highest-ranking "named executive officers" earned a combined total of well over $40 million in compensation in 2015.

79.    TIAA's disclosures further state that its employees' compensation and benefits programs are designed to "align their interests with those of the Company's participants by linking pay to long-term growth and *profitability*."[13] (emphasis added).

80.    Responding to criticism that TIAA-CREF's CEO and other executives "garnered salaries and bonuses significantly greater than similar pension fund operations," TIAA-CREF has stated that such extremely high pay was justified because "the company had to compete for top-level employees with major financial

---

[11] https://www.tiaa.org/public/pdf/C16623_where-tiaa-profits-go.pdf.
[12] TIAA Compensation Disclosures, *Executive Compensation Discussion and Analysis* 20 (May 2016), https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.
[13] TIAA Compensation Disclosures, *Executive Compensation Discussion and Analysis* 3 (May 2016), https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.

services corporations."[14] Critics found this justification dubious because the "flagship CREF Stock Account, an equity portfolio of $59 billion, was primarily indexed to the Russell 3000," meaning that "CREF automatically invested nearly two of every three dollars in companies held by the benchmark fund," leaving "little for the highly paid officers to manage." *Id*. This fund has been in the Plans for decades without consideration for removal by NYU Defendants.

## IX. NYU Defendants allowed TIAA to use highly confidential personal information of NYU employees and retirees to sell them TIAA's investment products and wealth management outside of the Plans.

81.     Private, confidential information which recordkeepers obtain about plan participants is information of value belonging to the plan and its participants. This information is a plan asset.

82.     TIAA used its position as recordkeeper in the NYU Plans to obtain access to participants, learning their ages, length of employment, time until retirement age, the size of their accounts, and choices of investments, and used that information for its benefit to market and sell lucrative investment products, insurance, 529 plans, IRAs, and wealth management products to participants as they neared retirement and before retirement. Such practices have been documented by former TIAA employees in multiple recent reports in the New York Times that have scrutinized TIAA's sales practices.[15]

---

[14] Funding Universe, *Teachers Insurance and Annuities Association – College Retirement Equities Fund History*, http://www.fundinguniverse.com/company-histories/teachers-insurance-and-annuities-association-college-retirement-equities-fund-history/.

[15] Gretchen Morgenson , *The Finger-Pointing at the Finance Firm TIAA*, N.Y. Times, Oct. 21, 2017, https://www.nytimes.com/2017/10/21/business/the-finger-pointing-at-the-finance-firm-tiaa.html; *see also* Gretchen Morgenson, *TIAA Receives New York Subpoena on Sales*

83.    One recent New York Times article, dated November 9, 2017, states
that New York's attorney general has issued subpoenas to TIAA for documents
related to its "dubious" sales practices. *Id*. The article goes on: "TIAA has previously
said it puts its clients first and has maintained that because its 855 financial
advisers and consultants do not receive commissions on the products they sell they
are unbiased. But former employees and TIAA regulatory filings challenge this
view, pointing out that the company awards bonuses to sales personnel when they
steer customers into more expensive in-house products and services." *Id*. The article
also describes how TIAA's role as a recordkeeper provides TIAA with access to sell
individuals additional investment products through IRAs. "Most of TIAA's clients
invest with the firm because their employers have hired it to administer their
workers' retirement plans . . . The company earns a record-keeping fee from the
institutions whose accounts it oversees, but can generate far more revenue when
investors buy its annuities and funds. This presents the potential for conflict." *Id*.

84.    Another recent New York Times article describes how TIAA's
marketing of its original nonprofit legacy and its business practices have been
called into question after several legal filings including a whistle-blower complaint
have accused the company of pushing its salespeople to promote its higher fee

---

*Practices*, N.Y. Times, Nov. 9, 2017, https://www.nytimes.com/2017/11/09/business/tiaa-
subpoena.html; and Tara Siegel Bernard, If you Bought In To TIAA Based On Reputation,
Check Your Accounts, N.Y. Times, Nov. 13, 2017,
https://www.nytimes.com/2017/11/13/your-money/tiaa-403b.html.

products and services.[16] The article describes how the whistleblower suit asserts that TIAA advisers had been instructed to sell products by exploiting customer fears. The whistleblower suit itself contends, among other things, that TIAA implemented a fraudulent scheme in 2011 to convert "unsuspecting retirement plan clients from low-fee, self-managed accounts to TIAA-CREF managed accounts" which were considerably more costly.[17]

85.     Other plans prohibit TIAA from using its position in a plan to sell investment products and services. Prudent fiduciaries protect participant account information from being exploited for commercial purposes and take affirmative steps to prohibit service providers from using confidential participant information to solicit participants with various products outside of the plan (and unrelated to the service provider's function in servicing the plan). Specifically, prudent fiduciaries establish clear limits on the proper use of confidential participant information. For example, the plan sponsor of the Denver City & County Deferred Compensation Plan (a plan recordkept by TIAA-CREF), expressly prohibits TIAA from cross-selling its products to Denver plan participants.[18] In this way, the fiduciaries of the Denver plan ensure that TIAA acts solely as a third-party recordkeeper for the plan

---

[16] Tara Siegel Bernard, If you Bought In To TIAA Based On Reputation, Check Your Accounts, N.Y. Times, Nov. 13, 2017, https://www.nytimes.com/2017/11/13/your-money/tiaa-403b.html.

[17] Gretchen Morgenson , *The Finger-Pointing at the Finance Firm TIAA*, N.Y. Times, Oct. 21, 2017, https://www.nytimes.com/2017/10/21/business/the-finger-pointing-at-the-finance-firm-tiaa.html.

[18] James Comtois, *TIAA clients cautious after N.Y. probe of sales practices*, Pensions&Investments, December 11, 2017, available at: http://www.pionline.com/article/20171211/PRINT/171219961/tiaa-clients-cautious-after-ny-probe-of-sales-practices

and prevent TIAA from exploiting its recordkeeping position by using participant information to sell participants TIAA's other products and services.

86.     The NYU Defendants could and should have prohibited TIAA from using its position as recordkeeper to the Plans to market and sell investment products, but they failed to do so. The value of TIAA's use of its position as a recordkeeper to the Plans to market and sell lucrative products to soon-to-be-retired participants and retired participants was substantial, conveying a stamp of approval by Defendants of TIAA.

87.     The NYU Defendants allowed TIAA to market and sell its services and investment products outside the Plans, benefitting TIAA enormously. While obligated to run the plan for the sole benefit of participants, the NYU Defendants instead enabled TIAA to benefit, and obtained no benefit to the Plans from this.

88.     Margaret Meagher, who has been the Co-Chair of the Committee since its inception in 2008, has admitted under oath that she knows TIAA uses its access to NYU employees and retirees and their confidential account information to sell its products. She has also admitted that Vanguard does not do this, and that the NYU Defendants could prevent TIAA from doing this. Yet, she admits that neither she nor anyone on the Committee has done so, or even inquired of TIAA as to the amounts they are making from selling these products. The NYU Defendants have also failed to capture any of this benefit for the Plans.

89.     Mark Petti, NYU's corporate designee, admitted providing TIAA this information enabling TIAA to know, for example, how close to retirement an NYU

34

employee is provides a financial marketing benefit. He also openly acknowledged that TIAA used the demographic data they receive from NYU to advertise personal wealth management services. Further, he conceded that no one with NYU attempted to value the financial benefit to TIAA from using the data to market to market its wealth management and products or to use it to negotiate a lower recordkeeping fee.

**X.   Move to consolidation and open architecture in 403(b) plans.**

90.     The NYU Plans have had multiple recordkeepers: TIAA and Vanguard.

91.     Once the 2007 final regulations went into effect on January 1, 2009, many plans moved to a single recordkeeper such as the Loyola Marymount University (LMU) Defined Contribution Plan, which recognized that under the new regulations, "Recordkeeping must be consolidated and/or managed by a single party."[19] Similarly, following the new IRS 403(b) regulations, the fiduciaries of the Pepperdine University Retirement Plan did the same,[20]as did Purdue University which also reduced the number of investment options in its plan from 381 to 19,[21]

---

[19] See LMU 403(b) Retirement Plan Project Overview, at 1, available at http://www.lmu.edu/AssetFactory.aspx?vid=33038

[20] See Pepperdine University Participant Q & A, available at http://community.pepperdine.edu/hr/content/benefits/fulltime/faq.pdf; *see also* Paul B. Lasiter, *Single Provider, Multiple Choices*, NACUBO, available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[21] James S. Almond, *403(b) Plan Redesign–Making a Good Retirement Plan Better*, Purdue University, available at http://www.cacubo.org/wp-content/uploads/2016/02/10_403b_Plan_Redesign_Making_a_Good_Retirement_Plan_Better.docx.

and Cal Tech University which obtained over $15 million in rebates for the plan as a result.[22]

92.    Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated *$3–4 million per year* which is then compounded over time." (emphasis added).

93.    These sponsors are not outliers. Many similarly situated fiduciaries have also comprehensively reviewed their plans, and have been able to reduce fees, consolidate recordkeepers and investment options, leading to enhanced outcomes and retirement security for their plans' participants.

94.    According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. See LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[23]

95.    Annual surveys by Plan Sponsor Council of America found that in each year from 2010 through 2014, the overwhelming majority of 403(b) plans—over 80%—have only a single recordkeeper, and provide an average of 28 investment

---

[22] *Caltech Names TIAA-CREF Recordkeeper,* Institutional Investor (Dec. 10, 2009), available at http://www.institutionalinvestor.com/Article/2355324/Search/Caltech-Names-TIAA-CREF-Record-Keeper.html#/.WBn8Oy0rKpp.

[23] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

fund options.[24] An earlier PSCA survey of 403(b) plans found that as of 2009, 57% of

403(b) plan fiduciaries had made changes to their plans as a result of the new

403(b) regulations that became effective January 1, 2009.[25]

96.    The majority of plans use a single recordkeeper because a "**multi-

recordkeeper platform is inefficient**" and squanders the ability to leverage a

plan's bargaining power. The Standard Retirement Services, Inc., *Fixing Your

403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in

original).[26] "By selecting a single recordkeeper, plan sponsors can enhance their

purchasing power and negotiate lower, transparent investment fees for

participants," while allowing participants to "benefit from a more manageable

number of institutional-quality investment options to choose from."[27] Additional

benefits of a single recordkeeper platform include simplifying personnel and payroll

data feeds, reducing electronic fund transfers, and avoiding duplication of services

when more than one recordkeeper is used.

97.    AonHewitt, an independent investment consultant, similarly

recognized that "403(b) plan sponsors can dramatically reduce participant-borne

costs while improving employees' retirement readiness by" "[c]onsolidating

---

[24] Each PSCA survey covers the year prior to the year indicated in the title. PSCA's 2015 Benchmarking Survey of 403(b) Plans, at 32, 65; PSCA's 2014 Benchmarking Survey of 403(b) Plans, at 32, 61; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2011 Benchmarking Survey of 403(b) Plans, at 28, 55, 59.

[25] PSCA's 2010 Benchmarking Survey of 403(b) Plans at 45.

[26] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

[27] *Id.*

recordkeepers," "[l]everaging aggregate plan size and scale to negotiate competitive pricing, and reducing the number of investment options and "utilizing an 'open architecture' investment menu[.]" AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[28]

98.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers makes it "difficult for employers to monitor available choices and provide ongoing oversight" while harming participants through "high investment and administrative costs" and a lack of guidance needed to achieve retirement readiness. Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[29]

99.     Other industry literature further supports the fact that the use of a single recordkeeper provides reasonable fees. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated

---

[28] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[29] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

the complications and confusion of having three different recordkeepers.");[30] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[31]

100.   Use of a single recordkeeper is also less confusing to participants and eliminates excessive, overlapping recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[32]

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND COMMITTED PROHIBITED TRANSACTIONS

101.   The use of multiple recordkeepers and proprietary funds required by the recordkeepers to be included in the Plans shows that, in contrast to the

---

[30] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[31] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[32] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

comprehensive plan reviews conducted by the 403(b) plan fiduciaries described above, the Defendants failed to adequately engage in a similar analysis. Had Defendants conducted such a review of the Plans, Defendants would not have allowed the Plans to continue to pay excessive administrative fees; would not have maintained an inefficient multi-recordkeeper structure; would not have continued to include an excessive number of investment options in the Plans, including duplicative funds in numerous investment styles and higher-cost retail share classes for which an identical lower-cost version of the same fund was available; and would not have retained investment options in the Plans despite a sustained track record of underperformance.

## I.   The Plans' investments.

102.   The NYU Defendants exercise discretionary authority and control over the investment options that are included in the Plans.

103.   For both Plans, the NYU Defendants provided mutual funds and insurance company variable annuity products as investment options.  The investment options are offered by TIAA-CREF and the Vanguard Group, Inc. ("Vanguard"). The NYU Defendants select investment options into which participants' investments are directed, and determine whether to remove investment options from the Faculty Plan and the Medical Plan.

104.   As of December 31, 2016, the NYU Defendants designated a total of 101 investment alternatives as options in the Faculty Plan, including 27 TIAA-CREF investments and 74 Vanguard investments. These investments included mutual funds (many of which had identical lower-cost share classes available, as

explained below), an insurance separate account, variable annuity options, and a fixed annuity option.

105.    As of December 31, 2016, the NYU Defendants designated a total of 82 investment alternatives as options in the Medical Plan, including 11 TIAA-CREF investments and 71 Vanguard investments. These investments also included mutual funds (many of which had identical lower-cost share classes available, as explained below), an insurance separate account, variable annuity options, and a fixed annuity option.

## II.    Cammack LaRhette's flawed advice.

106.    Since 2009 Cammack LaRhette has served as the Plans' investment advisor. In this capacity, Cammack has served as a co-fiduciary to the Plans and has advised the Retirement Plan Committee on a host of matters regarding the Plans, including on the reasonableness of fees in the Plans' investment options, the selection of service providers, and the performance of investments in the Plans.

107.    Because jumbo plans such as NYU's can obtain much lower fees for investment management, benchmarking fees in NYU's Plans to small plans or retail fees is wholly inappropriate.

108.    The use of Morningstar weighted averages is an inappropriate benchmark for evaluating fees charged by the investment options offered in the Plans because these averages include mostly retail share classes of funds that carry far higher fees than those appropriate for inclusion in massive jumbo plans, like the NYU Plans. Defendant Margaret Meagher, longtime Co-Chair of the Retirement

Plan Committee, conceded that Morningstar contains mostly retail funds in its averages.

109.    To use the Morningstar blended average to evaluate the appropriateness of the fees in the Plans would produce distorted results that give the incorrect appearance that high-fee funds in the Plans had reasonable fees compared to industry averages that fail to account for the massive size and bargaining power of the Plans.

110.    Cammack's Vice President, Jan Rezler, has admitted that the use of Morningstar averages as a fee benchmark is inappropriate for large plans such as NYU's. Yet, when Cammack actually became the Plans' investment consultant, Mr. Rezler has conceded under oath that Cammack used those Morningstar fee averages to evaluate each of the Plans' funds. This use of an improper benchmark masked the excessive fees in the Plans' funds and reveals a flawed benchmarking process.

111.    Defendant Margaret Meagher conceded that the Retirement Plan Committee, and all of its members, accepted Cammack's use of this admittedly flawed benchmark for years (continuing through the present) and never once questioned why Cammack used this inappropriate benchmark. Indeed, she admitted that not a single Committee member ever questioned the use of these Morningstar averages, took issue with their use, or even brought it up at a Committee meeting.

112.    Specifically, despite their long histories of dramatic underperformance and exorbitant fees detailed below, Cammack never recommended removing the CREF Stock or TIAA Real Estate Accounts. Indeed, the Retirement Plan Committee's Co-Chair, Margaret Meagher, admitted that the Committee never considered removing the CREF Stock Account and never even asked Cammack whether they considered the prudence of the CREF Stock Account since TIAA required its inclusion in the Plans. Ms. Meagher admitted that the NYU Plans had it for a long time so TIAA's continuing to require it was never an issue for the NYU Defendants.

113.    For years the TIAA Real Estate Account did not even have a disclosed benchmark. Moreover, it is an outlier in that, unlike REITs and other real estate funds, it owns actual buildings and therefore is highly illiquid. As a result, NYU Retirement Plan Committee Co-Chair, Margaret Meagher, has admitted that it holds 15-20% cash, which reduces its returns. This fund has demonstrated over a decade's worth of sustained underperformance when compared to comparable benchmarks including the Vanguard REIT Index. Ms. Meagher also acknowledged that the TIAA Real Estate Account was on a watch list for more than a year. The Committee's other Co-Chair, Linda Woodruff, conceded she did not recall there being specific criteria for how long a fund could underperform before being removed.

114.    Indeed, had Cammack conducted a comprehensive analysis of the TIAA Real Estate Account when Cammack was first engaged as the Plans' adviser, the fund's exorbitant fees and decade's worth of substantial underperformance for

the period leading up to December 31, 2009 (and continuing thereafter), would have provided Cammack with all the necessary information to recommend the fund's removal. Cammack's Vice President, Mr. Rezler, has also acknowledged that some plans have strict removal criteria requiring funds on a watch list more than a year to be removed, but the NYU Defendants did not have such criteria in the NYU Plans.

115.   Despite the acknowledged difficulty benchmarking it and despite its continued dramatic underperformance—underperformance which dated back over a decade prior to December 31, 2009 (see ¶¶228–29) —Cammack never recommended the TIAA Real Estate Account be removed from the Plans.

116.   As a result of Cammack's imprudent investment advice failing to recommend the removal of the imprudent TIAA Real Estate and CREF Stock Accounts despite their high fees and histories of abysmal performance, the Plans suffered tremendous losses as detailed further below.

117.   The Retirement Plan Committee's Co-Chair, Margaret Meagher, admitted that she had never heard of the terms "float" or "securities lending" from anyone and did not even know what the terms mean despite the DOL's requirement that plan fiduciaries must take into account a service provider's float income as part of the service provider's compensation for services to the plan. DOL Field Assistance Bulletin 2002-03.

118.   In addition, as the Plans' investment consultant, Cammack has never discussed with the Retirement Plan Committee terms such as float and securities

lending and Cammack failed to take these forms of compensation into account when evaluating the reasonableness of the Plans' recordkeeping fees. In failing to take this into account, Cammack provided flawed investment advice which the Retirement Plan Committee accepted without question.

## III.  The 2009 recordkeeping contract awarded to TIAA and continued thereafter was the result of a deeply flawed, biased process.

119.   As described above prudent fiduciaries conduct an RFP every three years in order to ensure their plans' recordkeeping fees are reasonable. Instead of doing this, the NYU Defendants waited approximately seven years, or not until late 2016, to conduct another RFP after the one conducted in 2009. Indeed, this RFP was executed only *after* the filing of a related lawsuit in this District against NYU by these same Plaintiffs challenging the fiduciaries' management of the Plans.

120.   The 2009 recordkeeping RFP that NYU conducted was deeply flawed and irreparably tainted because of the conflicted conduct involving the Retirement Plan Committee's Co-Chair, Margaret Meagher, and certain representatives of TIAA. This conduct prevented the RFP from being conducted in an independent and objective manner and ultimately made the RFP's results—which included the retention of TIAA-CREF as a recordkeeper—nothing but a foregone conclusion.

121.   Specifically, Margaret Meagher's statements under oath reveal that Ms. Meagher regularly met with TIAA representatives for dinners that were paid for exclusively by TIAA. These liaisons and private communications between Ms. Meagher and TIAA representatives were carried out *while* the RFP for

recordkeeping services was being conducted in 2009—an RFP process in which TIAA was a contender.

122.    Ms. Meagher originally testified that she would not have discussed "Committee business" at these individual dinners with TIAA representatives, yet thereafter she acknowledged that there was an active dialogue between Ms. Meagher and Peter Hueber, TIAA's director of Institutional Relationships, who was one of two point people overseeing TIAA's response to NYU's RFP.

123.    Ms. Meagher admitted she provided intelligence to TIAA on individual members of the Retirement Plan Committee and their potential vote on TIAA getting the recordkeeping business; faced questions from TIAA about the outlook for TIAA; and stated that she did not want to "lose ground" with TIAA. She further admitted that she did not tell other Committee members of her meetings with TIAA, keeping them hidden from her fellow fiduciaries; and she asked Cammack to provide her with TIAA's RFP pricing before any Committee member would receive it. Ms. Meagher likely made this request in order to be in a position to provide TIAA with advance warning of the RFP results.

124.    In addition to the private dinners that TIAA paid for when Ms. Meagher would meet with Mr. Hueber, Ms. Meagher also testified that she attended several conferences paid for by TIAA at locations including California and Florida.

125.    Tellingly, Ms. Meagher even went so far as to concede that, regardless of the outcome of the RFP, TIAA would still ultimately remain as one of the Plans' recordkeepers. Ms. Meagher's testimony makes clear that she went out of her way

46

to advantage TIAA throughout the RFP process, both with inside information and with her influence on the Committee. Tainted by the bias of the Committee's own Co-Chair, it is evident that the 2009 RFP could not have been conducted in a rigorous and independent manner as it should have been. In fact, Meagher admitted that even members of the Committee questioned whether the original proposal from TIAA had been competitive.

126.    Moreover, with Ms. Meagher still serving as the Committee's Co-Chair with intimate involvement in the recent 2016 RFP that NYU conducted regarding the Faculty Plan, this recent RFP is tainted by the same influence and bias infecting the process and skewing the results in favor of retaining TIAA-CREF as the recordkeeper, especially in view of Ms. Meagher's testimony that no matter what the outcome of the RFP, TIAA would remain as a recordkeeper to the Plans. In fact that is exactly what happened.

**IV.    Lack of basic knowledge by the fiduciaries of financial and fiduciary matters.**

127.    The lack of the most basic knowledge by the individual Defendants who have served as Committee members demonstrates a failure to meet basic fiduciary standards of prudence and loyalty. Members of the Retirement Plan Committee, including individually named Defendants, displayed an alarming lack of understanding of basic terms and principles in investment management and fiduciary best practices. This lack of understanding evidences a profound lack of the

basic knowledge and diligent attention that is required of plan fiduciaries in fulfilling their duties.[33] Examples abound:

- In addition to the Committee's Co-Chair having never heard of the terms "float" or "securities lending" (despite the DOL's rule requiring plan fiduciaries to take float income into account in evaluating total compensation), the Committee's other Co-Chair, Linda Woodruff did not even know what "revenue sharing" is. Specifically, Linda Woodruff stated she was "drawing a blank" on what revenue sharing is even though this is what is being used to pay the Plans' recordkeeping fees.

- Woodruff also admitted that she does not understand why the Plans' recordkeepers structure their fees the way they do and acknowledged that "it seems odd" that a recordkeeper's compensation would increase when assets increase despite the services staying the same.

- Despite being a Co-Chair of the Committee charged with making sure the Plans' recordkeepers compensation was reasonable, Ms. Woodruff also did not recall how the Plans' recordkeepers were compensated.

- Woodruff also admitted under oath that, despite being Co-Chair of the Committee, she did not conduct any independent analysis or follow-up looking into the merits of the recommendations provided by the Plans' adviser, Cammack.

---

[33] ERISA fiduciaries are held to the standard of a prudent financial expert. *See Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998).

- Another Committee member, Nancy Sanchez, openly acknowledged that she has only a "superficial[]" understanding of what a variable annuity is. When asked whether she thought variable annuities were appropriate investment options in the Plans Sanchez stated, "I don't know enough about them to be able to answer that question."

- Despite being on the Committee since its inception, Ms. Sanchez could also not name a single variable annuity offered by TIAA and could not state the name of any fees associated with variable annuities, much less the amount of any such fees.

- Another Committee member, Tina Surh, who was NYU's Chief Investment Officer, testified that she did not know the government agency charged with overseeing retirement plans such as the Plans.

- Ms. Surh had never heard of the term "jumbo plan" which is the term widely used in the industry for a plan the size of NYU's.

- Despite being a Committee member for more than nine years (i.e., since its inception) and the Plans including multiple variable annuity investments during that entire period, Ms. Sanchez: (i) does not know the names, much less the amount, of any component fees associated with variable annuities; (ii) does not know how variable annuities differ from mutual funds; and (iii) does not recall ever reviewing a variable annuity investment.

128.   Ms. Meagher's remarkable unawareness of basic facts relating to the Plans is also apparent in the following examples of her statements under oath:

- Meagher is unaware that the Medical Plan is much smaller than the Faculty Plan and actually believes it is larger.

- Is unaware if information on how the Plans rank in size relative to other defined contribution plans is available and has never inquired about such information.

- Was surprised to learn that the enormous size of the Plans' assets place it in the top fraction of 1% for defined contribution plans nationally.

- Is unaware that mutual fund companies will readily waive the minimum asset requirement for institutional share classes on funds for large defined contribution plans

- Is unaware that assets in equity funds in the Plans have risen significantly.

- Is unaware, despite it being a simple calculation, what participants in the Plans are currently paying for recordkeeping on a per participant basis and has not known this since 2009.

- Is unaware what cash drag is despite the fact that the TIAA Real Estate Account is comprised of up to 20 percent cash.

- Is unaware that the benchmark now used by TIAA for the TIAA Real Estate Account is a custom benchmark developed by TIAA after a period when there was not even a benchmark.

- Cannot recall if TIAA required certain investments to be included in the Plans.

- Is completely unaware of the amounts, layers, and categories of fees associated with the CREF Stock Account and never inquired about them.

- Is unaware of what a mortality and expense ratio is or that such a charge is a part of the CREF Stock Account fees.

- Is unaware of a distribution fee or that such a fee charged in the CREF Stock Account.

- Astoundingly, the Committee's Co-Chair Margaret Meagher, stated that TIAA is a non-profit entity. In fact, TIAA's non-profit status was revoked by Congress over 20 years ago. *See supra* ¶77. This false impression of TIAA's non-profit status is even more troubling given Ms. Meagher's open bias in favor of retaining TIAA as a recordkeeper.

129.    This lack of knowledge regarding vital areas concerning the Plans is particularly inexplicable given that Ms. Meagher has served on the Retirement Plan Committee since its inception—for over nine years—and served as the Committee's Co-Chair throughout this time.

## V.   The NYU Defendants limited fund options to only proprietary products of its recordkeepers in the Plans.

130.   Although there are thousands of high quality mutual funds that are readily available on the market to the Plans, Defendants ignored these options and included exclusively the proprietary investment options of the Plans' recordkeepers.

131.   In contrast to the practices of prudent fiduciaries, Defendants rejected an "open architecture" platform, which would have enabled the Plans' fiduciaries to select a true "best in class" fund lineup with investments offered by outside investment managers not associated with the Plans' recordkeepers.

132.   Instead of choosing an open architecture platform or hiring a pure recordkeeper who had no interest in the investments offered in the Plans, *all* of the investment options selected by the NYU Defendants to this day have been proprietary to the Plans' recordkeepers.

## VI.   The NYU Defendants improperly allowed TIAA-CREF to require inclusion of certain funds in the Plans and required that it provide recordkeeping services for its proprietary options.

133.   ERISA requires fiduciaries to independently evaluate the prudence of each investment option offered in a defined contribution plan, *DiFelice*, 497 F.3d at 423, and to remove imprudent investments within a reasonable time, *Tibble*, 135 S. Ct. at 1828–29.

134.   As noted, TIAA-CREF offered its products and services strictly on a bundled basis. If a plan offers the TIAA Traditional Annuity, TIAA-CREF required that the plan also offer the CREF Stock and Money Market account, and to also use TIAA as recordkeeper for its proprietary products.

52

135.    By allowing the Plans to enter such a bundled arrangement with TIAA-CREF, the NYU Defendants agreed to lock the Plans' participants into funds which the NYU Defendants, nor the Plans' investment consultant, Cammack, did not analyze. It can never be prudent to lock funds in a plan for the future and to keep them in because of recordkeeping. The NYU Defendants thus failed to discharge their duty to independently evaluate whether each investment option was prudent for the Plans, and to determine whether the use of TIAA as a plan recordkeeper was prudent, reasonably priced, and in the exclusive interest of participants. Instead of acting solely in the interest of participants, the NYU Defendants allowed TIAA's financial interest to dictate the Plans' investment selections and recordkeeping arrangement. Because the NYU Defendants allowed the CREF Stock Account to be locked into the Plans, the NYU Defendants could not satisfy their duty to remove imprudent investments within a reasonable time. As a result of the NYU Defendants' breach in allowing CREF Stock to be retained in the Plans because TIAA-CREF demanded it and not based on an independent and ongoing assessment of the merits of the option, the Plans suffered massive losses compared to prudent alternatives, as discussed in more detail below.

136.    Both Plans include TIAA's proprietary funds, including the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities that invest in underlying securities for a given investment style.

The value of the Plans' investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

137.   The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

      a.   "administrative expense" charge (24 bps);[34]

      b.   "distribution expense" charge (9.5 bps);

      c.   "mortality and expense risk" charge (0.5 bps); and

      d.   "investment advisory expense" charge (ranging from 4 to 12.5 bps).

138.   Two of these four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA-CREF to Plan participants, and the other two provide no benefit to the Plans' participants.

      a.   **Administrative expenses (or recordkeeping fees):** The administrative fee assessed on each variable annuity option is charged as a percentage of assets, rather than a flat fee per participant. As described above, recordkeeping costs depend on the number of participant accounts that the recordkeeper will service in the plan rather than based on a percentage of assets because a higher account balance costs no more to track than a lower account balance. As a result, as the growth in the Plans' assets outpaced the growth in participants, the fees paid to TIAA-CREF and Vanguard likewise increased even though the services provided did not increase at the same rate, resulting in further unreasonable compensation.

---

[34] Expenses are stated as of May 1, 2014.

b. **Distribution expenses (or 12b-1 fees):** Distribution expenses are charged for services performed for marketing and advertising of the account to potential investors. However, in a retirement plan, the funds are selected by the sponsor. Thus, marketing and distribution services provide no benefit to plan participants and are wholly unnecessary.

c. **Mortality and expense risk charges:** This charge only benefits a participant if she elects upon retirement to annuitize her holdings in the account to provide for periodic income. Prior to annuitizing her account, the participant derives no conceivable benefit for paying such a charge, and TIAA-CREF provides no actual services or incurs any risk to justify the fee until a decision is made at retirement to convert the value of the lump sum to an annuity. Most participants in retirement plans recordkept by TIAA-CREF do not elect to annuitize their holdings in their variable annuity accounts upon retirement. Yet, *all* participants pay these fees for many years regardless of whether they annuitize their variable annuity account.

d. **Investment advisory expense charge (or investment management fees):** It is a fundamentally established principle of investment management that larger asset size enables the asset holder to obtain lower fees as a percentage of assets. Fund managers institute breakpoints, whereby the investment management fee is reduced, as asset size goes up. Jumbo plans, such as NYU's, can command extremely low fees. Despite this recognized principle, TIAA-CREF has not instituted *any* breakpoints

55

whatsoever on its investment management fees to pass along economies of scale experienced by jumbo plan investors and the Plans' fiduciaries did not obtain the lower investment management fees that come with the Plans' enormous asset size. As a result, the Plans, with billions of dollars invested in CREF variable annuities, pay the same asset-based fee as the smallest client with a tiny fraction of their total assets, resulting in a windfall to TIAA-CREF and excessive fees paid by NYU employees and retirees.

139. The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is a pooled investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but is segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges, which were excessive for the same reasons. As of May 1, 2013, these charges consisted of the following:

a. "administrative expense" charge (26.5 bps);

b. "distribution expense" charge (8 bps);

c. "mortality and expense risk" charge (0.5 bps);

d. "liquidity guarantee" (18 bps); and

e. "investment management expense" charge (36.5 bps).

140.    The remaining TIAA-CREF funds are mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

141.    The Vanguard investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management, but also charge for distribution, marketing, and other expenses, depending on the type of investment and share class.

142.    This means that NYU plan participants are paying for marketing costs of funds which their employer has placed in their retirement plan when such marketing costs provide no benefit to them. Other mutual funds that were available to the Plans do not include such marketing costs.

143.    Mutual funds have shareholders who are not participants in either NYU Plan, or any retirement plan, and who purchase shares as a result of the funds' marketing efforts. However, all shareholders in the mutual funds, including the participants in the NYU Plans, pay the expenses set forth in ¶¶137–39, yet receive no benefit.

144.    As of December 31, 2016, of the Faculty Plan's $2.4 billion in net assets, TIAA-CREF funds accounted for over $1.8 billion and Vanguard funds accounted for over $770 million. As of December 31, 2016, of the Medical Plan's $1.8 billion in net assets, TIAA-CREF funds accounted for over $1.2 billion and

Vanguard funds accounted for over $819 million. Not a single other fund company's funds were used in the Plans.

## VII.    Defendants caused the Plans to pay excessive administrative and recordkeeping fees.

145.    The market for recordkeeping services is highly competitive and there are numerous recordkeepers in the market who will readily respond to a request for proposal.

146.    Because the only way to reliably determine the true market rate for a complex jumbo plan is to obtain an actual fee quote comparison, prudent fiduciaries of jumbo defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

147.    As noted, extensive industry literature and the experience of similarly situated fiduciaries has shown that multiple recordkeeper platforms are inefficient and result in excessive fees.

148.    Despite the recognized benefits of a single recordkeeper, to this date the NYU Defendants have continued to contract with two separate recordkeepers (TIAA-CREF and Vanguard) for the Faculty Plan and did not consolidate the Medical Plan to one recordkeeper (TIAA-CREF) until late 2012. This occurred despite the fact that both Plans have the same fiduciary Committee—the Retirement Plan Committee—and the same individual Committee members oversee both Plans.

149.    There is no prudent reason why it took the Medical Plan until late 2012 to consolidate to a single recordkeeper or why the Faculty Plan could not have been consolidated to a single recordkeeper at any time.

150.    The Retirement Plan Committee's own publicly-available admissions unequivocally concede that the Plans' structure was imprudent and caused plan losses. Specifically, in 2009, the Retirement Committee recognized that in order to leverage the Plans' then $3 billion in assets, improve the plans' administrative efficiency and reduce costs, and offer a "best in class fund lineup," it "need[ed] to streamline & reduce the fund lineup and select one vendor as sole recordkeeper[.]"[35]

151.    Moreover, the Retirement Plan Committee readily acknowledged that an unbundled platform was preferable to the plans' "bundled" arrangement. *Id*. at 18. It also admitted that plan consolidation would enable the Plans to obtain "better share classes yielding higher returns," which would "result in *significantly lower fee structures for the participant*." Id. (emphasis added).

152.    Even so, over seven years later, the NYU Defendants still have not taken the action it recognized was "need[ed]" as of 2009. In an October 13, 2016 meeting regarding the Plans—after the filing of a related lawsuit by Plaintiffs herein that challenged the Plans' use of multiple recordkeepers and duplicative

---

[35] Re*engineering II, More Opportunities for Self Service,* Slides 11, 12–18 (July 30, 2009), available at:
  https://www.nyu.edu/content/dam/nyu/execVicePres/documents/13-Appendix-D-Self-Service-Opportunities.ppt

options[36]—the Retirement Plan Committee admitted that it had still not met the goal of "reducing duplication and fees[.]"[37]

153.    As an indication of the fiduciaries' flawed process producing excessive recordkeeping fees, NYU's corporate designee, Mark Petti, cannot state how often information was provided to the Retirement Plan Committee in terms of what administrative fees the Plans were paying relative to other plans in the market; cannot state the name of the document in which that information would have been provided by Cammack to the Retirement Plan Committee; and cannot state what information the Retirement Plan Committee was given regarding the recordkeeping or administrative services fees paid relative to other defined contribution plans. He also conceded that the Plans' recordkeepers have always been compensated and continue to be compensated through uncapped revenue sharing.

154.    Instead of obtaining a flat per-participant rate or rebates of excessive revenue sharing back to the Plans, the NYU Defendants, as advised by the Plans' investment consultant, Cammack, allowed these recordkeepers to collect uncapped asset-based revenue sharing as payment for administrative services.

155.    Indeed, longtime Committee member Nancy Sanchez stated under oath that it would not be prudent to cap or fix the compensation paid to the Plans' recordkeepers to a hard dollar amount.

---

[36] The related lawsuit is *Sacertdote et al. v. New York University*, 1:16-cv-06284.
[37] *Minutes of the C-Faculty Senators Council Meeting of October 20, 2016,* Document B at 23, available at: https://www.nyu.edu/content/dam/nyu/facultyGovernance/documents/C-FSCMinutes102016.pdf.

156.   Based upon information from industry experts, the Plans' TIAA-CREF investments kicked back the following approximate amounts of revenue sharing to the TIAA-CREF  recordkeeping entity:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

157.   Further adding to the fees received, Vanguard's recordkeeping arm also received "internal" revenue sharing from using higher-cost share classes of Vanguard's mutual funds, in amounts substantially greater than it would have from the available lower-cost otherwise identical share classes.

158.   In addition to these revenue sharing payments, TIAA-CREF and Vanguard also received other indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees. The NYU Defendants also allowed TIAA to receive additional revenue from using its access to participants to sell other products, including life insurance, IRAs, 529 plans, and wealth management.

159.   To discharge its fiduciary duty to act prudently and in the exclusive interest of participants, the NYU Defendants and Cammack were required to consider TIAA-CREF's and Vanguard's financial interests in including funds in the Plans that would provide them with steady streams of revenue from revenue

sharing payments and investment management fees. The NYU Defendants and Cammack were also required to determine and monitor all sources of TIAA-CREF's and Vanguard's compensation and to ensure that the compensation was limited to a reasonable amount for the services provided. Had the NYU Defendants and Cammack discharged those duties, the Plans would not have retained exclusively options proprietary to the Plans' recordkeepers as Plan investments while failing to consider alternatives from other managers, and would not have allowed the Plans to pay the following excessive sums for recordkeeping.

160.    The NYU Defendants failed to consider TIAA's exploitation of its position as recordkeeper to sell lucrative retirement products to the Plans' participants, outside of their investments already in the Plans.

161.    Experts in the recordkeeping industry with vast experience in requests for proposals and information for similar plans have determined the market rate that the Plans likely would have been able to obtain had the fiduciaries put the Plans' recordkeeping services out for competitive bidding. Based on the Plans' features, the information available to Plaintiffs regarding the nature and type of administrative services actually provided by the Plans' recordkeepers, the Plans' combined participant level (roughly 25,000), and the market rates obtained for similar plans, a reasonable annual recordkeeping fee for the Plans would be no more than $840,000 in the aggregate for both Plans combined (a rate of no more than approximately $35 for each participant in the Plans per year) using a recordkeeper who does not sell investment products and does not benefit as TIAA

did from its position as a recordkeeper in selling lucrative retirement products outside of the Plans to the Plans' participants. Even if the NYU Defendants had negotiated a reasonable recordkeeping fee for the Faculty and Medical Plans separately, the Plans would have paid dramatically less for recordkeeping services.

162.    Based on schedules regarding service provider compensation in the Faculty Plan's Forms 5500 filed with the Department of Labor, and upon information regarding the rate of internal revenue share allocated to each of the Plans' recordkeepers from their in-house proprietary investment options, the Faculty Plan paid between $2.2 and $2.8 million (or approximately $147 to $200 per participant) per year from 2011 to 2016, over *770%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year, even before taking into account the additional benefits TIAA received from selling its products and wealth management services using its role as recordkeeper for access to NYU employees and retirees.

163.    Based on schedules regarding service provider compensation in the Medical Plan's Forms 5500 filed with the Department of Labor, and upon information regarding the rate of internal revenue share allocated to each of the Plans' recordkeepers from their proprietary investment options, the Medical Plan paid between $1.1 and $1.8 million (or approximately $139 to $221 per participant) per year from 2011 to 2016, over *571%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year, even before taking into account the additional benefits TIAA received from selling

63

its products and wealth management services using its role as recordkeeper for access to NYU employees and retirees.

164.    Soliciting untainted competitive bids from other recordkeepers would have allowed the Defendants to reduce the Plans' excessive recordkeeping fees to reasonable levels. Had the NYU Defendants conducted a diligent competitive bidding process for the Plans' recordkeeping services, and not allowed bundling of recordkeeping with the recordkeepers' investment products, the process would have resulted in very substantial reductions in the Plans' recordkeeping fees, totaling millions of dollars. This competitive bidding process would have enabled Defendants to select a recordkeeper charging reasonable fees, negotiate a reduction in recordkeeping fees, and obtain rebates of any excess expenses paid by participants for recordkeeping services.

165.    Aside from the failures to monitor the amount of revenue sharing payments and to adequately solicit competitive bids, the NYU Defendants, as advised by Cammack, also failed to negotiate rebates of the excessive fee payments to TIAA-CREF and Vanguard. Because the multi-billion dollar Plans paid the same asset-based fees as much smaller plans, Defendants could have demanded "plan pricing" rebates from TIAA-CREF based on the Plans' economies of scale. Defendants could have also demanded similar rebates from Vanguard. Had Defendants negotiated for these rebates, the Plans' recordkeeping fees would have been reduced, avoiding additional losses of retirement savings.

64

166.    Margaret Meagher, the Co-Chair of the Retirement Plan Committee, admitted that the Committee just took TIAA's word for the costs they reported and never sought to obtain from Vanguard the amount of its costs. Moreover, Ms. Meagher stated under oath that she did not recall the Committee ever seeking to get fees on a flat, per participant basis from Vanguard or TIAA.

167.    NYU's corporate designee, Mark Petti, admitted that neither NYU nor the Committee ever did the math to determine what the Plans were paying on a per participant basis for recordkeeping fees.

168.    By failing to prudently monitor and control the Plans' recordkeeping and administrative fees, particularly the open-ended asset-based revenue sharing received by TIAA-CREF and Vanguard, and maintaining an inefficient and costly structure of multiple recordkeepers, the NYU Defendants, as advised by Cammack, caused the Plans' participants to pay excessive and unreasonable fees for recordkeeping and administrative services. Defendants' failure to ensure that participants only paid reasonable fees for administrative and recordkeeping services caused the Faculty and Medical Plans and their participants to lose over $24 million of their retirement savings.[38]

---

[38] The Plans' losses from 2011–2016 have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in the Plans' investments, growing with the market.

**VIII.  The NYU Defendants imprudently wasted participants' money by selecting higher-cost share classes of Plan mutual funds instead of using readily available and absolutely *identical* versions of these same funds that would have allowed the Plans to avoid paying entirely unnecessary and excessive fees.**

169.    Cammack's Vice President admitted that lower cost share classes were available to NYU and a Co-Chair of the Retirement Plan Committee, Linda Woodruff, admitted that including retail share classes in the Plans was "probably not appropriate."

170.    In granting certiorari on the Solicitor General's recommendation, the Supreme Court in *Tibble* modified the question presented in the petition to specifically focus on the issue of mutual fund share classes.[39] If including retail-class mutual funds instead of identical lower-cost institutional shares was prudent as a matter of law, the issue of whether such a claim was timely would have been entirely irrelevant and the Supreme Court would have had no reason to grant certiorari. In a 9-0 opinion, in this context of retail versus institutional share classes, the Court held that ERISA fiduciaries have a "continuing duty to monitor investments and remove imprudent ones," and remanded for the Ninth Circuit. Thereafter, in a unanimous 11-judge opinion, the Ninth Circuit, sitting en banc, observed that under trust law, "cost-conscious management is fundamental to prudence in the investment function," and that "trustees are obliged to minimize

---

[39] "Whether a claim that ERISA plan fiduciaries breached their duty of prudence by offering higher-cost retail-class mutual funds to plan participants, even though identical lower-cost institutional-class mutual funds were available, is barred by 29 U.S.C. §1113(1) when fiduciaries initially chose the higher-cost mutual funds as plan investments more than six years before the claim was filed." *See* 135 S. Ct. 43.

costs." *Tibble V*, 843 F.3d at 1197–98 (quoting Restatement (Third) of Trust §90, cmt. b, and Unif. Prudent Investor Act §7).

171.    After a second trial, the district court entered a second judgment for plaintiffs, concluding that the Edison plan fiduciaries breached their duty of prudence by retaining retail-class shares of 17 mutual funds instead of switching to institutional-class shares of the same funds. *Tibble VI,* 2017 U.S. Dist. LEXIS 130806, at *36–39. The court found that a prudent fiduciary would have known "of the existence of the institutional shares" and would have switched to the institutional shares as soon as they became available. *Id*. at *39–42.

172.    Like *Tibble,* other courts have consistently found that, because the only difference between share classes is fees, a fiduciary's decision to provide the higher-cost share class raises an inference that the process was flawed.[40]

---

[40] *Braden,* 588 F.3d at 595–96 & n.5 (denying motion to dismiss where fiduciaries provided "retail class shares, which charge significantly higher fees than institutional shares for the same return on investment"); *Bell v. Pension Comm. of ATH. Holding Co.,* No. 15-2062, 2017 U.S. Dist. LEXIS 42107, at *8–9 (S.D. Ind. Mar. 23, 2017)(rejecting reliance on *Loomis* and *Hecker* because "[n]either court addressed whether a defendant violates their fiduciary duty in selecting high-cost investment options where *identical* investment options are available at a lower-cost."); *Terraza v. Safeway Inc.,* No. 16-3994, 2017 U.S. Dist. LEXIS 35732, at *39–40 (N.D. Cal. Mar. 13, 2017)(because indisputably "the *only* difference between the option that was offered and the option that allegedly should have been offered was price," … "[t]he Court can reasonably infer from this allegation that the Defendants acted imprudently by selecting the more expensive option"); *Kruger v. Novant Health, Inc.,* 131 F.Supp.3d 470, 477–79 (M.D.N.C. 2015)(denying motion to dismiss claim involving 403(b) plan where fiduciaries "utiliz[ed] imprudently expensive … retail class funds when institutional class shares were available"); *Krueger v. Ameriprise Fin., Inc.,* No. 11-2781, 2012 U.S. Dist. LEXIS 166191, at *29–30 (D. Minn. Nov. 20, 2012)(denying motion to dismiss based on use of higher-cost share class instead of lower-cost share class which would have provided "identical investment management"); *Tussey v. ABB, Inc.,* No. 06-4305, 2012 U.S. Dist. LEXIS 45240, at *8–9, 109–11, 115–16 (W.D. Mo. Mar. 31, 2012)(defendants "violated their fiduciary duties" by, *inter alia,* "select[*ing] more expensive share classes … when less expensive share classes were available[.]*")(emphasis added), *affirmed in relevant part,* 746 F.3d 327 (8th Cir. 2014).

173.   Jumbo retirement plans, like the Plans, have massive leverage to obtain low fees for investment management services. If a plan invests in mutual funds, prudent fiduciaries of jumbo defined contribution plans review all available share classes, and do so for every fund in their plans, whether the plan contains three funds, 30 funds, or 300 funds. Because the only difference between the various share classes is fees, prudent fiduciaries view higher-cost share classes as imprudent, because using a higher-cost share class results in the plan paying wholly unnecessary fees. Jumbo investors like the Faculty and Medical Plans can obtain share classes with far lower costs than retail mutual fund shares.

174.   As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and *select the share classes* (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The *failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach*.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011)(emphasis added).[41]

175.   Even if a jumbo plan does not meet the minimum investment thresholds for an institutional share class, fund companies will routinely waive those minimums for billion dollar plans if merely requested, particularly when the plan's total investment in the investment provider's platform is significant. This has

---

[41] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

been well documented. *See e.g.*, *Tibble v. Edison*, 729 F.3d 1110, 1137 n.24 (9th Cir. 2013)("Although the funds advertised investment minimums, the district court amply documented that it is common knowledge in the financial industry that these will be waived for 'large 401(k) plans with over a billion dollars in total assets . . . [i]n fact, defendant' own expert witness had 'personally obtained such waivers for plans as small as $50 million in total assets[.]'"). Therefore, the NYU Defendants knew or should have known that investment providers would have made lower-cost share classes available to the Plans if the NYU Defendants or Cammack had asked.

176.   Despite the availability of far lower-cost options, the Defendants have allowed the Plans to use investment options with far higher costs than were available to the Plans based on their size. Moreover, for the *exact same mutual fund option*, Defendants allowed the Plans to offer far higher-cost share classes of mutual funds instead of absolutely identical lower-cost share classes that were available to the Plans. The lower-cost share classes of these funds are identical in every respect—including liquidity—except for having lower fees.

177.   Jan Rezler, Vice President of Cammack, the Plans' investment adviser, has admitted that jumbo plans such as NYU's have greater negotiating leverage and should not be paying the same fees as small plans and that the Plans have access to lower-cost share classes. Yet, Mr. Rezler has conceded that the NYU Plans have funds which are not in the lower share classes that are available.

178.   Moreover, Defendant Linda Woodruff, a Co-Chair of the Retirement Plan Committee, admitted she was "having a hard time thinking of" a reason the

Plans would have offered higher-cost share classes of certain mutual funds when the lower-cost of these exact same funds were available to the Plans.

179.    Numerous sources confirm that the different share classes of a given mutual fund are identical except for fees, including the prospectuses of the Plans' funds filed with the SEC.

**Share classes**

Each Fund may offer Institutional, Advisor, Premier and Retirement Class shares in this Prospectus. The Lifecycle Retirement Income Fund also offers Retail Class shares. *Each Fund's investments are held by the Fund as a whole, not by a particular share class, so an investor's money will be invested the same way no matter which class of shares is held.* However, there are *differences among the fees and expenses* associated with each class and not everyone is eligible to buy every class.

TIAA-CREF Lifecycle Funds, Prospectus at 163 (Sept. 27, 2016)(emphasis added).[42]

180.    Under ERISA, each and every investment option must be prudent. Despite this, for the entire proposed class period nearly *half* of the investment options in the Faculty Plan were retail funds, or options that had lower-cost identical funds available. This demonstrates a sustained failure of process on the part of the NYU Defendants to ensure that each option in the Plans was prudent.

181.    In the Faculty and Medical Plans, lower-cost mutual funds *identical* to the Plans' Vanguard mutual funds include and have included the following:

---

[42] Available at:
https://www.sec.gov/Archives/edgar/data/1084380/000093041316008290/c85911_485bpos.htm#168.

| Plan Mutual Fund[43] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard 500 Index (Inv) (VFINX) | 17 bps | Vanguard Institutional Index (Instl Plus) (VIIIX) | 2 bps | 750.00% |
| Vanguard Asset Allocation (Inv) (VAAPX) | 27 bps | Vanguard Asset Allocation (Adm) (VAARX) | 19 bps | 42.11% |
| Vanguard Balanced Index (Inv) (VBINX) | 26 bps | Vanguard Balanced Index (Instl) (VBAIX) | 8 bps | 225.00% |
| Vanguard Capital Opportunity (Inv) (VHCOX) | 48 bps | Vanguard Capital Opportunity (Adm) (VHCAX) | 41 bps | 17.07% |
| Vanguard Developed Markets Index (Inv) (VDMIX) | 20 bps | Vanguard Developed Markets Index (Instl Plus) (VDMPX) | 6 bps | 233.33% |
| Vanguard Developed Markets Index (Adm) (VTMGX) ** | 9 bps | Vanguard Developed Markets Index (Instl) (VTMNX) | 7 bps | 28.57% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 35 bps | Vanguard Emerging Markets Stock Index (Instl) (VEMIX) | 15 bps | 133.33% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 33 bps | Vanguard Emerging Markets Stock Index (Instl Plus) (VEMRX) | 10 bps | 230.00% |
| Vanguard Emerging Markets Stock Index (Adm) (VEMIX) ** | 12 bps | Vanguard Emerging Markets Stock Index (Instl Plus) (VEMRX) | 10 bps | 20.00% |
| Vanguard Energy (Inv) (VGENX) * | 38 bps | Vanguard Energy (Adm) (VGELX) | 31 bps | 22.58% |
| Vanguard Equity-Income (Inv) (VEIPX) | 31 bps | Vanguard Equity-Income (Adm) (VEIRX) | 22 bps | 40.91% |

---

[43] Funds marked with an * were only included in the Faculty Plan.  Funds marked with a ** were only included in the Medical Plan. If there is no asterisk, they were included in both.

| Plan Mutual Fund[43] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard European Stock Index (Inv) (VEURX) | 26 bps | Vanguard European Stock Index (Instl) (VESIX) | 10 bps | 160.00% |
| Vanguard European Stock Index (Adm) (VEUSX) ** | 12 bps | Vanguard European Stock Index (Instl) (VESIX) | 9 bps | 33.33% |
| Vanguard Explorer (Inv) (VEXPX) | 49 bps | Vanguard Explorer (Adm) (VEXRX) | 32 bps | 53.13% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 26 bps | Vanguard Extended Market Index (Instl) (VIEIX) | 8 bps | 225.00% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 24 bps | Vanguard Extended Market Index (Instl Plus) (VEMPX) | 6 bps | 300.00% |
| Vanguard Extended Market Index (Adm) (VEXAX) ** | 10 bps | Vanguard Extended Market Index (Instl Pl) (VEMPX) | 6 bps | 66.67% |
| Vanguard FTSE Social Index (Inv) (VFTSX) | 29 bps | Vanguard FTSE Social Index (Instl) (VFTNX) | 16 bps | 81.25% |
| Vanguard GNMA (Inv) (VFIIX) | 23 bps | Vanguard GNMA (Adm) (VFIJX) | 13 bps | 76.92% |
| Vanguard Growth & Income (Inv) (VQNPX) | 32 bps | Vanguard Growth & Income (Adm) (VGIAX) | 21 bps | 52.38% |
| Vanguard Growth Index (Inv) (VIGRX) | 26 bps | Vanguard Growth Index (Instl) (VIGIX) | 8 bps | 225.00% |
| Vanguard Growth Index (Adm) (VIGAX) ** | 9 bps | Vanguard Growth Index (Instl) (VIGIX) | 8 bps | 12.50% |
| Vanguard Health Care (Inv) (VGHCX) * | 36 bps | Vanguard Health Care (Adm) (VGHAX) | 29 bps | 24.14% |
| Vanguard High-Yield Corporate (Inv) (VWEHX) | 28 bps | Vanguard High-Yield Corporate (Adm) (VWEAX) | 15 bps | 86.67% |

| Plan Mutual Fund[43] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Inflation-Protected Securities (Inv) (VIPSX) | 22 bps | Vanguard Inflation-Protected Securities (Instl) (VIPIX) | 7 bps | 214.29% |
| Vanguard Institutional Index (Instl) (VINIX) * | 4 bps | Vanguard Institutional Index (Instl Plus) (VIIIX) | 2 bps | 100.00% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index (Instl) (VBIMX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index (Instl Plus) (VBIUX) | 5 bps | 300.00% |
| Vanguard Intermediate-Term Bond Index (Adm) (VBILX) ** | 10 bps | Vanguard Intermediate-Term Bond Index (Instl Plus) (VBIUX) | 5 bps | 100.00% |
| Vanguard Intermediate-Term Investment-Grade (Inv) (VFICX) | 24 bps | Vanguard Intermediate-Term Investment-Grade (Adm) (VFIDX) | 11 bps | 118.18% |
| Vanguard Intermediate-Term Treasury (Inv) (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury (Adm) (VFIUX) | 12 bps | 108.33% |
| Vanguard International Growth (Inv) (VWIGX) | 49 bps | Vanguard International Growth (Adm) (VWILX) | 33 bps | 48.48% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 22 bps | Vanguard Long-Term Bond Index (Instl) (VBLLX) | 7 bps | 214.29% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 20 bps | Vanguard Long-Term Bond Index (Instl Plus) (VBLIX) | 5 bps | 300.00% |
| Vanguard Long-Term Investment-Grade (Inv) (VWESX) | 26 bps | Vanguard Long-Term Investment-Grade (Adm) (VWETX) | 13 bps | 100.00% |

| Plan Mutual Fund[43] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Long-Term Treasury (Inv) (VUSTX) | 25 bps | Vanguard Long-Term Treasury (Adm) (VUSUX) | 12 bps | 108.33% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 26 bps | Vanguard Mid Cap Index (Instl) (VMCIX) | 8 bps | 225.00% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 24 bps | Vanguard Mid Cap Index (Instl Plus) (VMCPX) | 6 bps | 300.00% |
| Vanguard Mid Cap Index (Instl) (VMCIX) ** | 8 bps | Vanguard Mid Cap Index (Instl Plus) (VMCPX) | 6 bps | 33.33% |
| Vanguard Morgan Growth (Inv) (VMRGX) | 43 bps | Vanguard Morgan Growth (Adm) (VMRAX) | 29 bps | 48.28% |
| Vanguard Pacific Stock Index (Inv) (VPACX) | 26 bps | Vanguard Pacific Stock Index (Instl) (VPKIX) | 10 bps | 160.00% |
| Vanguard Pacific Stock Index (Adm) (VPADX) ** | 12 bps | Vanguard Pacific Stock Index (Instl) (VPKIX) | 9 bps | 33.33% |
| Vanguard Prime Money Market (Inv) (VMMXX) | 23 bps | Vanguard Prime Money Market (Adm) (VMRXX) | 9 bps | 155.56% |
| Vanguard PRIMECAP (Inv) (VPMCX) | 45 bps | Vanguard PRIMECAP (Adm) (VPMAX) | 36 bps | 25.00% |
| Vanguard REIT Index (Inv) (VGSIX) | 26 bps | Vanguard REIT Index (Instl) (VGSNX) | 9 bps | 188.89% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 22 bps | Vanguard Short-Term Bond Index (Adm) (VBIRX) | 11 bps | 100.00% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 20 bps | Vanguard Short-Term Bond Index (Instl Plus) (VBIPX) | 5 bps | 300.00% |
| Vanguard Short-Term Bond Index (Adm) (VBIRX) ** | 10 bps | Vanguard Short-Term Bond Index (Instl Plus) (VBIPX) | 5 bps | 100.00% |

| Plan Mutual Fund[43] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Short-Term Federal (Inv) (VSGBX) | 22 bps | Vanguard Short-Term Federal (Adm) (VSGDX) | 12 bps | 83.33% |
| Vanguard Short-Term Investment-Grade (Inv) (VFSTX) | 24 bps | Vanguard Short-Term Investment-Grade (Instl) (VFSIX) | 9 bps | 166.67% |
| Vanguard Short-Term Treasury (Inv) (VFISX) | 22 bps | Vanguard Short-Term Treasury (Adm) (VFIRX) | 12 bps | 83.33% |
| Vanguard Small Cap Growth Index (Inv) (VISGX) | 26 bps | Vanguard Small Cap Growth Index (Instl) (VSGIX) | 8 bps | 225.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 26 bps | Vanguard Small Cap Index (Instl) (VSCIX) | 8 bps | 225.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 24 bps | Vanguard Small Cap Index (Instl Plus) (VSCPX) | 6 bps | 300.00% |
| Vanguard Small Cap Index (Instl) (VSCIX) ** | 8 bps | Vanguard Small Cap Index (Instl Plus) (VSCPX) | 6 bps | 33.33% |
| Vanguard Small Cap Value Index (Inv) (VISVX) | 26 bps | Vanguard Small Cap Value Index (Instl) (VSIIX) | 8 bps | 225.00% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Instl) (VBTIX) | 7 bps | 214.29% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Instl Plus) (VBMPX) | 5 bps | 340.00% |
| Vanguard Total Bond Market Index (Instl) (VBTIX) ** | 6 bps | Vanguard Total Bond Market Index (Instl Plus) (VBMPX) | 5 bps | 20.00% |

| Plan Mutual Fund[43] | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Total International Stock Index (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index (Instl) (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index (Inv) (VTSMX) | 17 bps | Vanguard Total Stock Market Index (Instl Plus) (VITPX) | 2 bps | 750.00% |
| Vanguard Total Stock Market Index (Instl) (VITSX) ** | 4 bps | Vanguard Total Stock Market Index (Instl Plus) (VITPX) | 2 bps | 100.00% |
| Vanguard U.S. Growth (Inv) (VWUSX) | 45 bps | Vanguard U.S. Growth (Adm) (VWUAX) | 29 bps | 55.17% |
| Vanguard Value Index (Inv) (VIVAX) | 26 bps | Vanguard Value Index (Instl) (VIVIX) | 8 bps | 225.00% |
| Vanguard Value Index (Inv) (VVIAX) ** | 9 bps | Vanguard Value Index (Instl) (VIVIX) | 8 bps | 12.5% |
| Vanguard Wellesley Income (Inv) (VWINX) | 28 bps | Vanguard Wellesley Income (Adm) (VWIAX) | 21 bps | 33.33% |
| Vanguard Wellington (Inv) (VWELX) | 30 bps | Vanguard Wellington (Adm) (VWENX) | 22 bps | 36.36% |
| Vanguard Windsor II (Inv) (VWNFX) | 35 bps | Vanguard Windsor II (Adm) (VWNAX) | 27 bps | 29.63% |
| Vanguard Windsor (Inv) (VWNDX) | 33 bps | Vanguard Windsor (Adm) (VWNEX) | 22 bps | 50.00% |

182.   Lower-cost alternatives *identical* to the Faculty Plan's TIAA-CREF

mutual funds include and have included the following:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF International Equity Index (Retire) (TRIEX) | 35 bps | TIAA-CREF International Equity Index (Instl) (TCIEX) | 10 bps | 250.00% |
| TIAA-CREF Large-Cap Value Index (Retire) (TRCVX) | 34 bps | TIAA-CREF Large-Cap Value Index (Instl) (TILVX) | 9 bps | 277.78% |
| TIAA-CREF Lifecycle 2010 (Retire) (TCLEX) | 65 bps | TIAA-CREF Lifecycle 2010 (Instl) (TCTIX) | 40 bps | 62.50% |
| TIAA-CREF Lifecycle 2015 (Retire)  (TCLIX) | 67 bps | TIAA-CREF Lifecycle 2015 (Instl) (TCNIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2020 (Retire) (TCLTX) | 67 bps | TIAA-CREF Lifecycle 2020 (Instl) (TCWIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2025 (Retire) (TCLFX) | 69 bps | TIAA-CREF Lifecycle 2025 (Instl) (TCYIX) | 44 bps | 56.82% |
| TIAA-CREF Lifecycle 2030 (Retire) (TCLNX) | 71 bps | TIAA-CREF Lifecycle 2030 (Instl) (TCRIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle 2035 (Retire) (TCLRX) | 72 bps | TIAA-CREF Lifecycle 2035 (Instl) (TCIIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2040 (Retire) (TCLOX) | 72 bps | TIAA-CREF Lifecycle 2040 (Instl) (TCOIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2045 (Retire) (TTFRX) | 72 bps | TIAA-CREF Lifecycle 2045 (Instl) (TTFIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2050 (Retire) (TLFRX) | 71 bps | TIAA-CREF Lifecycle 2050 (Instl) (TFTIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle Retirement Income (Retire) (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income (Instl) (TLRIX) | 40 bps | 62.50% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Mid-Cap Growth (Retire) (TRGMX) | 77 bps | TIAA-CREF Mid-Cap Growth (Instl) (TRPWX) | 52 bps | 48.08% |
| TIAA-CREF Mid-Cap Value (Retire) (TRVRX) | 74 bps | TIAA-CREF Mid-Cap Value (Instl) (TIMVX) | 49 bps | 51.02% |
| TIAA-CREF Small-Cap Blend Index (Retire) (TRBIX) | 34 bps | TIAA-CREF Small-Cap Blend Index (Instl) (TISBX) | 9 bps | 277.78% |

183.    These lower-cost share classes of the *identical* mutual funds for the Faculty Plan and Medical Plan have been available for years, some dating back to the early 2000's or before.

184.    The failure to select far lower-cost share classes for the Plans' mutual fund options that are identical in all respects (portfolio manager, underlying investments, and asset allocation), except for cost, demonstrates that the NYU Defendants failed to consider the size and purchasing power of the Plans when selecting share classes and failed to engage in a prudent process for the selection, monitoring, and retention of those mutual funds.

185.    Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the lower-cost share classes, the Plans' participants would not have lost millions of dollars of their retirement savings.

**IX.    The NYU Defendants selected and retained a large number of duplicative investment options in the same investment style instead of selecting "best in class" options as prudent fiduciaries must do, and diluted the Plans' ability to obtain reasonable fees for their size.**

186.    The NYU Defendants provided a dizzying array of duplicative funds in the same investment style, thereby reducing the bargaining power associated with offering a single "best in class" option in each investment style, which significantly reduces investment fees, and causing "decision paralysis" for participants.

187.    Indeed, Margaret Meagher, Co-Chair of the Retirement Plan Committee, recognized the herculean effort that was required for the Retirement Plan Committee to fulfill its fiduciary obligations due to the sheer number of investment options in the Plans, specifically admitting that monitoring so many fund options in the Plans can be a "daunting task".

188.    It is well-documented in industry literature, and well-known by prudent fiduciaries of large defined contribution plans, that a very large number of options such as the number in the NYU Plans does not give participants the benefit of fiduciaries selecting "best in class" options and causes investor confusion and "decision paralysis."[44]

189.    Cammack's Vice President, Jan Rezler, has admitted that large fund lineups can overwhelm participants and cause confusion.

190.    Moreover, Margaret Meagher, the Committee Co-Chair, conceded that reducing the number of investment options in the Plans would enable the NYU

---

[44] Sheena S. Iyengar, et al., Choice Proliferation, Simplicity Seeking, and Asset Allocation, 94 J.Pub. Econ. 530 (Mar. 2010)(finding that the presence of more funds in a plan results in poor individual asset allocation decisions).

Defendants to ease the difficulty of meeting their fiduciary obligations to monitor each fund.

191.    In comparison, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had an average of *15* investment options, excluding target date funds.[45] This reasonable number of options provides choice of investment style to participants while maintaining a larger pool of assets in each investment style, which benefits participants by avoiding participant confusion and ensuring lower fees.

192.    A larger pool of assets in each investment style significantly reduces fees paid by participants. Consolidating duplicative investments of the same investment style into a single investment option would strengthen the Plans' ability to command lower-cost investments and provide "best in class" funds.

193.    Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Assembling a haphazard lineup of over 100 duplicative, high-cost funds, using *only* funds that are those of the recordkeeper and none of the thousands of other funds available—and shifting to participants the burden to screen those options—does not reflect a prudent investment selection process.

---

[45] Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015), available at https://www.callan.com/research/files/990.pdf.

194.   Moreover, using many actively managed funds within the same investment style results in the Plans effectively having an index fund return, while paying much higher fees for active management than the fees of a passive index fund, which has much lower fees because there is no need for active management and its higher fees.

195.   Rather than selecting "best in class" funds, from 2010 to date, the Faculty Plan included and continues to include duplicative investments in every major asset class and investment style, including balanced/asset allocation (9–10 options), fixed income and high yield bond (17 options), international (11 options), large cap domestic equities (19–20 options), mid cap domestic equities (9 options), small cap domestic equities (5 options), real estate (2 options), money market (4 options), and target date investments (2 fund families). The Medical Plan included and continues to include duplicative investments in balanced/asset allocation (9–10 options), fixed income and high yield bond (17 options), international (10 options), large cap domestic equities (17–18 options), mid cap domestic equities (7 options), small cap domestic equities (4 options), real estate (2 options), money market (4 options), and stable value (2 options).

196.   For illustration purposes, the NYU Defendants included up to six large cap domestic blend investments for the Faculty Plan and Medical Plan as of December 31, 2016. These investments are summarized below and compared to a far lower-cost large cap domestic blend alternative that was available to the Plans, the Vanguard Institutional Index Fund (Instl Plus), which was only recently

included in the Medical Plan.  The Vanguard Institutional Index Fund (Instl Plus)

(VIIIX), by definition, mirrors the market, and has an expense ratio of 2 bps.

| Large Cap Blend Investments[46] | Assets | Fee | Institutional Index Fund (VIIIX) | Plan's Excess Cost |
|---|---|---|---|---|
| CREF Stock Account | $812,146,351 | 46 bps | 2 bps | 2200% |
| CREF Equity Index Account | $104,165,602 | 37 bps | 2 bps | 1750% |
| Vanguard Growth & Income (Adm) (VGIAX) ** | $13,850,027 | 23 bps | 2 bps | 1050% |
| Vanguard Growth & Income (Inv) (VQNPX) * | $4,987,624 | 37 bps | 2 bps | 1750% |
| Vanguard Institutional Index Fund (Instl) (VINIX) * | $62,168,369 | 4 bps | 2 bps | 100% |
| Vanguard PRIMECAP Core (Inv) (VPCCX) * | $2,828,531 | 50 bps | 2 bps | 2400% |
| Vanguard Total Stock Market Index Fund (Instl) (VITSX) ** | $44,993,383 | 4 bps | 2 bps | 100% |
| Vanguard Total Stock Market Index Fund (Inv) (VTSMX) * | $9,469,355 | 17 bps | 2 bps | 750% |
| **Total of Higher-Cost Alternatives** | **$1,054,609,242** | | | |

197.    With over *$916 million* held in the CREF Stock Account and the CREF

Equity Index Account, these large cap blend options were *23 and 18 times* more

expensive than the lower-cost Vanguard option with an expense ratio of 2 bps.

---

[46] Funds marked with an * were only included in the Faculty Plan.  Funds marked with a ** were only included in the Medical Plan. If there is no asterisk, they were included in both.



198.   There are many other large cap index funds that are also available in the market at far lower costs than the Plans' large cap blend funds. Had the amounts invested in the Plans' large cap blend options been consolidated into a single large cap blend investment such as the Vanguard Institutional Index Fund (Instl Plus), Plan participants would have avoided losses of well over $4 million dollars in fees in 2014 alone, and many more millions since 2011.

199.   In addition, the NYU Defendants selected and continue to retain multiple passively managed index options in the same investment style. As discussed above, unlike actively managed funds, index funds do not attempt to beat their benchmark through active stock selection, but instead simply attempt to track a given index, such as the S&P 500, and thus have much lower fees than actively managed funds. In the large cap blend investment style, the NYU Defendants

included four separate index funds in each Plan which generate investment results that correspond to the return of the U.S. equity market. As another example, the NYU Defendants retained four separate index funds for the fixed income and intermediate-term bond investment styles.

200.    Since index funds merely hold the same securities in the same proportions as the index,[47] having multiple index funds in the Plans provides no benefit to participants. Instead, it hurts participants by diluting the Plans' ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

201.    Had the NYU Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, the Plans would have generated higher investment returns, net of fees, and participants would not have lost significant retirement assets.

202.    The NYU Defendants' failure to pool the assets invested in duplicative investment options for the same investment style into a single investment option caused Plan participants to pay millions of dollars in unreasonable investment expenses, thereby depleting their retirement assets.

---

[47] Another example of an index is the Dow Jones Industrial Average.

## X.      The NYU Defendants imprudently retained historically underperforming Plan investments.

203.    A fiduciary who breaches its fiduciary duties is required to make good any losses to the plan resulting from each such breach. 29 U.S.C. §1109(a). Defendants' failure to conduct appropriate due diligence in selecting and monitoring the Plans' investments resulted in options being retained in the Plans despite years of historical underperformance compared to superior lower-cost alternatives, causing massive losses to the Plans compared to what those assets would have earned if invested in prudent alternatives.

204.    Despite acknowledging in 2009 that one of the fiduciary advantages of consolidation included the ability to "develop[] an investment policy and monitor fund performance," Defendants did not create an investment policy statement until 2014—over five years later.[48]

### A.      Defendants imprudently retained the CREF Stock Account.

205.    TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plans. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. Under the restrictions, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account. Instead of controlling each plan option allowed in the Plans, as ERISA requires, the

---

[48] Ree*ngineering II, More Opportunities for Self Service,* (July 30, 2009), available at: https://www.nyu.edu/content/dam/nyu/execVicePres/documents/13-Appendix-D-Self-Service-Opportunities.ppt

NYU Defendants allowed TIAA-CREF to dictate that the CREF Stock Account would be placed and retained in the Plans. The NYU Defendants did so without a prudent process to determine whether there were other prudent alternatives in the exclusive best interest of Plans' participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by nearly 50% (15 bps).

206.   The CREF Stock Account has excessive and unnecessary fees, has consistently underperformed for years, and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plans, yet has not been removed from the Plans nor frozen to new investments. The CREF Stock Account is one of the largest investment options in the Plans with over $812 million in total assets, and has been offered to participants throughout the period from 2011 to date.[49]

207.   As understood in the investment community, passively managed investment options should either be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis, as set forth above. This extreme unlikelihood is even greater in

---

[49] TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category in its fund fact sheets, as well as in participant disclosures.

the large cap market because such companies are the subject of many analysts'
coverage, while smaller stocks are not as widely covered by analysts and thus are
subject to potential inefficiencies in pricing.

208.    The efficiencies of the large cap market hinder an active manager's
ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief
> that securities markets are remarkably efficient. Most investors would be
> considerably better off by purchasing a low expense index fund, than by
> trying to select an active fund manager who appears to possess a "hot hand."
> Since active management generally fails to provide excess returns and tends
> to generate greater tax burdens for investors, the advantage of passive
> management holds, a fortiori.

Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50

J. FIN. 549, 571 (1995).[50]

209.    Academic literature overwhelmingly concludes that active managers
consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for
> passive investing. Dozens of studies have examined the performance of
> mutual funds and other professional-managed assets, and virtually all of
> them have concluded that, on average, active managers underperform
> passive benchmarks…The median active fund underperformed the passive
> index in 12 out of 18 years [for the large-cap fund universe]…The bottom line
> is that, over most periods, the majority of mutual fund investors would have
> been better off investing in an S&P 500 Index fund.
>
> ****
>
> Most of the dismal comparisons for active managers are for large-cap
> domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*,

ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed.,1998).

---

[50] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

210.    Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it is in participants' best interest to offer an actively managed large cap option for the particular investment style and asset class, in light of the higher costs of active management.

211.    The NYU Defendants failed to undertake such an analysis, or any analysis, when it allowed the actively managed CREF Stock Account to be included and retained in the Plans. This is particularly true given TIAA-CREF's requirement that the CREF Stock Account be provided in the Plans in order to drive revenue to TIAA-CREF. By allowing the Plans to be bound by this requirement, the NYU Defendants failed to conduct an independent evaluation of the prudence of this option, which contradicts every principle of prudent investing because an investment that was no longer prudent could not be removed from the Plans.

212.    Indeed, Defendant Margaret Meagher, Co-Chair of the Retirement Plan Committee, admitted that the Committee never considered removing the CREF Stock Account despite its abysmal history of high fees and underperformance.

213.    Additionally, as detailed above, the 46 bps that the CREF Stock Account charged was comprised of four layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plans' participants. NYU Defendants failed to analyze whether these fees were appropriate and

reasonable in light of the services provided and given that the Plans collectively invested over *$812 million* in the CREF Stock Account.

214.   Had the NYU Defendants engaged in a prudent investment review and monitoring process, they would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

215.   The CREF stock account did not merely experience poor performance in a single year or two, but rather its historical performance has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark.

216.   The NYU Defendants and TIAA-CREF identified the Russell 3000 Index as the appropriate benchmark to evaluate the fund's investment results, as shown in the excerpt below that was provided to the Plans' participants.

| Investment Name / Benchmark | Morningstar Category | Ticker Symbol | Inception Date | Average Annual Total Returns/Benchmark | | |
|---|---|---|---|---|---|---|
| | | | | 1 Yr. | 5 Yr. | 10 Yr. or Since Inception |
| **CREF Stock Account R3** | Large Blend | QCSTIX | 04/24/2015 | -3.33% | 7.39% | 5.16% |
| *Russell 3000 Index* | | | | -0.34% | 11.01% | 6.90% |

217.   The following chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style and its benchmark for the one-, five-, and ten-year

89

periods ending December 31, 2016.[51] For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Instl Plus) (VITPX) and the Vanguard Institutional Index (Instl Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.



218.   The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Instl Plus) (2 bps) and the Vanguard Institutional Index (Instl Plus) (2 bps).

---

[51] Performance data provided as of December 31, 2016 to correspond to the Plans' most recent Form 5500 filed with the Department of Labor as of the filing of this complaint.

219.    Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one, five-, and ten-year periods ending December 31, 2016. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard PRIMECAP (Adm) (VPMAX) and Vanguard Capital Opp. (Adm) (VHCAX).



220.    The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[52]

---

[52] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these





funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.



221.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (40 bps), the Vanguard PRIMECAP (Adm) (35 bps), and the Vanguard Capital Opp. (Adm) (40 bps).

222.    Besides this abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plans. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July

2012).[53] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the over 60 separate underlying investment strategies, which greatly reduced the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5. Had the NYU Defendants, or the Plans' investment adviser, Cammack, conducted a reasonable due diligence investigation, they would have discovered these defects and removed the CREF Stock Account from the Plans.

223.    The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of prudent fiduciaries, the NYU Defendants failed to conduct a prudent process to monitor the CREF Stock Account and have retained the fund even though it continues to underperform lower-cost investment alternatives that are readily available to the Plans.

224.    Prudent fiduciaries of defined contribution plans regularly monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries place underperforming investments on a "watch list." If performance does not improve within a reasonable period, fiduciaries replace those imprudent investments with better-performing and reasonably priced options. Under the

---

[53] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans based on years of historical underperformance.

225.    Had the NYU Defendants removed the CREF Stock Account and the amounts been invested in any of the actively or passively managed lower-cost alternatives identified in ¶¶217 and 219, participants in the Plans would not have lost well in excess of $148 million of their retirement savings from the fund being retained in the Plans.[54]

### B.    The NYU Defendants imprudently retained the TIAA Real Estate Account.

226.    The NYU Defendants allowed the Plans to include the TIAA Real Estate Account as one of the real estate investment options in the Plans. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Instl) (VGSNX).

227.    With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real Estate Account is also over *10 times more expensive* than the Vanguard REIT Index (Instl), which has an expense ratio of 8 bps.

---

[54] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.



228.   The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[55] Despite this, the NYU Defendants have not removed or frozen the Real Estate Account and to date has retained it in the Plans.

---

[55] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Instl) was 5.49%.







229.   This underperformance continued for years before 2009 and has continued after 2009. The TIAA Real Estate Account significantly underperformed the Vanguard REIT Index (Instl) over the one-, five-, and ten-year periods ending September 30, 2017.





230.   As the Supreme Court unanimously ruled in *Tibble*, fiduciaries of defined contribution plans have a continuing duty to monitor plan investment

options and replace imprudent investments. *Tibble*, 135 S. Ct. at 1829. The NYU Defendants failed to conduct such a process and continue to retain the TIAA Real Estate Account as an investment option in the Plans, despite its continued dramatic underperformance and far higher costs compared to available investment alternatives.

231.    Had the amounts invested in the TIAA Real Estate Account instead been invested in the lower-cost and better-performing Vanguard REIT Index (Instl), Plan participants would not have lost almost $20 million of their retirement savings.[56]

## CLASS ACTION ALLEGATIONS

232.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. §1109(a).

233.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration and the New York University Retirement

---

[56] Losses in the Plans have been brought forward to the present value using the investment returns of the Vanguard REIT Index (Instl) to compensate participants who have not been reimbursed for their losses.

Plan for Members of the Faculty, Professional Research Staff and Administration from November 10, 2011, through the date of judgment, excluding the Defendants and any participant who is a fiduciary to the Plans.

234.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 20,000 members and is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.   Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plans were harmed by Defendants' misconduct, as described above.

d.   Plaintiffs are adequate representatives of the Class because they were participants in the Plans during the Class period, have no interest that

is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of its fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

235.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, it would be impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter,

and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

236.   Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.      Schlichter, Bogard & Denton has been appointed as class counsel in 17 other ERISA class actions regarding excessive fees in large defined contribution plans. As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206, at *4–5 (S.D.Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816

at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation,

Schlichter, Bogard & Denton has achieved unparalleled results on behalf of

its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622

at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable

defendants and their sophisticated attorneys required Class Counsel to

demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper

Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D. Ill. Jan. 31, 2014).

  b. The U.S. District Court Judge G. Patrick Murphy recognized the

work of Schlichter, Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation
> illustrates an exceptional example of a private attorney general
> risking large sums of money and investing many thousands of
> hours for the benefit of employees and retirees. No case had
> previously been brought by either the Department of Labor or
> private attorneys against large employers for excessive fees in a
> 401(k) plan. Class Counsel performed substantial work[,]
> investigating the facts, examining documents, and consulting
> and paying experts to determine whether it was viable. This
> case has been pending since September 11, 2006. Litigating the
> case required Class Counsel to be of the highest caliber and
> committed to the interests of the participants and beneficiaries
> of the General Dynamics 401(k) Plans.

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at

8–9 (S.D.Ill. Nov. 22, 2010).

  c. Schlichter, Bogard & Denton handled the only full trial of an

ERISA excessive fee case, resulting in a $36.9 million judgment for the

plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB,

Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the

district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans.

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

d.    In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "Schlichter, Bogard & Denton added great value to the Class through the persistence and skill of their attorneys." No. 06-cv-743, Doc. 587, at 5 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.).

e.    In approving a recent settlement including $32 million plus significant affirmative relief, Chief Judge Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class

Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

   f. In November 2016, Judge Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. November 3, 2016).

   g. Recently, on October 24, 2017, Judge Andre Birotte Jr. of the United States District Court for the Central District of California found that the $16.75 million settlement fund obtained by Schlichter, Bogard & Denton was an "exceptional result" for the class that came after approximately eleven years of hard fought litigation. *Waldbuesser v. Northrop Grumman Corp.*, No. 06-6213, Doc. 803 at 4–5. (C.D.Cal. October 24, 2017).

   h. Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*—the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ

of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

      i.     The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[57] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[58] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[59] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014);[60] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[61] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [62] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on*

---

[57] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[58] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[59] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[60] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[61] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[62] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

*Trial*, NPR (Dec. 15, 2014);[63] Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[64] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[65]

## COUNT I

## Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

## Locking the Plans into CREF Stock Account and TIAA Recordkeeping

237.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

238.   The NYU Defendants were required to discharge their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

239.   The NYU Defendants were required to independently assess "the prudence of *each* investment option" for the Plans on an ongoing basis, *DiFelice*, 497 F.3d at 423, and to act prudently and solely in the interest of the Plans' participants in deciding whether to maintain a recordkeeping arrangement, DOL Adv. Op. 97-16A. The NYU Defendants were also required to remove investments that were not

---

[63] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[64] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[65] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

or no longer were prudent for the Plans, as the Supreme Court recently confirmed. *Tibble*, 135 S. Ct. at 1828–29.

240.    By allowing TIAA-CREF to mandate the inclusion of the CREF Stock Account and Money Market Account in the Plans, and to require that it provide recordkeeping for its proprietary options, the NYU Defendants committed the Plans to an imprudent arrangement in which certain investments could not be removed from the plan *even if they were not or no were longer prudent investments*, and prevented the Plans from using alternative recordkeepers who could provide superior services at a lower cost.  In so doing, the NYU Defendants abdicated their duty to independently assess the prudence of each option in the Plans on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plans' recordkeeper. By allowing TIAA-CREF to dictate these terms, the NYU Defendants favored the financial interests of TIAA-CREF in receiving a steady stream of revenues from bundled services, violating ERISA's requirement that the Plan be run for the exclusive benefit of participants.

241.    Because the NYU Defendants shackled the Plan with the CREF Stock Account and TIAA recordkeeping services without engaging in any process of evaluation much less a prudent decisionmaking process as to the prudence of those options, the NYU Defendants are liable to make good to the Plans all losses resulting from its breach. 29 U.S.C. §1109(a). As described in detail above, the Plans suffered massive losses from the inclusion of the CREF Stock Account in the Plans compared to what those assets would have earned if invested in prudent

alternative investments that were available to the Plans, and also suffered losses from paying TIAA recordkeeping fees that far exceeded market rates.

242.   Each NYU Defendant knowingly participated in the breach of the other NYU Defendants, knowing that such acts were a breach, enabled the other NYU Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other NYU Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each NYU Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Locking the Plans into CREF Stock Account and TIAA Recordkeeping

243.   Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

244.   Section 1106(a)(1) prohibits transactions between a plan and a "party in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)   sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> * * *
> (C)   furnishing of goods, services, or facilities between the plan and party in interest;
>
> (D)   transfer to, or use by or for the benefit of a party in interest, of any assets of the plan …

29 U.S.C. §1106(a)(1).

245.    Congress defined "party in interest" to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000); 29 U.S.C. §1002(14)(A)–(C). As service providers to the Plans, TIAA-CREF and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

246.    By allowing the Plans to be locked into an unreasonable arrangement that required the Plans to include the CREF Stock Account and to use TIAA as the recordkeeper for its proprietary products even though the fund was not a prudent option for the Plans due to its excessive fees and poor performance, and even though TIAA's recordkeeping fees were unreasonably expensive for the services provided, the NYU Defendants caused the Plans to engage in transactions that they knew or should have known constituted an exchange of property between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA-CREF in connection with the Plans' investments in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA.

247.    Under 29 U.S.C. §1109(a), the NYU Defendants are liable to restore all losses to the Plans resulting from these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

248.   Each NYU Defendant knowingly participated in the breach of the other NYU Defendants, knowing that such acts were a breach, enabled the other NYU Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other NYU Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each NYU Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

## Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)
## Unreasonable Administrative Fees

249.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

250.   The NYU Defendants were required to discharge their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

251.   If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying … through revenue sharing," to

"determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense," is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

252.    The NYU Defendants' process for monitoring and controlling the Plans' recordkeeping fees was flawed in that the NYU Defendants failed to: monitor the total amount of the revenue sharing received by the Plans' recordkeepers, determine if those amounts were competitive or reasonable for the services provided to the Plans, or use the Plans' size to reduce fees or obtain rebates for all excessive revenue sharing payments.

253.    NYU Defendants also failed to evaluate recordkeeping on a flat per participant basis as required by prudent fiduciary practice.

254.    Further, when evaluating the reasonableness of recordkeeping fees—contrary to the DOL's requirement that they do so—the NYU Defendants failed to take into account income and benefits such as securities lending and float among other benefits received by the Plans' recordkeepers. *See* DOL Field Assistance Bulletin 2002-03. [66]

255.    Moreover, the NYU Defendants failed to solicit bids from competing providers on a flat per-participant fee basis or to even be aware of what the fees paid were on a per participant basis. Thus, as the Plans' assets grew, the asset-

---

[66] The DOL requires that all benefits a service provider receives such as float must be determined, evaluated, and taken into account in a prudent analysis of the reasonableness of fees.

based revenue sharing payments to the Plans' recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties.

256.   By allowing TIAA-CREF and Vanguard to put their proprietary investments in the Plans without scrutinizing those providers' financial interest in using funds that provided them a steady stream of revenue sharing payments, and to do so mostly in high-priced retail funds with large amounts of revenue sharing, the NYU Defendants failed to act in the exclusive interest of participants.

257.   In contrast to the comprehensive plan reviews conducted by similarly situated 403(b) plan fiduciaries which resulted in consolidation to a single recordkeeper and significant fee reductions, and in failing to follow the recommendations of their consultant to move to a single recordkeeper in a timely manner, the NYU Defendants failed to engage in a timely and reasoned decisionmaking process to determine whether the Plans would similarly benefit from consolidating the Plans' administrative and recordkeeping services under a single provider. Instead, the NYU Defendants retained two recordkeepers to provide recordkeeping services. This failure to consolidate the recordkeeping services eliminated the Plans' ability to obtain the same services at a lower cost with a single recordkeeper. The NYU Defendants' failure to "balance the relevant factors and make a reasoned decision as to the preferred course of action—under

circumstances in which a prudent fiduciary would have done so"—and, indeed, *did* so—was a breach of fiduciary duty. *George*, 641 F.3d at 788.

258.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

259.   The NYU Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

260.   The NYU Defendants each knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Unreasonable Administrative Fees

261.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

262.   As service providers to the Plans, TIAA-CREF and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

263.   In engaging multiple entities—TIAA-CREF and Vanguard—to provide recordkeeping services to the Plans and allowing them to collect unreasonably high

fees for the services provided, the NYU Defendants caused the Plans to pay excessive fees for unnecessary services, thereby causing the Plans to engage in transactions that the NYU Defendants knew or should have known constituted an exchange of property between the Plan and TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA-CREF or Vanguard in connection with the Plans' investments in funds that paid revenue sharing to TIAA or Vanguard.

264.   Under 29 U.S.C. §1109(a), the NYU Defendants are liable to restore all losses to the Plans resulting from these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

265.   Each NYU Defendant knowingly participated in the breach of the other NYU Defendants, knowing that such acts were a breach, enabled the other NYU Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other NYU Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each NYU Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT V

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

#### Unreasonable investment management fees, unnecessary marketing and distribution (12b-1) fees and mortality and expense risk fees, and the imprudent inclusion of the CREF Stock Account and TIAA Real Estate Account.

266.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

267.   The NYU Defendants are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plans' assets are invested prudently. The NYU Defendants had a continuing duty to evaluate and monitor the Plans' investments on an ongoing basis and to "remove imprudent ones" within a reasonable time. *Tibble,* 135 S. Ct. at 1829.

268.   These duties required the NYU Defendants to independently assess whether each option was a prudent choice for the Plans or to allow the recordkeepers to put their entire investment lineups in the Plans' menus. *DiFelice*, 497 F.3d at 423; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590, 595–96 (8th Cir. 2009). Not a single fund of the thousands of funds available from the myriad of fund companies was considered or included in the Plans other than the proprietary funds of the Plans' recordkeepers.

269.    In making investment decisions, the NYU Defendants were required to consider all relevant factors under the circumstances, including without limitation alternative investments that were available to the Plans, the

117

recordkeepers' financial interest in having their proprietary investment products included in the Plans, and whether the higher costs of actively managed funds was justified by a realistic expectation of higher returns. *Braden*, 588 F.3d at 595–96; *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014); 29 C.F.R. § 2550.404a-1(b); Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2).

270.    The NYU Defendants have included in the Plans mostly the same investment options for *decades* and have retained them without seriously considering alternatives in the same investment style from other fund companies. They have selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with high expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times.

271.    Many of these options included unnecessary layers of fees that provided no benefit to participants but significant benefits to TIAA-CREF and Vanguard, including marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

272.    Rather than consolidating the 101 options in the Faculty Plan and 82 options in the Medical Plan into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, the NYU Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plans of their ability to qualify for lower cost share classes of certain investments,

while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion.

273.    In addition, as a fiduciary required to operate as a prudent financial expert, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), the NYU Defendants knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance.

274.    The Plans' investment offerings included the use of mutual funds and variable annuities with expense ratios far in excess of other lower-cost options available to the Plans. These lower-cost options included lower-cost share class mutual funds with the identical investment manager and investments.

275.    *All* of the Plans' options were the recordkeepers' own proprietary investments. No consideration was given by the NYU Defendants to any investment option regardless of investment style that was not a proprietary option of the recordkeepers. This violated the fundamental fiduciary principle of using "open architecture" in the Plans.

276.    Thus, the use of these funds was tainted by the recordkeepers' financial interest in including these funds in the Plans, which the NYU Defendants failed to consider. In so doing, the NYU Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of participants. The NYU Defendants therefore failed to discharge their

duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans. This was a breach of fiduciary duties.

277.   The NYU Defendants also failed to engage in a prudent process for monitoring the Plans' investments and removing imprudent ones within a reasonable period. This resulted in the Plans continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plans.

278.   CREF Stock Account: The NYU Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments with similar underlying asset allocations.

279.   TIAA Real Estate Account: The NYU Defendants selected and retained the TIAA Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

280.   Had the NYU Defendants engaged in a prudent investment review process, they would have concluded that these options were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans, and thus should be removed from the Plans or, at a minimum, frozen to new investments.

281.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

282.   The NYU Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

283.   Each NYU Defendant knowingly participated in the breach of the other NYU Defendants, knowing that such acts were a breach, enabled the other NYU Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other NYU Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each NYU Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT VI

### Prohibited transactions—29 U.S.C. §1106(a)(1)

**Unreasonable investment management fees, unnecessary marketing and distribution (12b-1) fees and mortality and expense risk fees.**

284.   Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

285.   As the plan's providers of investment services, TIAA-CREF and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

286.   In including 101 TIAA-CREF and Vanguard investment options in the Faculty Plan and 82 TIAA-CREF and Vanguard investment options in the Medical

Plan, many of which were duplicative and charged excessive and unnecessary fees compared to superior low-cost alternatives that were available to the Plans, including identical lower-cost share classes of the same mutual funds, the NYU Defendants caused the Plan to pay excessive fees for unnecessary and duplicative services, thereby causing the Plans to engage in transactions that the NYU Defendants knew or should have known constituted an exchange of property between the Plan and TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA-CREF or Vanguard in connection with the Plans' investments in TIAA-CREF and Vanguard investment options.

287.   Under 29 U.S.C. §1109(a), the NYU Defendants are liable to restore all losses to the Plans resulting from these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

**COUNT VII**

**Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)**

**NYU Defendants' Use of Retail Share Classes**

288.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

289.   The NYU Defendants were required to independently assess "the prudence of *each* investment option" for the Plans on an ongoing basis, *DiFelice*, 497

F.3d at 423, and to remove investments that were not or no longer were prudent for the Plans. *Tibble*, 135 S. Ct. at 1828–29.

290.    Jumbo investors like the Plans that have billions of dollars in assets can obtain share classes with far lower costs than retail mutual fund shares that are appropriate for much smaller investors.

291.    The NYU Defendants as fiduciaries of two multi-billion dollar retirement savings plans had enormous bargaining leverage in the investment marketplace. The NYU Defendants squandered this leverage by including dozens and dozens of retail investment options in the Plans even though the Plans qualified for the *identical* versions of these same funds offered in lower-cost share classes.

292.    Defendant members of the Retirement Plan Committee, including the Committee's Co-Chair, Linda Woodruff, have admitted that it is inappropriate for the Plans to be using higher-cost share classes of funds when lower-cost, identical versions of these same funds are available to the Plans. *See* ¶169.

293.    The NYU Defendants also failed to engage in a prudent process for monitoring the Plans' investments and removing imprudent ones within a reasonable period. This resulted in the Plans continuing to offer excessively expensive funds in higher-cost share classes despite the fact that the Plans were eligible to include identical, lower-cost versions of these same funds *with absolutely no difference in liquidity*.

294.    In selecting and retaining these higher-cost, retail share class investment options, the NYU Defendants imprudently relied on the Morningstar weighted average as a benchmark to evaluate the fees of these investment options despite the fact that both they and their advisor, Cammack, admitted that such a benchmark—which is comprised of mostly retail class funds—is inappropriate for jumbo plans like NYU's. The imprudent reliance on this benchmark masked the unreasonable and excessive fees of these higher-cost retail class investment options.

295.    Under ERISA, each and every investment option is required to be prudent. Despite this, throughout the entire proposed class period nearly *half* of the investment options in the Faculty Plan were retail funds, or investment options that had lower-cost identical funds available. Likewise, during the proposed class period, the Medical Plan included *dozens* of retail funds, or options that had lower-cost identical funds available.

296.    The Plans' widespread use of these higher-cost options when identical, lower-cost options were readily available—as set forth individually in ¶¶181–82— demonstrates a sustained failure of process on the part of the NYU Defendants to ensure that each option in the Plans was prudent.

297.    A prudent fiduciary under the circumstances would have reviewed prospectuses and immediately switched upon learning that a lower-cost share class was available.

298.    This absence of process is evident from the failures of the Defendants, including the Co-Chairs of the Retirement Plan Committee, and other individual

Defendants and Committee members to have any knowledge of the most basic financial and investment terms or other matters central to the Plans as set forth above in ¶¶127–29.

299.    Total losses to the Plans will be determined after complete discovery in this case and are continuing.

300.    The NYU Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

301.    Each NYU Defendant knowingly participated in the breach of the other NYU Defendants, knowing that such acts were a breach, enabled the other NYU Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other NYU Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each NYU Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT VIII

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

### The NYU Defendants' Enabling TIAA To Profit From Its Role as Recordkeeper and the Defendants' Failure to Protect Valuable Plan Assets

302.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

303.    The NYU Defendants were required to discharge their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

304.    As detailed in ¶¶81–89, above, the NYU Defendants breached this duty by enabling TIAA to use its position as the Plans' recordkeeper to obtain access to participants, gaining valuable, private, and sensitive information including participants' contact information, their choices of investments, the asset size of their accounts, their employment status, age and proximity to retirement, among other things. The NYU Defendants allowed TIAA to use this valuable and confidential information to aggressively sell lucrative TIAA products and wealth management services without restraint or oversight to plan participants throughout their employment with NYU, as they neared retirement age, and beyond. This information was even more lucrative for TIAA because the NYU Defendants are using TIAA as a recordkeeper and for the Plans' investments, thereby giving endorsement to TIAA, and making even more value its ability to sell products and wealth management services. The NYU Defendants not only granted TIAA unfettered access to sell their products and services, but also failed to even attempt to determine the value of this marketing benefit.

305.    The Retirement Plan Committee, and its members, were aware of TIAA's misuse of participant information in this regard and did nothing prevent it

from taking place. Specifically, the Committee's Co-Chair Margaret Meagher stated under oath not only that she was aware that TIAA-CREF was actively cross-selling various products to the Plans' participants including life insurance, IRAs, and wealth management services, but that the NYU Defendants fully enabled it. *See* ¶88. NYU's corporate designee, Mark Petti, also admitted that NYU was aware of this. *See* ¶89. In addition to knowing that this practice was ongoing and actively supporting it, the NYU Defendants did nothing to put in place safeguards which would prevent such practice from occurring or to quantify the value that was being conferred to TIAA in being allowed to use this employee information for its own commercial gain.

306.    Had the NYU Defendants acted as a prudent fiduciary, as set forth *supra* ¶85, they would have prohibited TIAA from using confidential and valuable participant account information for purposes other than the limited purpose of providing recordkeeping services. Prudent fiduciaries would have taken measures to protect this information and prevent it from being misused by a service provider. Instead, far from having such safeguards in place, the NYU Defendants enabled TIAA to use this information to aggressively target NYU Plan participants for TIAA's benefit.

307.    By allowing TIAA to use this participant account information to market and sell products and services and by failing to protect this vital participant information from being misused or exploited for commercial gain, the NYU Defendants failed to act in the exclusive best interest of the Plans' participants.

308.   Total losses and lost benefits to the Plans will be determined after complete discovery in this case and are continuing.

309.   The NYU Defendants are personally liable under 29 U.S.C. §1109(a) to restore to the Plans any losses to the Plans, including the value of benefits received by TIAA, resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

310.   Each NYU Defendant knowingly participated in the breach of the other NYU Defendants, knowing that such acts were a breach, enabled the other NYU Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other NYU Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each NYU Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IX

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### The NYU Defendants' Enabling TIAA To Profit From Its Role as Recordkeeper and the Defendants' Failure to Protect Valuable Plan Assets

311.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

312.   As the Plans' provider of investment services, TIAA-CREF is a party in interest. 29 U.S.C. §1002(14)(B).

313.   As detailed in ¶¶81–89, above, the NYU Defendants failed to protect vital and confidential participant information from being used by the Plans'

recordkeeper TIAA-CREF to aggressively market a variety of TIAA's financial products to NYU plan participants, including 529 plans, IRAs, annuities, mortgages, life insurance policies and wealth management services.

314.   The Retirement Plan Committee was aware of TIAA's misuse of participant information in this regard and did nothing prevent it from taking place. Specifically, the Committee's Co-Chair Margaret Meagher admitted under oath that she was aware that TIAA-CREF was actively cross-selling various products to the Plans' participants including life insurance, IRAs, and wealth management services. *See* ¶88. NYU's corporate designee, Mark Petti, also admitted under oath that NYU was aware of TIAA's practices in this regard. *See* ¶89. Despite knowing that this practice was ongoing, the NYU Defendants did nothing to put in place safeguards which would prevent such practice from occurring or otherwise quantify the value that was being conferred to TIAA in being allowed to use this information for its own commercial gain.

315.   The NYU Defendants failed to prevent TIAA from using the Plans' participant account information to enable TIAA to employ highly-targeted marketing and cross-selling efforts directed at the Plans' participants. In doing so, the NYU Defendants enabled TIAA to exploit its position as recordkeeper. By permitting TIAA to utilize valuable information about the Plans' participants— information and data which the NYU Defendants should have been protected as Plan assets—and to use that information to market and sell lucrative financial products to the Plans' participants outside of their investments already in the

129

Plans, the NYU Defendants caused the Plans to engage in transactions that the NYU Defendants knew or should have known constituted an exchange of property between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the NYU Defendants permitted TIAA to harvest information from the Plans' records for purposes other than to provide recordkeeping services to the Plans or used the Plans' participant information to sell outside retirement products and wealth management services to the Plans' participants.

316.  Under 29 U.S.C. §1109(a), the NYU Defendants are liable to restore all losses to the Plans, including the value of benefits received by TIAA resulting from these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

317.  Each NYU Defendant knowingly participated in the breach of the other NYU Defendants, knowing that such acts were a breach, enabled the other NYU Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other NYU Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each NYU Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT X

**Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)**

**Cammack's Fiduciary Breaches as the Plans' Investment Adviser**

318.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

319.    Cammack has served as the Plans' investment consultant since 2009. In this capacity Cammack serves as a co-fiduciary with respect to the investment advice it renders regarding the Plans. Among numerous investment advisory services that Cammack is contracted to perform, Cammack is responsible for advising the Plans on investment options.

320.    Cammack provided consistently flawed investment advice that improperly supported the retention of numerous funds in the Plans despite their high-cost and poor performance.

321.    The combined size of the Plans, which is currently over $5 billion, enables the Plans to obtain far lower fees for investment management and administrative expenses than small plans and retail investors can obtain. It is well known in the industry and to Cammack that Morningstar weighted average expense benchmarks are based on mostly retail funds and those used in small plans. Cammack nonetheless used Morningstar weighted averages to benchmark the fees of the Plans' investment options. Cammack's own corporate representative, Vice President Jan Rezler, even admitted that this benchmark was inappropriate for use with the Plans because of their enormous size. *See* ¶110.

322.    The NYU Defendants selected and retained as Plan investment options mutual funds and insurance company variable annuities with excessive expenses when compared to proper benchmarks and poor performance relative to much lower-cost investment options that were readily available to the Plans.

323.    Many of these options included unnecessary layers of fees that provided illusory benefits to participants but significant benefits to TIAA-CREF and Vanguard, including marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

324.    By using what it admits is an improper benchmark, Cammack masked the excessive fees of funds in the Plans. Cammack also failed to consider advising or recommending investments in funds which were not TIAA or Vanguard, the proprietary funds of the recordkeepers, despite recommending non-TIAA or Vanguard funds to other plans and clients. All of the Plans' options were proprietary to the Plans' recordkeepers, TIAA and Vanguard. These funds were tainted by the recordkeepers' financial interest in including these funds in the Plans, which Cammack failed to consider in making recommendations to the Committee.

325.    In so doing, Cammack failed to make investment recommendations based solely on the merits of the investment funds and what was in the interest of participants. Cammack therefore failed to discharge its duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and

defraying reasonable expenses of administering the Plans. This was a breach of fiduciary duties.

326. Cammack failed to engage in a prudent process for monitoring and recommending the removal of the Plans' investment options. This resulted in the Plans continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plans, while being compared to inappropriate benchmarks.

327. Cammack also accepted the "lockup" arrangement whereby TIAA required inclusion and retention of the CREF Stock Account and TIAA Money Market fund along with itself as recordkeeper. This acceptance resulted in Cammack never seriously addressing the prudence of the CREF Stock Account, its fees, or the removal of TIAA as recordkeeper.

328. <u>CREF Stock Account and TIAA Real Estate Account</u>: Based on the lack of prudent investment advice of Cammack, the NYU Defendants retained the CREF Stock Account and TIAA Real Estate Account despite their excessive costs and historical underperformance. When it was first hired as a consultant in 2009, and continuing thereafter, Cammack failed to conduct the necessary comprehensive analysis of the historical performance for either of these funds. Cammack also failed to advise that a "lockup" arrangement with the CREF Stock Account being required to be in the Plans regardless of performance is inherently an imprudent arrangement.

329.   Cammack also failed to recommend removal of the TIAA Real Estate Account despite its long historical record of underperformance, its lack of even a benchmark for years, its outlier structure and illiquidity, its requirement to hold up to 20% of assets in low-yielding cash, and its cash drag.

330.   Had Cammack conducted a prudent investment review process of these funds when it was first engaged as the Plans' consultant in 2009 (or on an ongoing basis thereafter) it would have concluded that these options were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans, and would have recommended them for removal from the Plans.

331.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

332.   Cammack is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT XI

### Breach of Fiduciary Duties—29 U.S.C. §1105(a)

### Cammack's Co-Fiduciary Breaches

333.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

334.   Cammack, as an advisor and fiduciary to the Plans, knowingly participated in and enabled the NYU Defendants to commit the breaches set forth in Counts I, III, V, VII, and VIII by providing imprudent investment advice regarding: the retention of the CREF Stock and Real Estate Accounts, the payment of excessive recordkeeping and administrative fees, TIAA's use of confidential participant account information to cross-sell products and services for its own benefit, the continued use of higher-cost retail share classes, and in failing to ever consider recommending removal of TIAA as recordkeeper.

335.   Cammack consistently provided imprudent investment advice relying on what even Cammack conceded was a wholly inappropriate Morningstar fee average comprised mostly of retail funds to evaluate fees of investment options for a plan the size of NYU's. The use of this improper benchmark masked the unreasonable fees of the Plans' funds.

336.   Cammack also failed to consider funds other than those offered by TIAA and Vanguard, failed to recommend that the NYU Defendants negotiate for recordkeeping services on a flat per participant basis, and failed to monitor all sources of income and benefits received by the Plans' recordkeepers, including float, securities lending, and the benefits TIAA received through the use of participant information to cross-sell its products and services. Cammack also enabled the breaches of the NYU Defendants by failing to conduct a prudent and thorough investment review process for either the CREF Stock or TIAA Real Estate Accounts and imprudently supported the retention of these investment options by, among

other things, relying on an improper benchmark for their fees. Cammack's co-fiduciary breaches caused millions of dollars of losses to the Plans.

337.   Cammack participated in the breaches of the other NYU Defendants set forth in Counts I, III, V, VII, and VIII, knowing that such acts were a breach, enabled the other NYU Defendants to commit these breaches by failing to lawfully discharge its own fiduciary duties, knew of the breaches by the other NYU Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Thus, Cammack is liable for the losses caused by the breaches set forth in Counts I, III, V, VII, and VIII, of its co-fiduciaries under 29 U.S.C. §1105(a).

338.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

339.   Cammack is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count, and in Counts I, III, V, VII, and VIII, and is subject to other equitable or remedial relief as appropriate.

## COUNT XII

### Principal-Agent Liability For Fiduciary Breach

340.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

341.   This Count alleges breach of fiduciary duty against the NYU School of Medicine.

342. NYU School of Medicine is listed as the Medical Plan's Plan Administrator on the federally required publicly filed form 5500 disclosures.

343. The fiduciary breach of the Retirement Plan Committee members who were employed by the NYU School of Medicine were also the actions of the agents of NYU School of Medicine and NYU School of Medicine is liable to the Plans as principal under the doctrine of respondeat superior.

344. NYU School of Medicine had the responsibility to control and manage the operation and administration of the Plans, including the selection of service providers for the Plans, with all powers necessary to enable them to properly carry out such responsibilities.

345. As principal to their employees on the Retirement Plan Committee, the NYU School of Medicine also has a duty to monitor these employees to make sure they are complying with their duties.

346. The NYU School of Medicine delegated certain of its fiduciary responsibilities to the Retirement Plan Committee and its members, including responsibility for some administrative matters, and some responsibility for evaluating, selecting, and monitoring the Plans' investment options, and retained some responsibility.

347. NYU, including the NYU School of Medicine breached its monitoring duties by, among other things:

    a. Failing to monitor the Retirement Plan Committee and its members, including the individual Defendants who are members of the

Retirement Plan Committee, to evaluate their performance on a regular basis; to have a system or procedure in place for doing so; to have rules or procedures in place prohibiting Retirement Plan Committee members from carrying out biased behavior favoring a recordkeeping to retain their business; to assure that Retirement Plan Committee members had the most basic knowledge of financial terms and industry practices and the knowledge to carry out their fiduciary obligations, as seen by the lack of these set forth in ¶¶127 and 129; and standing idly by as the Plans suffered enormous losses as a result of its delegates' imprudent actions and omissions with respect to the Plans;

b.      Failing to monitor the fiduciary process of the Retirement Plan Committee, including the individual Defendants who are members of the Retirement Plan Committee, which would have alerted any prudent monitoring fiduciary to the potential breach because of the grossly excessive administrative and investment management fees and consistent underperforming Plan investments in violation of ERISA;

c.      Failing to ensure that the Retirement Plan Committee and its members, including the individual Defendants who are members of the Retirement Plan Committee, had a prudent process in place for evaluating the Plans' administrative fees ensuring that the fees were competitive, conducting an untainted RFPs every three years, identifying and determining the amount of all sources of compensation to the Plans' recordkeepers,

138

including income from float and securities lending and other benefits, determining the amount of any revenue sharing payments, preventing the recordkeepers from receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same, and implanting a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plans;

d.      Failing to ensure that the Retirement Plan Committee and its individual members, including the individual Defendants who are members of the Retirement Plan Committee, considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plans' investments; and failing to ensure that the Committee and its members implement an "open architecture" platform that would enable a "best in class" lineup;

e.      Failing to ensure that the Retirement Plan Committee and its individual members, including the individual Defendants who are members of the Retirement Plan Committee, act in the exclusive best interests of the Plans' participants by putting in place any safeguards to protect valuable and confidential participant account information and preventing this information, which is a plan asset, from being misused by TIAA to target Plan participants with TIAA's financial products, including life insurance, 529 plans, IRAs, annuities and wealth management services;

f.      Failed to ensure that the Retirement Plan Committee and its individual members, including individual Defendants who are members of the Retirement Plan Committee, determine, quantify, and consider the value of marketing and selling TIAA products using valuable Plan participant account information;

g.      Failed to ensure that the Retirement Plan Committee and its individual members, including individual Defendants who are members of the Retirement Plan Committee, have the requisite background, training, and experience, including knowledge of very basic financial terms and practices (*see* ¶¶127–29), that would enable them to fulfill their duties as fiduciaries to the Plans;

h.      Failing to ensure that the Retirement Plan Committee and its individual members, including individual Defendants who are members of the Retirement Plan Committee, used the much lower-cost, institutional share classes in the Plans rather than the higher-cost retail funds which are inappropriate for plans the size of NYU's;

i.      Failing to ensure that the Retirement Plan Committee and its individual members, including individual Defendants who are members of the Retirement Plan Committee, independently scrutinized whether Cammack's due diligence advice and recommendations were appropriate and prudent;

j.      Failing to remove members of the Retirement Plan Committee,

including individually named Defendants who are or were members of the
Retirement Plan Committee, whose performance was inadequate in that they
lacked basic knowledge needed for fiduciaries of defined contribution
retirement plans (*see* ¶¶127–29) and continued to maintain imprudent,
excessively costly, and poorly performing investments, all to the detriment of
Plan participants' retirement savings.

348.   Had NYU School of Medicine discharged its fiduciary monitoring
duties prudently as described above, the Plans would not have suffered these losses.
Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the
Plans, the Plaintiffs, and the other Class members, lost tens of millions of dollars of
retirement savings.

## JURY TRIAL DEMANDED

349.   Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States,
Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plans and all similarly
situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendants have breached its fiduciary duties
  as described above;

- Find and adjudge that Defendants are personally liable to make good
  to the Plans all losses to the Plans resulting from each breach of
  fiduciary duty, and to otherwise restore the Plans to the position they
  would have occupied but for the breaches of fiduciary duty;

141

- Determine the method by which losses to the Plans under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to cease allowing TIAA to use its position as recordkeeper to market and sell products and wealth management services;

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);

- Order Defendants to disgorge all benefits TIAA received from excessive fees and from marketing TIAA's IRA products and wealth management services, to compensate Plaintiffs for such benefits that Defendants allowed TIAA to obtain;

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- Reform the Plans to include only prudent investments;

- Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- Require the fiduciaries to select investments and service providers based solely on the merits of those selections, and not because it is a

requirement in order to offer some different investment product or to
use the provider;

- Certify the Class, appoint each of the Plaintiffs as a class
  representative, and appoint Schlichter, Bogard & Denton LLP as
  Class Counsel;

- Award to the Plaintiffs and the Class their attorney's fees and costs
  under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems
  appropriate.

January 10, 2017                      Respectfully submitted,
                                      /s/ Andrew D. Schlichter
                                      SCHLICHTER, BOGARD & DENTON LLP
                                      Andrew D. Schlichter, Bar No. 4403267
                                      Jerome J. Schlichter*
                                      Stephen M. Hoeplinger*
                                      James Redd, IV*
                                      Ethan D. Hatch*
                                      100 South Fourth Street, Suite 1200
                                      St. Louis, Missouri 63102
                                      Phone: (314) 621-6115, Fax: (314) 621-5934
                                      aschlichter@uselaws.com
                                      jschlichter@uselaws.com
                                      shoeplinger@uselaws.com
                                      jredd@uselaws.com
                                      ehatch@uselaws.com
                                      *Admitted *Pro Hac Vice*